Manuel GARZA, Jr., TDCJ No. 999434, Petitioner,

v.

Rick THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

Civil No. SA–09–CA–528–OG.

United States District Court, W.D. Texas, San Antonio Division.

Dec. 18, 2012.

584

Michael Clark Gross, Law Office of Michael C. Gross, San Antonio, TX, for Petitioner.

Ellen Stewart–Klein, Office of the Attorney General, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER

ORLANDO L. GARCIA, District Judge.

Petitioner Manuel Garza, Jr., filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his October, 2002 Bexar County conviction for capital murder and sentence of death. For the reasons set forth hereinafter, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Background

### A. The Offense in Petitioner's Own Words

There is no legitimate doubt as to the events of February 2, 2001 that resulted in the death of San Antonio Police Officer John "Rocky" Riojas. Within hours of his arrest on February 4, 2001, petitioner gave a voluntary, written statement in which he gave two, slightly different, accounts of how he fatally shot officer Riojas while violently resisting an otherwise lawful arrest on outstanding warrants.[1]

Two days later, on February 6, 2001, petitioner gave a second written statement concerning his fatal shooting of officer Riojas.[2] In this second statement, in addition to furnishing additional background infor-

---

1. Petitioner's first written confession was admitted into evidence during petitioner's capital murder trial as State Exhibit no. 173. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 27, testimony of Thomas Matjeka, at p. 94. A copy of State Exhibit 173 appears in S.F. Trial, Volume 35. Petitioner's first written confession was read into the record in open court. *Id.*, at pp. 97–102.

 In pertinent part, petitioner's first written statement provides as follows:

 I knew the cop was gonna [sic] arrest me for the warrants. The cop told me to get on the car, like spread 'em, but I ran. I ran towards the back of the apartments but I got tired quick. The cop was yelling for me to stop but I didn't stop. I didn't want to go to jail because I had the warrants. When I got to the back of the apartments the cop was still yelling at me to stop and I stopped running. I got the cop in a hug, I wrapped both my arms around him and I started wrestling with him. We both fell down and the cop started grabbing my neck from behind. I couldn't breath [sic] and then the cop let go of me for a little bit and then he tried to grab his gun out. I was face down on the ground and the cop was holding me down trying to arrest me. I wasn't going to go to jail. When the cop tried to get his gun out he was behind me still grabbing onto me with one hand pushing me down into the ground and he was reaching for his gun with the other hand. I was still trying to get away because I didn't want to go to jail. I twisted around while I was under the cop and I was able to face him and I saw he had just got his gun out of his holster. I grabbed the cop's hand that was holding the gun and my other hand was holding the cop off me.

 * * *

 He was a big dude. I grabbed the hand that he had the gun in and I was able to twist the gun away from me and it was pointed upwards where it was facing the cop and then the gun went off. I saw blood all over my hand and the cop just fell. I ran. I took the cop's gun with me when I ran and I ran to Tanya's apartment. * * *

 Det. Matjeka told that when I first came in I said something different about shooting. It did happen a little different than what I said. What really happened was we were on our knees by the curb. The officer was behind me and I was still trying to get away and the officer was still trying to get a hold of me. I seen [sic] the officer was taking his gun out of his holster and I twisted and reached and grabbed his gun with my left hand. I got the gun from the officer and I reached around over my right shoulder and I was trying to crawl away and I pointed the gun over my right shoulder and I pulled the trigger. The gun had a hair trigger on it and it surprised me when it went off so quick. I only fired one time. The cop went down and he landed on my right side and I got up and took off running. The cop was laying face down and he wasn't moving. The part about going to Tanya's and then going home was true.

 The part about me throwing the gun in the river was a lie too. I don't know why I told you that. I gave the gun to my brother-in-law Ben as soon as I got home last night. I don't know what he did with it.

2. Petitioner's written statement of February 6, 2001 was admitted into evidence at petitioner's capital murder trial as State Exhibit no. 174. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at p. 112. A copy of State Exhibit no. 174 appears in S.F. Trial, Volume 35. Petitioner's second written statement was read in its entirety before the jury in open court. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp. 112–19.

mation, petitioner gave a third, more elaborate, account of his fatal shooting of officer Riojas which, in pertinent part, states as follows:

> After I called Gilbert, I was walking back to the apartments and I seen the cop. The cop was in a marked car but without the lights. The car had the San Antonio Police Department markings on it so I knew he was a cop. I walked across the street and I saw the cop go by and I saw the cop make a U-turn. I knew the cop was gonna stop me because I was wearing all black. I knew the cop was gonna arrest me because I knew I had outstanding warrants. I knew I had an MTR for Escape and some other warrants for Burglary of a Vehicle and warrants for possession of marijuana.

> \* \* \*

> The cop stopped me when he got out of his car about two feet from his car. The cop asked me to come to him and he asked me if I lived there and I told him no. The cop asked me my name and I gave him a fake name of Manuel Garcia. Once I gave him the fake name I seen the cop look towards his car, he was still standing by his door and I thought at that point that the cop was gonna check on me. I knew he'd find out about the warrants and I didn't want to go to jail so I just ran. Right before I ran the cop told me to put my hands on the car. I knew that that was it and I ran. I never put my hands on the cop's car. I gave the cop the false name so he wouldn't find the warrants. I had my wallet but my wallet had a fake ID in it under another name.

> \* \* \*

> As I started running the cop was telling me to stop. I just wanted to get away. I knew I was gonna go to jail and I didn't want that. Who wants to be in jail? The cop was on my ass chasing me. The cop was close to me the whole time. He only told me to stop once though. I continued to run through the apartments until I got by some mailboxes. I finally stopped running because I was tired. The cop was right there and he grabbed my right hand and he punched me in the mouth. I grabbed the cop in a hug and I put both my arms around him and we started wrestling and we both fell to the ground. When we fell to the ground I was on the bottom and the cop was on top of me. I was on my back and the cop was on top of me his stomach to me. We started rolling around on the ground fighting. I was getting the officer on the ground and the officer was getting me on the ground. I was fighting so hard with the officer that the next day my whole body hurt. I was so sore I couldn't hardly move. I don't recall if we were saying anything or not.

> Finally I seen the officer get his gun out. I was on my back on the ground and the officer was kneeling over me and he had his hand on me holding me down and I saw the officer pulling his gun. When the officer pulled his gun out. I was able to get my hands on his gun. I was able to twist around and the cop fell on his back. I had my hand on his gun and he had his hand on the gun and the gun was out in front of us. I had my left hand on his gun and the cop had his gun in his right hand. I grabbed the cop's right wrist with my right hand and I grabbed the gun in my left hand. I was pulling forward with my left hand and pulling the cops right hand back away from the gun. The cop was trying to hold me down but he was trying to keep his gun too. I had a

better angle and position and I was able to pull the gun out of the cop's hand.

I was able to crawl away a few feet and I got up on my knees. The cop came up behind me and he reached around and he grabbed my arm that had the gun in it. I still had the gun in my left hand and the cop was still trying to get the gun. I wanted to get away and the cop was holding me to where I had to reach over and the gun was pointing his way over my right shoulder and the gun went off as the cop was grabbing it. When I pulled the trigger the cop's body was against mine. When the gun went off I couldn't hear nothing. My face didn't burn but my ear hurted bad in the inside. My ear was ringing so bad that when the guy that took me home was trying to talk to me I couldn't hear him. After I shot the cop fell right down. I only fired one shot. I didn't fall but he did. I got up and I never even looked at the cop. I ran back into the apartments to where I was at before. I think I went to Albert's first but I know I went to Tonya's.

* * *

I want to say to the media and to the officer's family and everybody out there that this wasn't intentional and I truly think this was the cop's fault. I don't see why he wanted to pull out his gun. I want to say to the judge and the jury to please do justice and please have mercy on me and give me the benefit of the doubt. I don't think I should get death or life in prison. I think I deserve something under that. I need a lot of help about how to do life. I wasn't raised right.[3]

### B. Indictment

On April 11, 2001, a Bexar County grand jury indicted petitioner in cause no. 2001–CR–1877 on a single Count of capital murder, to wit, intentionally and knowingly causing the death of officer Riojas by shooting Riojas with a deadly weapon, i.e., a firearm, while Riojas was in the lawful discharge of an official duty and petitioner knew Riojas was a police officer.[4]

### C. Appointment of Defense Counsel

The state trial court appointed attorneys Raymond E. Fuchs and Edward Camara, Jr. as counsel for petitioner.[5] On July 11, 2002, attorney Fuchs filed a motion to withdraw as counsel for petitioner.[6] The state trial court granted said motion.[7] On July 19, 2002, the trial court appointed attorney Vincent D. Callahan as counsel for petitioner.[8]

Petitioner filed both an unsuccessful objection in the trial court and an unsuccessful mandamus action in a state appellate court challenging the ex parte the substitution of attorney Fuchs with attorney Callahan.[9] In re Manuel Garza, 2002 WL 1856712 (Tex.App.-San Antonio, August 14, 2002).

### D. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced October 15, 2002.

---

3. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp. 113–16, 118–19.

4. Transcript of pleadings, motions, and other documents filed in petitioner's trial court proceeding (henceforth "Trial Transcript"), at p. 15.

5. Trial Transcript, at pp. 13–14.

6. Trial Transcript, at pp. 75, 83–84.

7. Trial Transcript, at p. 76.

8. Trial Transcript, at p. 35.

9. Trial Transcript, at pp. 37–76, 81.

## 1. *The Prosecution's Case*

In addition to petitioner's statements excerpted above, the prosecution presented testimony from (1) various law enforcement personnel regarding communications officer Riojas had with other officers immediately before his fatal shooting and the evidence collected following the discovery of officer Riojas' body immediately after the fatal shooting,[10] (2) a pair of civilian eyewitnesses to the fatal shooting,[11] (3) two

10. A San Antonio Police Department employee identified recordings of officer Riojas' communications with the department on the evening of his murder. S.F. Trial, Volume 23, testimony of Lisa Cisneros, at pp. 84–109. Another San Antonio Police Department employee identified the recording of the 9–1–1 call alerting police to officer Riojas' fatal shooting. S.F. trial, Volume 23, testimony of Jesse Pena, at pp. 117–22. One person who placed a 9–1–1 call testified about her and her friend's discovery of officer Riojas' body and their call to the authorities. S.F. Trial, Volume 24, testimony of Alicia Bacon, at pp. 34–45.

Several San Antonio Police Officers and a civilian whom officer Riojas had stopped shortly before the fatal shooting testified that officer Riojas was driving a marked San Antonio Police vehicle and dressed in a San Antonio Police uniform and bulletproof vest at the time of the fatal shooting. S.F. Trial, Volume 23, testimony of George Augustus Jahant, at pp. 50, 82; Volume 23, testimony of Jose Luis Gallardo, at pp. 113–15; Volume 24, testimony of Thelma G. Self, at pp. 64–65; Volume 24, testimony of Jerry Fuller, at pp. 73–76; Volume 25, testimony of Alexander Devora, Jr., at pp. 166–80. Officer Riojas' police Glock was not recovered at the crime scene. S.F. Trial, Volume 24, testimony of Thelma G. Self, at p. 66; Volume 25, testimony of Alexander Devora, Jr., at p. 173; Volume 25, testimony of Kelly Bender, at p. 183.

Several San Antonio Police officers and employees testified extensively regarding their efforts to diagram, photograph, and videotape the crime scene, as well as collect evidence at the crime scene. S.F. Trial, Volume 24, testimony of Marcus Wilhelm Booth, at pp. 80–98 (describing the close proximity of a stand of mail boxes to the location where officer Riojas' body was found); Volume 24, testimony of Treise Shen, at pp. 99–137 (describing various items, including necklaces, a shell casing, a green-handled screwdriver, blood samples, officer Riojas' name plate, and parts of officer Riojas' uniform belt found at the crime scene); Volume 24, testimony of Angela Salvatierra, at pp. 138–57 (describing the recovery of Riojas' uniform and clothing from the hospital following the declaration of Riojas' death); Volume 24, testimony of Tiffany Dillon Lozano, at pp. 162–73 (describing the recovery of blood samples from the crime scene); Volume 25, testimony of Kelly Bender, at pp. 181–187 (describing the recovery of Riojas' holster, radio, flashlight, and magazines).

In addition, the police also recovered petitioner's jacket, a knit cap, and numerous blood stains from an apartment near the crime scene which petitioner visited immediately after the shooting. S.F. Trial, Volume 25, testimony of Treise Shen, at pp. 147–66. A friend of the petitioner's and her boyfriend both identified the jacket and knit cap in question as petitioner's. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 50, 66–68, 99; testimony of Nosario Alvarez, Jr., at pp. 123, 133–34, 137. Ms. Dominguez also identified a silver necklace found at the crime scene at belonging to petitioner. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 70–71.

11. Nathan Henges testified, in pertinent part, (1) he went to the balcony of an apartment to take a smoke and heard voices, including one saying "come here," coming from a neighboring apartment complex, (2) he saw two men standing apart at a distance from his vantage point of about eighty feet, (3) the taller man wore a large jacket and all black clothes, (4) he saw the two men grab each other and begin to wrestle each other, (5) the two went to the ground and were rolling around with both men attempting to mount and dominate the other, (6) he watched the two men wrestling for about thirty seconds, (7) he heard a scream and briefly turned away, (8) when he looked back, he heard a gunshot, (9) he did not see how the gunshot occurred, (10) when he looked back he saw the taller of the two men crouching then stand up, (11) he heard someone say "you bitch," before the taller man ran off, (12) he saw no movement from the other man, who was lying on the ground, (13) the gunshot awakened his girlfriend and

acquaintances of the petitioner regarding petitioner's appearance and conduct immediately after the fatal shooting,[12] (4) the medical examiner who performed the autopsy on Riojas' body,[13] (5) petitioner's brother-in-law and sister regarding petitioner's disposition of the murder weapon and petitioner's behavior and statements in the days after the murder,[14] (6) a forensic

they both called 9–1–1, (14) he identified the suspect as Hispanic, wearing a maroon jacket and dark or black pants, (15) people were congregating near officer Riojas' body within a minute of the shooting, and (16) he went downstairs and gave police a statement when they arrived at the scene. S.F. trial, Volume 23, testimony of Nathan Maxwell Henges, at pp. 124–48, 167–80, 188. Significantly, Henges testified that it appeared to him the taller man in the maroon jacket was the aggressor during the fight and he never saw either man throw any punches at the other. *Id.*, at pp. 173, 179, 182, 188.

Erica Henderson testified, in pertinent part, that (1) she observed officer Riojas' marked vehicle as she drove into the apartment complex, (2) the police vehicle was parked at an angle with the driver's door open, (3) as she drove around the complex, she observed a San Antonio Police Officer and a suspect both on their knees struggling side by side, (4) the officer was attempting to get the suspect in a headlock, (5) the suspect had a gun in his left hand, (6) both men appeared to be struggling for the gun—with the officer attempting to get it away from the suspect, (7) the suspect appeared to be attempting to keep the gun away from the officer, (8) the suspect raised the gun up over his right shoulder and ducked his head, (9) she then heard and saw the shot, (10) the officer's hands were nowhere near the gun when the shot was fired, (11) after the shot, she saw the officer fall and the suspect got up, (12) the suspect briefly looked at the officer, put the gun in his pants, and then ran off, and (13) she called 9–1–1 after backing up her car to see which way the suspect ran. S.F. Trial, Volume 23, testimony of Erica Henderson, at pp. 198–215, 221–36, 238–40. Like Henges, Ms. Henderson saw neither of the two men throw any punches. *Id.*, at p. 233.

12. Tanya Dominguez testified, in pertinent part, that petitioner pounded on her apartment door, barged in when the door was opened, appeared to be frazzled and upset, said loudly he had been in a fight, went to the restroom, washed his hands, got the dry heaves, and asked her boyfriend for a ride

home. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 50–58.

Nosario Alvarez, Jr., testified, in pertinent part, that (1) he had seen petitioner pacing outside the apartment when he arrived at Tanya Dominguez's apartment complex that evening, (2) when petitioner entered Ms. Dominguez's apartment later, petitioner was breathing hard and appeared to have been in a struggle, (3) petitioner was briefly in the restroom, (4) petitioner said he had been in a fight and had scratch marks or wounds on his face and neck, (5) petitioner appeared very nervous and talked very fast, (6) petitioner asked for a ride home, and (7) as they drove away they saw a squad car in front of the apartment complex and petitioner crouched down. S.F. Trial, Volume 25, testimony of Nosario Alvarez, Jr., at pp. 117–27.

13. The medical examiner who performed the autopsy on Riojas' body testified without contradiction that (1) Riojas died as a result of a single, very close range, gun shot wound to the head which moved front to back, upward, and left to right, (2) Riojas had bruises and abrasions on his arms and knuckles, (3) the bullet that struck Riojas' head fragmented upon impact with the skull with a portion of the bullet entering Riojas' skull and traveling across the top of the brain before exiting the skull on the right side of the head, causing lacerations, bruising, and hemorrhage, (4) the entrance wound displayed fractures radiating out across the skull, (5) examination of the top of the skull revealed a furrow in the brain with attendant bleeding and bruising, (6) a portion of the fatal bullet was recovered in the right parietal area above the right ear, (7) the gun which fired the fatal shot was one to two inches from Riojas' head when fired, and (8) Riojas had abrasions on his hands and contusions on his left knee, right elbow, upper right thigh. S.F. Trial, Volume 25, testimony of Randall Frost, at pp. 17–29, 36.

14. Petitioner's brother-in-law testified, in pertinent part, that (1) petitioner arrived at their apartment between 10:00 and 10:15 p.m. on February 2, 2001, (2) petitioner rang the doorbell several times and appeared pan-

serologist regarding the presence of DNA consistent with Riojas on petitioner's clothing and a necklace found at the crime scene,[15] (7) a firearms examiner regarding the safeties and trigger pull on Riojas' Glock police pistol,[16] (8) the San Antonio

icked, (3) petitioner's face had several scratches and was a little bit bloody, (4) petitioner explained that he had been jumped on the west side at a party, during the fight a gun fell out of the waistband of the person who jumped petitioner, and petitioner picked it up, (5) the petitioner pointed the gun at "them" and got away, (6) petitioner had a lump on his head, a busted lip, and cuts on his face, neck, arms, and ear, (7) petitioner changed clothes and left their apartment about forty-five minutes later, and (8) petitioner returned the next day around ten-to-eleven a.m. and said he needed money to wash his clothes. S.F. Trial, Volume 26, testimony of Ben David Parovel, at pp. 5–19, 39–41, 50. Parovel also testified he noticed the SAPD serial number on the side of the gun petitioner gave him, wiped the gun down, and threw it away in a dumpster after counting the bullets and determining one bullet was missing. *Id.*, at pp. 22–25, 42–43. The day after the shooting, Parovel confronted the petitioner about Riojas' murder and petitioner replied that "some fat dude from the west dude" had shot Riojas. *Id.*, at pp. 26–27, 51–52. Parovel retrieved the gun from the dumpster, unsuccessfully attempted to sell it, and then returned it to the dumpster. *Id.*, at pp. 29–31.

Petitioner's sister testified (1) she was asleep when petitioner arrived late at her apartment on February 2, 2001, (2) petitioner knocked and rang the doorbell, (3) all she heard was that petitioner had been jumped at a party on the west side and had been in a fight, (4) petitioner was upset, used the bathroom, got a change of clothes, and left, (5) she did not hear any discussion regarding a gun, (6) while petitioner was in the bathroom, she heard a news story about the shooting of Riojas, (7) when she told petitioner about the story, petitioner said nothing, (8) petitioner appeared to be acting normal when he left, (9) she did not see petitioner when she awoke the next morning (Saturday), (10) when she returned home from running errands Saturday, Parovel told her about the gun, (11) she saw a news story on Saturday night about Riojas' shooting and recognized a jacket and a silver necklace shown in the televised story as belonging to petitioner, (12) when petition-

er returned to her apartment Saturday night, petitioner asked Parovel about the gun, (13) when Parovel said he had gotten rid of the gun, petitioner said "good, good," (14) petitioner left shortly thereafter but returned shortly before police arrived, (15) the police arrested petitioner, and (16) petitioner told her he had gone to a party on the west side and a group of guys tried to jump him. S.F. Trial, Volume 26, testimony of Corinna Garza, at pp. 56–96.

15. A forensic serologist employed at the Bexar County Criminal Investigation Laboratory testified Riojas could not be excluded as a possible source of the blood found on (1) the black leather jacket and knit cap petitioner left at Tanya Dominguez's apartment, (2) a sliver necklace found near a pool of blood at the crime scene, and (3) a blue towel found at Tanya Dominguez's apartment. S.F. Trial, Volume 26, testimony of Erin Reat, at pp. 171–92.

16. A firearms examiner for the Bexar County Crime Lab testified in pertinent part that (1) Riojas' Glock contained three safeties, all of which were operating properly, (2) normal trigger pull for a Glock is five and one-half pounds, (3) Riojas' Glock's trigger pull was between eight and eight and one-half pounds, consistent with San Antonio Police Department policy, (4) because the bullet fragment recovered from Riojas' body weighed only 92.7 grams instead of the expected 155 grams and was damaged, he was unable to definitively determine whether the bullet recovered from Riojas' body had been fired from Riojas' Glock, and (5) he was able to determine that the cartridge or shell casing found at the crime scene had been fired by Riojas' Glock. S.F. Trial, Volume 27, testimony of Edward William Love, at pp. 6–33.

A pair of San Antonio Police Officers testified regarding the recovery of officer Riojas' Glock pistol from a dumpster at the apartment complex where petitioner's sister Corinna lived with Ben Parovel. S.F. Trial, Volume 26, testimony of Barney Darrell Whitson, at pp. 97–104; Volume 26, testimony of Michelle Morock, at pp. 121–28.

Police Detective who took petitioner's written statements,[17] (9) a pair of San Antonio Police Officers who witnessed petitioner make post-arrest threats against other officers.[18]

### 2. The Defense's Case

The defense called (1) a civilian employee of the San Antonio Police Department who testified, at the time petitioner executed his first written statement, the petitioner said his shooting of Riojas had been accidental,[19] (2) a trace evidence analyst regarding the absence of gunshot residue on petitioner's jacket/trench coat,[20] (3) an acquaintance of petitioner who saw peti-

---

17. San Antonio Police Detective Thomas Matjeka testified, in pertinent part, that (1) he observed two necklaces, Riojas' name plate, and a shell casing at the crime scene in close proximity to where Riojas' body had been located prior to its transfer to the hospital, (2) a green-handled screwdriver was found on a wall near Riojas' vehicle, which was found with the driver's door open and the engine running, (3) when he and other officers went to the apartment of Corinna Garza and Ben Parovel to arrest petitioner, petitioner refused to respond to officers' demands that petitioner show himself until petitioner's sister called out to petitioner, at which time petitioner walked out nonchalantly with a smile on his face and was informed he was being arrested for outstanding misdemeanor warrants; (4) petitioner was given his *Miranda* warnings before being questioned and prior to petitioner giving and executing both of petitioner's written statements concerning Riojas' murder, (5) during petitioner's initial interview, petitioner was laughing and joking and petitioner asked about Riojas' murder without any prompting or questioning by police, (6) petitioner's neck was bruised and discolored and petitioner had injuries to his chest, shoulder, lips inside his mouth, neck, and fingers, (7) no promises or threats were made to induce either of petitioner's written statements to police, (8) initially, petitioner said he threw the gun he used to shoot Riojas into the river but later corrected that statement when informed by police they knew the weapon was in Ben Parovel's possession, (9) petitioner was permitted to visit with Parovel at the police headquarters, (10) during his second interview, petitioner indicated he wanted to change the statement "I pulled the trigger" to "the gun went off," (11) at the start of his first interview, petitioner indicated the gun had gone off accidentally, (12) during his second interview, petitioner stated for the first time that Riojas had punched petitioner in the mouth, whereas in his first interview, petitioner said he turned around and grabbed Riojas, (13) when describing the posture he assumed when he stopped running from Riojas, petitioner demonstrated a "bladed stance," which Matjeka described as a position in which someone is about to strike or attack, (14) when Matjeka informed petitioner that he knew petitioner had killed Riojas, petitioner's demeanor became cocky and petitioner said "prove it!", (15) petitioner said his whole body hurt the day after his confrontation with Riojas, (16) petitioner never indicated he ever surrendered or attempted to surrender to Riojas, and (17) petitioner never claimed Riojas had ever pointed his weapon at petitioner. S.F. Trial, Volume 27, testimony of Thomas Matjeka, at pp. 35–193.

18. San Antonio Police Officer testified that, while being escorted to a holding cell, shortly after arrest, petitioner displayed a cocky demeanor, smirked at officers. and announced "y'all are lucky I didn't get y'all fucking asses, too." S.F. Trial, Volume 27, testimony of Joel Contreras, at pp. 201–03.

Another officer testified petitioner stared at him in an apparent attempt to intimidate the officer and then announced "you're lucky I didn't kill your bitch ass." S.F. Trial, Volume 27, testimony of Nathan Preston, at pp. 206–08.

19. S.F. Trial, Volume 28, testimony of Jesusita Perez, at p. 41. Ms. Perez also testified petitioner's demeanor throughout the time she witnessed petitioner's execution of his statement on February 4, 2001 was remorseless, kind of cocky, or otherwise emotionless. *Id.*, at p. 44.

20. S.F. Trial, Volume 28, testimony of Michael Martinez, at pp. 45–67. Mr. Martinez also testified (1) he found no gun shot residue on wipes of Riojas' left hand but did find a single particle on Riojas' right hand, (2) environmental factors can influence the presence of gun shot residue on objects, (3) petitioner's black jacket/trench coat did not appear to

tioner the evening of the fatal shooting,[21] (4) a second trace evidence analyst regarding the presence of gunshot residue on Riojas' clothing,[22] (5) a friend of petitioner who was stopped by officer Riojas days before the fatal shooting and asked about petitioner's whereabouts,[23] (6) a friend of petitioner who witnessed the beginning of the confrontation between petitioner and officer Riojas (but not the fatal shooting)

and who had also been questioned by Riojas in the days before the fatal shooting regarding petitioner's whereabouts,[24] and (7) a former BCADC inmate who once overheard petitioner screaming "help me, help me," while both were in custody.[25]

### 3. The Verdict

On October 24, 2002, after deliberating less than three hours, petitioner's jury returned its verdict, finding petitioner guilty

---

have gunshot residue on the sleeves or upper chest, and (4) the back of petitioner's jacket was not tested for gun shot residue. *Id.*

21. Brandy Williams testified, in pertinent part, that (1) she, Gilbert Vigil and another person had plans to get together with petitioner on the evening of February 2, 2001 to go to the movies but petitioner did not arrive at her place until between 10:00 and 10:30 p.m., (2) earlier in the evening, Gilbert Vigil went to pick up petitioner at an apartment off Fredericksburg Road but returned without petitioner, (3) when petitioner did finally arrive at her place, petitioner looked like he had been in a fight, but was otherwise normal except that petitioner was quieter than normal, and (4) after they all watched television, Bryce Bavel took petitioner someplace. S.F. Trial, Volume 28, testimony of Brandy Williams, at pp. 68–78.

22. A trace evidence analyst testified he found gun shot residue on the collar of Riojas' uniform shirt, indicating the collar was in close proximity to a gun being fired. S.F. Trial, Volume 28, testimony of James D. Garcia, at pp. 84–94, 102.

23. Anna Ortega testified, in pertinent part, that (1) she was a long time friend of petitioner and (2) she was stopped by officer Riojas in late-January or early-February, 2001 on the access road near the apartment complex of petitioner's sister while giving a ride to another of petitioner's friends, Gilbert Vigil. S.F. Trial, Volume 29, testimony of Anna Terry Ortega, at pp. 11, 27–31.

24. Jamie Martinez testified (1) her family and petitioner's families knew each other, (2) on February 2, 2001, she and Gilbert Vigil drove to an apartment complex off Fredericksburg Road to pick up petitioner, (3) when they

entered the complex, they saw a cop in a car talking with someone near the front of the complex, (4) the cop got out of his car and Vigil was about to park the vehicle in which they were driving when they saw the cop grab petitioner and put petitioner up against the police vehicle, (5) the cop was trying to put handcuffs on petitioner but petitioner kept turning around, (6) the cop was pushing petitioner, (7) they drove past slowly, (8) she looked back and didn't see petitioner or the cop, (9) when she looked again, she saw petitioner run and the cop chase after petitioner, and (10) she recognized Riojas as the cop because, a few days prior to that date, Riojas had pulled over a vehicle in which she and Gilbert Vigil were riding and questioned them about petitioner's whereabouts. S.F. Trial, Volume 29, testimony of Jamie Martinez, at pp. 36–48.

On cross-examination, Ms. Martinez admitted she had given police a statement in which she (1) failed to mention she ever saw Riojas push petitioner, (2) failed to mention she had been a passenger in a vehicle stopped by officer Riojas, (3) admitted she recognized Riojas as a police officer on February 2, 2001 by his uniform, and (4) told police she saw Riojas talking with petitioner for a minute before the two men began their confrontation. *Id.*, at pp. 49–61. Ms. Martinez also admitted she saw petitioner the day after the fatal shooting and the petitioner was acting normally. *Id.*, at pp. 86–87.

25. Mark Trevino testified (1) he was housed in the Bexar County Adult Detention Center near petitioner in February, 2001, (2) on one occasion, he heard petitioner screaming "help me, help me" and (3) he believed the petitioner was crazy. S.F. Trial, Volume 29, testimony of Mark Trevino, at pp. 96–101.

beyond a reasonable doubt of capital murder.[26]

### E. *Punishment Phase of Trial*

The punishment phase of petitioner's capital murder trial commenced on October 25, 2002.

#### 1. *The Prosecution's Evidence*

The prosecution presented police officers and lay witnesses who testified regarding a wide variety of crimes committed by petitioner, both as a juvenile and adult, including (1) the February 20, 1995 attempted burglary of an apartment,[27] (2) the April 2, 1995 theft of a motor vehicle and an ensuring vehicle chase,[28] (3) the May 6, 1995 attempted burglary of a vehicle,[29] (4) the October 19, 1995 theft of a motor vehicle,[30] (5) the November 9, 1995 burglary of a habitation,[31] (6) the November 18, 1995 theft of a motor vehicle,[32] (7)

---

**26.** Trial Transcript, at p. 213; S.F. Trial, Volume 30, at pp. 72–73.

**27.** An apartment resident returning home observed two young men attempting to break into a rear window of her apartment, drove to a neighbor's apartment, and called police. S.F. Trial Volume 32, testimony of Danielle Whitfield, at pp. 8–12. Police arrived, searched the location, arrested one of the two suspects, and collected fingerprints. S.F. Trial, Volume 32, testimony of Mike P. Carrillo, at pp. 12–14; testimony of Monty Fox, at pp. 15–18. Fingerprints found at the scene matched those of petitioner. S.F. Trial, Volume 32, testimony of Melvin Lleras, at p. 158.

**28.** A Cadillac owner reported his vehicle stolen from his driveway and, when police spotted the vehicle, petitioner led officers on a high speed chase, during which the occupants of the stolen Cadillac drove erratically and ran multiple stop signs. S.F. Trial, Volume 32, testimony of T.J. Barnes, at pp. 18–21; testimony of Chris Meehan, at pp. 21–28. Another stolen vehicle, a Chevy Cavalier, was found parked at the location from which the Cadillac was stolen. S.F. Trial, Volume 32, testimony of Chris Meehan, at pp. 22–23. Fingerprints lifted off the Cadillac matched petitioner's. S.F. Trial, Volume 32, testimony of Chris Meehan, at pp. 25, 27; testimony of Melvin Lleras, at pp. 158–59.

**29.** The owner of a vehicle leaving early for work that morning found petitioner had broken out a window of her car, had moved her car, and was attempting to drive away in the vehicle. S.F. Trial, Volume 31, testimony of Linda Dettloff, at pp. 33–35. When the owner threatened to let her dog loose on him, petitioner fled the scene on foot and was arrested two blocks away by police after a brief chase. S.F. Trial, Volume 31, testimony

of Linda Dettloff, at pp. 33–38; testimony of Scott Schmitz, at pp. 42–47. A fingerprint found on the vehicle petitioner attempted to steal matched petitioner's. S.F. Trial, Volume 31, testimony of Kevin Potz, at pp. 49–51; Volume 32, testimony of Vernon Ginn, at pp. 214–15.

**30.** A Cadillac was stolen from the residence of its owner that date, abandoned, and recovered by police later that same date with the rear window and steering column broken. S.F. Trial, Volume 31, testimony of Abel Palacios, at pp. 88–90; testimony of Robert McCaskill, at pp. 94–98. Fingerprints found on the interior of the vehicle matched those of petitioner. S.F. Trial, Volume 31, testimony of Robert McCaskill, at p. 96; Volume 32, testimony of Vernon Ginn, at p. 215.

**31.** When a child care worker notified police that she had observed a pair of young men (petitioner and a black male) attempting to burglarize a home across the street from where she was working, police arrived at the scene and chased the burglars. S.F. Trial, Volume 32, testimony of Sabrina Broz, at pp. 40–44; testimony of Charles Jackson, at pp. 45–50; testimony of Jeff Crab, at pp. 50–54. Police arrested petitioner about two blocks away in possession of a screwdriver and a checkbook belonging to the owners of the burglarized residence. S.F. Trial, Volume 32, testimony of Charles Jackson, at pp. 47–48; testimony of Jeff Crab, at pp. 52–53, testimony of Mercial White, at pp. 55–57. Fingerprints found inside the residence matched petitioner's. S.F. Trial, Volume 32, testimony of Jeff Crab, at p. 53; testimony of Melvin Lleras, at pp. 157–58.

**32.** A San Antonio Police Officer observed petitioner and another youth pushing an appar-

the February 21, 1996 theft of a motor vehicle,[33] (8) the February 29, 1996 burglary of a habitation,[34] (9) the October 10, 1997 arrest of petitioner on a youth commission warrant, at which time petitioner was found on school property in the possession of three knives and a screwdriver,[35] (10) the October 20, 1997 search of petitioner's bedroom at his uncle and aunt's home during which search police found a wealth of stolen property and a Glock pistol and two loaded magazines,[36] (11) petitioner's December 24, 1997 escape from a juvenile halfway house,[37] (12) petitioner's December 29, 1997 theft and burglary of a motor vehicle,[38] (13) petitioner's December 31, 1997 to January 1, 1998 theft of a motor vehicle and the ensuing high speed chase and crash of the stolen vehicle,[39] (14)

---

ently broken vehicle along the side of a road, stopped to investigate, determined the vehicle was stolen, and arrested both youths. S.F. Trial, Volume 32, testimony of Phillip Wang, at pp. 29–32. The vehicle in question was later linked to a burglary and marijuana was found in petitioner's pants pocket at the time of his arrest. *Id.*, at pp. 31–32.

33. The owner of an Oldsmobile Cutlass reported his vehicle stolen on that date and was informed shortly thereafter his vehicle was in the city pound. S.F. Trial, Volume 31, testimony of Walter Lentz, at pp. 91–93. The vehicle's steering column had been torn loose and there were dents in the front and side. *Id.*, at p. 93. Fingerprints found on the vehicle matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 216.

34. Petitioner and two other burglars were arrested inside a residence on that date and a revolver, which the homeowner had never seen before, was found in the water bed behind which petitioner was hiding at the time of his apprehension. S.F. Trial, Volume 31, testimony of Ken Tuttle, at pp. 6–15; testimony of Jeff Crabb, at pp. 15–25; testimony of Cecil Wright, at pp. 25–32,

35. S.F. Trial, Volume 32, testimony of Ramiro Sanchez, at pp. 114–17.

36. Petitioner's aunt and uncle became worried about petitioner's conduct and notified law enforcement personnel, who conducted a consent search of the bedroom at petitioner's aunt and uncle's residence where petitioner had been staying and found a Glock pistol, two thirteen-round magazines, a Canon camera, numerous CD's and pieces of stereo equipment, and several stereo speakers. S.F. Trial, Volume 32, testimony of Jeffrey Cole Hastings, at pp. 106–14.

37. Petitioner's juvenile probation officer testified extensively concerning petitioner's juvenile criminal records, various juvenile justice and mental health facilities where authorities attempted to rehabilitate petitioner, and petitioner's Christmas Eve escape from the Truman House. S.F. Trial, Voume 32, testimony of Juan Antonio DeLeon, at pp. 118–45. Mr. DeLeon testified, in pertinent part that petitioner was sent to the Truman House to complete a six-to-eight month program but petitioner left that facility without permission. *Id.*, at pp. 133–35.

38. A Chevy Blazer reported stolen on that date was recovered six-to-seven hours later stripped of its seats, dashboard, stereo, DC's, with a broken window and steering column, and with numerous items of stolen property inside. S.F. Trial, Volume 31, testimony of Jorge Tablis, at pp. 118–20; testimony of Nobel Ozment, at pp. 120–23. Fingerprints found on the vehicle were identified as petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 216.

39. A trio of San Antonio Police Officers testified regarding the events of the night of December 31, 1997 into the early morning hours of January 1, 1998 during which they engaged in a high speed pursuit of a stolen vehicle driven by petitioner which did not end until petitioner drove the stolen vehicle into the backstop at an elementary school, destroying the backstop and petitioner was arrested attempting to flee the scene. More specifically, one officer testified (1) he spotted an '86 Olds driven by two kids who did not appear old enough to be driving, (2) when he ran the plates, he learned the vehicle had been reported stolen, (3) when he stopped the vehicle and exited his patrol car, the suspect vehicle sped off and a high speed chase ensured involving multiple police vehicles, (4) the petitioner drove the suspect vehicle at speeds of between

petitioner's January 29, 1999 theft of a vehicle and destruction of the football field at petitioner's former high school,[40] (15) petitioner's January 30, 1999 burglary of a vehicle,[41] (16) petitioner's theft and burglary of a vehicle on March 5, 1999,[42] (17) petitioner's theft and burglary of a vehicle on April 15, 1999,[43] (18) petitioner's May 5,

eighty and one hundred miles per hour, without its lights on, and nearly collided with another vehicle when petitioner drove through an intersection without stopping, and (5) the chase did not end until petitioner drove the stolen vehicle into an elementary school backstop. S.F. Trial, Volume 31, testimony of Michael F. Helle, at pp. 51–61. Another officer testified (1) he observed the petitioner driving the suspect vehicle without any lights around midnight and screeching tires as the vehicle made turns, (2) petitioner swerved in and out of traffic dangerously, (3) at one point, petitioner slowed the suspect vehicle suddenly in an apparent effort to get the police vehicle behind him to make contact and deploy the police vehicle's air bags, a maneuver used by sophisticated car thieves to avoid pursuit, (4) the suspect vehicle destroyed the backstop into which petitioner drove it, and (5) when arrested, petitioner was laughing and displayed an arrogant demeanor. S.F. Trial, Volume 31, testimony of Richard Cuellar, at pp. 62–68. The officer who arrested petitioner following the high speed chase testified (1) petitioner drove the suspect vehicle without lights at a high rate of speed, swerving dangerously in and out of traffic, (2) he dove into and tackled petitioner as petitioner exited the suspect vehicle after it crashed into a backstop, (3) petitioner struck him several times but he punched back and eventually managed to place petitioner in handcuffs, (4) after being placed in the back of a patrol car, petitioner managed to pull his hands out from behind him, (5) he re-cuffed petitioner, and (6) when he patted petitioner down, he found a .38 caliber pistol in petitioner's right front pocket. S.F. Trial, Volume 31, testimony of Lawrence Patrick Saiz, at pp. 69–81.

**40.** The owner of a Jeep Cherokee testified (1) he reported same missing on that date, (2) his vehicle was found the following date in the middle of football field at MacArthur High School with the back seat, steering column, and ignition broken, (3) his vehicle spent six or seven weeks at the dealer being repaired. S.F. Trial, Volume 31, testimony of Russell Knoebel, at pp. 110–14. A San Antonio Police Officer testified he was dispatched to MacArthur High School where he observed the jeep had been used to make doughnuts in the middle of the football field, tearing up the field in the process. S.F. Trial, Volume 31, testimony of Roman DeLeon, at pp. 114–17. Fingerprints on the stolen vehicle matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at pp. 217–18.

**41.** The owner of a pickup truck reported on that date that his vehicle's window had been broken and a tool box stolen from inside his vehicle. S.F. Trial, Volume 31, testimony of Claudio Velasquez, at pp. 82–84. Fingerprints were lifted from both the exterior and interior of the burglarized vehicle. S.F. Trial, Volume 31, testimony of Michelle Morock, at pp. 85–88. Those fingerprints matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 217.

**42.** The owner of a Pontiac Grand Prix testified his vehicle was stolen that date and, when later recovered by police, was missing its stereo, speakers, and amplifier and the steering wheel was broken. S.F. Trial, Volume 31, testimony of Arturo Vasquez, at pp. 98–101. A San Antonio Police Officer testified (1) he observed the stolen vehicle in question traveling without its lights around 10:30 p.m., (2) when he took up pursuit, the stolen vehicle took off, (3) when he finally caught up with the stolen vehicle, it was sitting vacant on the shoulder of a road with its engine running, and (4) the vehicle was processed by an evidence technician. S.F. Trial, Volume 31, testimony of Dennis Kifer, at pp. 102–06. A San Antonio Police Detective testified a screwdriver, hammer, and lug wrench were found inside the front seat of the stolen vehicle and, while no fingerprints were found on the tools, fingerprints were lifted from inside the top of the passenger window. S.F. Trial, Volume 31, testimony of Steve Holson, at pp. 106–10. The fingerprints lifted from the vehicle in question were petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 218.

**43.** The owner of a BMW testified (1) her vehicle, which contained two expensive cam-

1999 theft of a pair of expensive tennis shoes from a department store,[44] (19) petitioner's July 1, 1999 unauthorized use of a motor vehicle and the ensuing high speed chase through a residential community,[45] (20) petitioner's July 6, 2000 escape from custody following arrest and the extensive search leading to petitioner's re-arrest on outstanding warrants,[46] (21) petitioner's burglary of a vehicle on October 16, 2000,[47] (22) petitioner's October 31, 2000 arrest on charges of driving while under the influ-

---

eras, was stolen on that date and recovered four days later and (2) one of the cameras was missing, along with the ties and wheels off the vehicle. S.F. Trial, Volume 31, testimony of Heidi Crabtree Dunlop, at pp. 123–29. A San Antonio Police evidence technician lifted latent fingerprints from the exterior of the stolen vehicle, which was missing its stereo. S.F. Trial, Volume 31, testimony of Robert Rackley, at pp. 129–32. A San Antonio Police Sergeant testified one of the cameras stolen from the vehicle in question was pawned and (2) after obtaining a consent to search from petitioner's mother, he recovered other items stolen from the vehicle in question, along with many other stolen items from petitioner's bedroom. S.F. Trial, Volume 31, testimony of Glen Patrick Michaels, at pp. 132–41. Petitioner did not have permission to pawn the stolen camera, which was valued at between six thousand and sixty-five hundred dollars. S.F. Trial, Volume 31, testimony of Robert L. Bridgman, at pp. 141–45. The employee of the pawn shop where petitioner pawned the stolen camera for forty dollars identified petitioner as the person who pawned the specialized camera on April 17, 1999. S.F. Trial, Volume 31, testimony of Manuel Martinez, at pp. 145–50. The pawn ticket issued to petitioner for the camera contained petitioner's Texas driver's license number. S.F. Trial, Volume 31, testimony of Brad Yuchinski, at pp. 151–53. The fingerprints found on the stolen vehicle matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at pp. 218–19.

**44.** A pair of loss prevention employees of J.C. Penney at Ingram Park Mall testified (1) regarding their observation of facts which led them to suspect petitioner's theft of a seventy-five dollar pair of tennis shoes, (2) they followed petitioner outside the Mall and approached petitioner, (3) when they asked petitioner to return the merchandise, petitioner threw the stolen tennis shoes down and attempted to run off, but (4) they managed to detain petitioner until police arrived to arrest petitioner. S.F. Trial, Volume 32, testimony of Clint Frerich, at pp. 57–61; testimony of Harry Riffle, at pp. 61–65.

**45.** Two San Antonio Police Officers testified regarding (1) their unsuccessful efforts to stop a stolen vehicle driven by petitioner as the petitioner raced through stop signs in a residential neighborhood at speeds of forty to fifty miles per hour, (2) petitioner's crashing into another occupied vehicle during the chase, (3) petitioner's wrecking the stolen vehicle by driving it into a rock wall, and (4) the subsequent foot chase that resulted in petitioner's arrest. S.F. Trial, Volume 31, testimony of Lloyd Lopez, at pp. 153–61; testimony of Ramiro Escamilla, at pp. 162–67.

**46.** Two San Antonio Police Officers testified regarding (1) petitioner's arrest on that date on outstanding warrants, (2) petitioner's efforts to resist that initial arrest, (3) the discovery of a CD player and many country western CD's wrapped in a pair of jeans under the car seat near where petitioner had been sitting prior to his arrest, (4) petitioner's haughty demeanor when he presented the officer with a TDCJ identity card, (5) petitioner's escape from the back seat of a patrol car, (6) the helicopter and police canine search that ensued and resulted in petitioner's apprehension in a stairwell of a nearby apartment complex. S.F. Trial, Volume 32, testimony of Kenneth Mahl, at pp. 83–100; testimony of James Fiste, at pp. 101–06.

**47.** The owner of a car parked in the Sunflower apartment complex testified (1) his vehicle was burglarized that date, along with several others in the same complex, (2) his car stereo was torn out, and (3) a pair of his sunglasses was also taken. S.F. Trial, Volume 32, testimony of Michael Ortega, at pp. 33–36. A San Antonio Police evidence technician testified she lifted latent fingerprints off the vehicle from which the items in question were stolen. S.F. Trial, Volume 32, testimony of Sandra Mahoney Rangel, at pp. 36–39. The fingerprints in question matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 219.

ence, without a valid driver's license or proof of insurance, and possession of marijuana,[48] (23) petitioner's burglaries, with others, of several vehicles in the same apartment complex on November 29, 2000 and the ensuing high speed chase that led to petitioner's arrest and subsequent written confession that he had burglarized three vehicles,[49] (24) petitioner's January 9, 2001 burglary of a vehicle,[50] and (25) petitioner's second burglary on January 24, 2001 of one of the same vehicles he had burglarized on November 29, 2000.[51]

The prosecution also presented documentary evidence establishing the petitioner had been convicted on separate occasions of multiple charges of unauthorized use of a motor vehicle, as well as charges of theft, escape, evading arrest, theft, criminal mischief, resisting arrest, and unlawfully carrying a weapon.[52] A copy of petitioner's juvenile conviction records was also admitted into evidence, along with a complete copy of petitioner's Texas Youth Commission file.[53]

**48.** A pair of Alamo Heights Police Officers testified regarding (1) a traffic stop of a vehicle driven by petitioner for speeding and having no tail lights, (2) the discovery of a distinct odor of alcohol on petitioner's breath, (3) petitioner's failure of a field sobriety test, (4) petitioner's arrest and the discovery of a bag of marijuana in petitioner's pocket, and (5) petitioner's assertion during his booking that he was a member of the Spanish Gangsters street gang. S.F. Trial, Volume 32, testimony of Cindy Pruitt, at pp. 71–80; testimony of James Mosman, at pp. 80–83.

**49.** The owners of several vehicles at the Deerfield apartment complex testified regarding the burglary of their vehicles on that date. S.F. Trial, Volume 32, testimony of Carlos Garza, at pp. 160–73; testimony of Robert Harris, at pp. 192–97; testimony of Kelly Joseph Mann, at pp. 206–09. One of the victims also testified he followed the suspect vehicle in which he had seen the car burglars depart the apartment complex and the burglars' vehicle reached speeds of eighty miles per hour before he was able to flag down a Castle Hills Police Officer who later stopped the suspect vehicle. S.F. Trial, Volume 32, testimony of Carlos Garza, at pp. 162–70. A Castle Hills Police Officer and San Antonio Police Officer each testified petitioner gave a false name when arrested and that much property was found inside the suspect vehicle. S.F. Trial, Volume 32, testimony of Russell King, at pp. 180–86; testimony of Christopher Lutton, at pp. 187–91. A San Antonio Police Detective testified the petitioner gave a written statement in connection with the November 29, 2000 car burglaries, which was admitted into evidence at petitioner's trial as State Exhibit no. 189, in which petitioner confessed to having broken into three of the vehicles.

S.F. Trial, Volume 32, testimony of Elizabeth Greiner, at pp. 197–203.

**50.** The father of the owner of a vehicle testified (1) his son's vehicle was burglarized on that date and a car stereo and clothing bag were taken and (2) his son's vehicle was fingerprinted. S.F. Trial, Volume 32, testimony of Alfredo Uballe, at pp. 65–68. A San Antonio Police evidence technician testified he lifted latent fingerprints from the vehicle in question. S.F. trial, Volume 32, testimony of Scott Coonradt, at pp. 68–70. A fingerprint examiner testified the prints were petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 219.

**51.** The same black Plymouth petitioner burglarized on November 29, 2000 was again burglarized on January 24, 2001 and fingerprints were left in the vehicle, from which the same two items were stolen, i.e., a car stereo speaker box and amplifier. S.F. Trial, Volume 32, testimony of Kelly Joseph Mann, at pp. 210–11. A San Antonio Police Detective testified he lifted latent fingerprints from the driver's door of the vehicle following the January 24, 2001 burglary. S.F. Trial, Volume 32, testimony of Richard Sanchez, at pp. 203–06. A fingerprint examiner testified the latent prints matched petitioner's. S.F. Trial, Volume 32, testimony of Vernon Ginn, at p. 220.

**52.** S.F. Trial, Volume 32, testimony of Vernon Ginn, at pp. 222–26; and State Exhibit nos. 190–98 (found in S.F. Trial, Volume 37).

**53.** S.F. Trial, Volume 33, at p. 66 (admitted as State Exhibit no. 200).

Petitioner's Texas Youth Commission file was admitted into evidence as State Exhibit

A San Antonio Police Officer testified that, following petitioner's arrest on February 4, 2001, he observed petitioner displaying a cocky demeanor and saw petitioner make a slashing gesture across his neck and flashing gang signs.[54]

### 2. The Defense's Evidence

Petitioner's uncle (the brother of petitioner's mother) testified, in pertinent part, that (1) he was close to petitioner while petitioner was young, (2) petitioner was a good student in elementary school, (3) petitioner's mother was "always a good mother," (4) petitioner's father was sent to prison and was never around when petitioner was growing up, (5) petitioner continued to do well in school even after his father went to prison, (6) petitioner's father died from an overdose of heroin after being released from prison, (7) he never saw petitioner's father use drugs in front of petitioner or the other children, (8) petitioner was not trying to impress people or imitate his father by stealing cars, (9) he heard a little bit about abuse by petitioner's father, (10) petitioner's mother was a good person who raised her children correctly, made sure her children had food when they were hungry and a roof over their heads, (11) petitioner had "every advantage from his mother that a child could have," (12) he was proud of his sister's efforts to raise her children, and (13) he had been to prison himself but was the only adult male in petitioner's life other than petitioner's father.[55]

no. 188 and is found in S.F. Trial, Volume 36. Among the significant documents in this voluminous trial exhibit are (1) a report prepared in December, 1997 by the program administrator at the Truman House suggesting petitioner remains a significant threat to public safety, (2) a June, 1996 report noting petitioner's history of abuse by his father, petitioner's gang involvement, and petitioner's estrangement from his mother, (3) a June, 1996 report by a Bexar County juvenile probation officer which includes a detailed educational and family history for petitioner, a lengthy list of petitioner's juvenile criminal behavior, and concludes petitioner can be adequately handled within the juvenile justice system, (4) a July, 1996 individual case plan assessment which reports that petitioner has had authority problems with teachers, "was often in trouble for fighting with peers," has been involved with street gangs, and reported that "money and prestige motivated him to engage in criminal activity," (5) documents from a November, 1997 TYC hearing at which petitioner was adjudged guilty of two counts of possession of a weapon, (6) a report detailing petitioner's October, 1997 arrest for possession of three knives and a screwdriver while on a high school campus, (7) a December, 1997 psychological evaluation prepared by a Dr. Ben Furgeson which (a) describes petitioner's father as physically abusive toward both petitioner and his mother, (b) describes petitioner's family environment as "abusive, non-supporting, and rejecting," (c) describes petitioner as negative toward authority, having difficulty internalizing society's norms and values, impulsive, unfriendly, antisocial, and not very industrious, and (d) attributes petitioner's antisocial behavior to petitioner's gang involvement and conduct disorder, adolescent onset, and (8) a June, 1996 psychological evaluation performed by Dr. Roger Sherman which states, in part, that (a) petitioner reported his father abused petitioner when petitioner's father was on drugs, (b) petitioner's intellectual functioning is in the high end of the low average range, (c) petitioner's psychological profile was consistent with that of a person who "is likely to have ongoing, serious problems with norm violations," (d) suggests petitioner would benefit from gaining an increased sense of responsibility for his behavior, (d) petitioner exhibits little interest in others, may lack coping skills, may have difficulty meeting the demands of daily life, and may have problems with control and in interpersonal relationships, and (e) once again gives a diagnosis of conduct disorder, adolescent onset. S.F. Trial, Volume 36, State Exhibit no. 188, at pp. 5, 45–57, 60–65, 163–64, 193–95, 208, 296–99, 304–11.

**54.** S.F. Trial, Volume 31, testimony of Joel Contreras, at pp. 168–70.

**55.** S.F. Trial, Volume 33, testimony of Louis Garza, at pp. 26–40.

Petitioner's older sister testified, in pertinent part, that (1) their mother was good but their father was not good, (2) their father was very abusive toward their mother, (3) their father was verbally and physically abusive toward her and petitioner, (4) their father sexually abused her when she was seven years old and the petitioner was "poisoned" when she told petitioner what their father had done to her, (5) their father went to prison twice when they were growing up and did not live with their family after he was released the second time, (6) petitioner had to repeat the seventh grade but was a good student, (7) petitioner had no adult male role models, (8) two or three relatives of their mother went to prison, all of their father's brothers went to prison, but their mother has never been to prison, (9) their father died of a drug overdose and petitioner took his death very hard, (10) petitioner was very peaceful when in custody in the Texas Youth Commission and in state prison, (11) petitioner knows the difference between right and wrong and would not be a danger to society if given a sentence of life imprisonment, and (12) she had no knowledge regarding the details of petitioner's criminal record.[56]

Petitioner's mother testified, in pertinent part, that (1) she was eighteen when petitioner was born, (2) their family moved at least once a year because petitioner's father was using drugs, (3) petitioner's father did drugs (heroin) in front of their children, (4) petitioner's father was not a good provider or a good husband and was physically abusive toward their children,

striking petitioner often, (5) petitioner's father went to prison four or five times, (6) petitioner was hurt when his father was released from prison but did not live with their family, (7) petitioner had to repeat the seventh grade but was a good student, (8) petitioner began acting out and hurting himself when his father died, (9) petitioner wanted more than she could furnish or provide, (10) petitioner was peaceful when incarcerated and would not be a danger to society if imprisoned, (11) petitioner attended a lot of elementary schools, (12) she had no knowledge of petitioner using drugs, and (13) she filed a formal complaint with Child Protective Services after she learned her husband had sexually abused their daughter.[57]

### 3. The Verdict

On October 29, 2002, after deliberating just over two and a half hours, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all the evidence, including the circumstances of the offense and the petitioner's character and personal moral culpability, there were not sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[58] The state trial court imposed sentence in accordance with the verdict.[59]

---

**56.** S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41–54.

**57.** S.F. Trial, Volume 33, testimony of Maria Gonzalez, at pp. 54–61.

**58.** S.F. Trial, Volume 33, at pp. 110–11; Trial Transcript, at pp. 225–26. The petitioner's

jury began its punishment phase deliberations at approximately 2:51 p.m. and returned its verdict at approximately 5:33 p.m. that same date. S.F. Trial, Volume 33, at pp. 107–10.

**59.** S.F. Trial, Volume 33, at p. 113.

## F. *Direct Appeal*

Petitioner appealed his conviction and sentence, asserting six points of error.[60] The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence in an unpublished opinion. *Garza v. State,* AP 74,467, 2005 WL 395442 (Tex.Crim. App. February 16, 2005). Petitioner did not thereafter seek certiorari review of his conviction or sentence from the United States Supreme Court.

**60.** Petitioner's appellant's brief included points of error arguing that (1) the trial court erred in relieving petitioner's first lead trial counsel on the eve of voir dire, (2) the trial court erred in refusing to permit prosecution witness Erica Henderson to testify that she believed the shooting may have been accidental, (3) the trial court erred in admitting gruesome photographs taken during Riojas' autopsy, (4) the trial court erred in excluding petitioner's proffered testimony regarding previous acts of violence by Riojas, (5) the trial court erred in failing to instruct the jury regarding the lesser-included offense of manslaughter, and (6) the aggravating factors contained in the Texas capital sentencing scheme are unconstitutionally vague. Attorney Michael C. Gross signed petitioner's appellant's brief.

**61.** As grounds for relief in his first state habeas corpus application, petitioner argued (1) the state trial court erroneously removed petitioner's first lead trial counsel, (2) the trial court erred in refusing to permit petitioner to cross-examine prosecution witness Erica Henderson regarding her opinion as to whether petitioner's fatal shooting of Riojas might have been accidental, (3) the trial court erred in refusing to permit petitioner to introduce evidence showing Riojas' character for violence, (4) petitioner's trial counsel rendered ineffective assistance by failing to (a) call a defense investigator to contradict the trial testimony of Erica Henderson, (b) introduce petitioner's medical records, and (c) adequately investigate petitioner's background and introduce mitigating evidence of petitioner's troubled childhood, (5) the Texas capital sentencing scheme contains vague aggravating factors, (6) proportionality review of all

## G. *First State Habeas Corpus Proceeding*

On October 25, 2004, petitioner filed his first state habeas corpus application, urging thirteen claims therein.[61]

The state habeas trial court held an evidentiary hearing in petitioner's first state habeas corpus proceeding on March 24, 2008, March 31, 2008, and April 23, 2008 during which the parties presented the testimony of petitioner's paternal uncle Raul Gonzales, Jr., clinical psychologist

capital sentences is constitutionally required, (7) the Texas capital sentencing scheme unconstitutionally fails to assign a burden of proof to the mitigating evidence special issue, (8) the Texas capital sentencing scheme unconstitutionally fails to advise sentencing jurors regarding the effect of a single holdout juror, (9) the inability of juries to accurately predict future dangerousness renders the Texas capital sentencing scheme's future dangerousness special issue unconstitutional, and (10) the death penalty as currently administered in Texas violates the Eighth Amendment. First State Habeas Transcript, at pp. 1–108.

Petitioner attached to his first state habeas corpus application copies of (1) the final judgment from his state criminal proceeding, (2) an affidavit from Jeffrey S. Mitchel (former court-appointed investigator), (3) a psychological evaluation performed on petitioner around age fifteen dated June 19, 1996, (4) a series of probation reports on petitioner dated June 20, 1996, July 11, 1994, September 20, 1995, and September 3, 1997, (5) an affidavit from a clinical psychologist, Dr. Jack Ferrell, dated October 21, 2004, (6) an affidavit by another clinical psychologist (Dr. Susana A. Rosin) dated October 19, 2004, (7) a report from Dr. Katherine Allen, a sociologist, dated October 19, 2004, (8) an affidavit and accompanying correspondence from petitioner's trial counsel's mitigation expert (Ann Matthews), (9) an affidavit from one of petitioner's paternal uncles (Raul Gonzales, Jr.), and (10) affidavit from a retired TDCJ official (Larry Fitzgerald). First State Habeas Transcript, at pp. 111–198.

Attorney Suzanne Kramer signed petitioner's first state habeas corpus application.

Dr. Jack Ferrell, petitioner's co-counsel at trial—attorney Ed Camara, sociologist Dr. Katherine Allen, and petitioner's lead trial counsel—attorney Vincent D. Callahan.

In an Order issued September 22, 2008, the state habeas trial court issued its findings of fact and conclusions of law and recommended that petitioner's first state habeas corpus application be denied.[62]

The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied state habeas relief in an unpublished order. *Ex parte Manuel Garza*, WR–70,797–01, 2008 WL 5245545 (Tex.Crim.App. December 17, 2008).

## H. *Initial Proceedings in this Court*

On December 16, 2009, petitioner filed his original petition for federal habeas corpus relief in this Court, along with a voluminous set of exhibits thereto. *Docket entry nos. 11–12.*

On January 7, 2010, petitioner filed a motion to stay, requesting abeyance of proceedings in this Court to permit peti-tioner to return to state court and exhaust state habeas corpus remedies on a variety of new claims and new evidence never previously presented to any state court. *Docket entry no. 13.* This Court granted that request in an Order issued February 18, 2010. *Docket entry no. 17.*

## I. *Second State Habeas Corpus Proceeding*

On June 17, 2010, petitioner filed his second state habeas corpus application.[63]

The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application "as an abuse of the writ without considering the merits of the claims." *Ex parte Manuel Garza*, WR 70,797–02, 2011 WL 4826968 (Tex.Crim. App. October 12, 2011).

## J. *Return to this Court*

On January 26, 2012, petitioner filed his amended federal habeas corpus petition together with all of the voluminous docu-

---

**62.** First State Habeas Transcript, at pp. 201–38.

**63.** As grounds for relief in his second state habeas corpus proceeding, this time represented by attorney Michael C. Gross, petitioner argued (1) the removal of petitioner's original lead trial counsel deprived petitioner of due process, (2) petitioner was denied the right to cross-examine prosecution witness Erica Henderson regarding her opinion as to whether the petitioner's fatal shooting of Riojas might have been accidental, (3) petitioner's trial counsel rendered ineffective assistance by failing to (a) adequately voir dire the jury venire regarding the death penalty, (b) adequately investigate and present mitigating evidence showing petitioner suffers from fetal alcohol syndrome arising from his mother's heroin use, (c) call investigator Jeff Mitchel to contradict Erica Henderson, and (d) introduce hospital records showing that petitioner sustained injuries, (4) the trial court erred in refusing to permit the defense to present evidence showing Riojas' character for violence,

(5) the Texas capital sentencing scheme's aggravating factors fail to channel the jury's discretion because they lack definitions, (6) due process requires proportionality review of capital sentences, (7) the absence of an assigned burden of proof on the mitigating evidence special issue renders the Texas capital sentencing scheme unconstitutional, (8) the failure of the Texas capital sentencing scheme to advise jurors of the impact of a single holdout juror violates the Constitution, and (9) juries are incapable of predicting future dangerousness. Second State Habeas Transcript, at pp. 244–413.

Petitioner attached to his second state habeas corpus application a voluminous set of exhibits, including a new affidavit from clinical psychologist Dr. Jack Ferrell, a new affidavit from mitigation specialist Gerald Byington, and a host of new affidavits from various members of petitioner's family which had not previously been presented to any state court. Second State Habeas Transcript, at pp. 782–1811.

ments he had attached to his second state habeas corpus application. *Docket entry nos. 29–30.*

On March 26, 2012, respondent filed his answer to petitioner's amended petition, arguing in part that petitioner had procedurally defaulted on a portion of petitioner's ineffective assistance claims by failing to raise same in the state courts until petitioner's second state habeas corpus proceeding. *Docket entry no. 31.*

## II. *Standard of Review*

■ Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

■ The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, *per se,* establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown,* 558 U.S. 120, 132–33, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application

of that law is 'objectively unreasonable.' ''); *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has recently explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, —— U.S. ——, ——, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011) (quoting *Harrington v. Richter*, 562 U.S. ——, ——, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

■ Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' ''); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

■ The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 300–01, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341–42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

■ In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473–74, 127 S.Ct. at 1939–40 ("AEDPA also requires

federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' "); *Rice v. Collins,* 546 U.S. 333, 338–39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' "); *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.' "); 28 U.S.C. § 2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen,* 558 U.S. at 300–01, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins,* 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

▌ Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler,* 625 F.3d 229, 239 (5th Cir.2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied,* —— U.S. ——, 132 S.Ct. 124, 181 L.Ed.2d 46 (2011); *St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 550 U.S. 921, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006) (holding the same), *cert. denied,* 550 U.S. 920, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc* )(holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Removal of Lead Trial Counsel*

#### A. *The Claim*

In his first claim for relief in his amended petition herein, petitioner argues the

state trial court's "removal" over petitioner's objection of petitioner's original lead trial counsel practically on the eve of voir dire violated the Sixth and Fourteenth Amendments.[64]

## B. State Court Disposition

Petitioner presented a primarily state-law version of this same complaint to the Texas Court of criminal Appeals as point of error number one in his direct appeal.[65] The Texas Court of Criminal Appeals rejected this state-law argument on the merits. *Garza v. State*, 2005 WL 395442, at *1–*2.

Petitioner re-urged the same arguments, relying upon both state and federal constitutional authorities, as his first ground for relief in his first state habeas corpus application.[66] The state habeas trial court concluded petitioner had procedurally defaulted on this new claim, to the extent this claim was different from petitioner's similar complaint on direct appeal (i.e., relied upon federal authorities), by failing to present the new legal theories underlying this claim on direct appeal.[67] The Texas Court of Criminal Appeals adopted these conclusions when it denied relief in petitioner's first state habeas corpus proceeding. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented an even more federalized version of this same complaint in his second state habeas corpus application.[68] The Texas Court of Criminal Appeals dismissed this application under state writ—abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

## C. Applicable Federal Law

 "The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. 'A defendant may not insist on representation by an attorney he cannot afford.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989) (*quoting Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988)). "Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of .... counsel.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. at 626, 109 S.Ct. at 2652. "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Id.* The right to counsel of choice does not extend to defendants who require counsel to be appointed for them. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 151, 126 S.Ct. 2557, 2565, 165 L.Ed.2d 409 (2006).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Su-

---

64. Amended Petition for Writ of Habeas Corpus by a Person in State Custody, filed January 26, 2012, docket entry no. 29 (henceforth "Amended Petition"), at pp. 38–44.

65. Brief for the Appellant, at pp. 8–13.

66. First State Habeas Transcript, at pp. 5–11.

67. First State Habeas Transcript, at p. 223.

68. Second State Habeas Transcript, at pp. 296–92.

preme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

 To satisfy the first prong of *Strickland,* i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook,* 558 U.S. 4, 7, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009); *Strickland · v. Washington,* 466 U.S. at 688–89, 104 S.Ct. at 2065. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

 To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided the same day as *Strickland,* the Supreme Court held a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047.

As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U.S. at 659–61, 104 S.Ct. at 2047–48. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U.S. at 661 n. 31, 104 S.Ct. at 2048 n. 31.

In *Bell v. Cone*, 535 U.S. 685, 695–96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697–98, 122 S.Ct. at 1851–52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding). Simply put, garden variety ineffective assistance claims of the nature asserted by petitioner herein do not warrant application of the presumption of prejudice recognized in *Cronic*.

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir.2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir.2002) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953, 123 S.Ct. 420, 154 L.Ed.2d 300 (2002); *Mayo v. Cockrell*, 287 F.3d 336, 340 n. 3 (5th Cir. 2002) (holding the same), *cert. denied*, 537 U.S. 975, 123 S.Ct. 443, 154 L.Ed.2d 332 (2002); *Burdine v. Johnson*, 262 F.3d 336, 344 n. 4 (5th Cir.2001) (holding the same), *cert. denied*, 535 U.S. 1120, 122 S.Ct. 2347, 153 L.Ed.2d 174 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir.2000) (" 'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated

that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing." (*citations and footnote omitted* )).

#### D. *AEDPA Analysis & De Novo Review of Federal Claims*

##### 1. *The Undisputed Facts*

Petitioner was represented at all times relevant to his capital murder charge by two court-appointed trial attorneys. One of those attorneys, Ed Camara, was appointed in February, 2001 and represented petitioner throughout petitioner's trial court proceedings.[69] Attorney Raymond Fuchs, also appointed in February, 2001, was granted permission to withdraw from petitioner's representation on July 11, 2002.[70] The state trial court appointed attorney Vincent D. Callahan to represent petitioner (and replace attorney Fuchs) on July 19, 2002.[71]

A *Jackson v. Denno* hearing on petitioner's motion to suppress and a hearing on other pretrial motions was held on August 29, 2002, during which both attorneys Callahan and Camara represented petitioner.[72] General voir dire of the jury venire took place the following date, i.e., on August 30, 2002, again with both attorneys Camara and Callahan representing petitioner.[73] Individual voir dire commenced September 16, 2002 and continued thereafter, once more with both attorneys Callahan and Camara representing petitioner. Save for the period between July 11 and July 19, 2002, petitioner was represented at all times relevant to petitioner's capital murder trial by two court-appointed attorneys. Attorney Camara continuously represented petitioner from February, 2001

(more than six weeks prior to petitioner's indictment) throughout petitioner's capital murder trial. Thus, at no point during the trial court capital murder proceeding against petitioner was petitioner denied legal representation.

##### 2. *State Law Claims Do Not Warrant Federal Habeas Relief*

 Insofar as petitioner's first claim herein relies upon alleged violations of petitioner's state procedural or state constitutional rights in connection with the state trial court's replacement of attorney Fuchs with attorney Callahan, that claim does not present a legitimate basis for federal habeas corpus relief. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers,* 497 U.S. at

---

**69.** Trial Transcript, at p. 14.

**70.** Trial Transcript, at pp. 13, 75–76.

**71.** Trial Transcript, at p. 35.

**72.** S.F. Trial, Volume 2, at pp. 3–153.

**73.** S.F. Trial, Volume 3, at pp. 3–26.

780, 110 S.Ct. at 3102; *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874.

When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*

*Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

### 3. *Federal Constitutional Claims Without Merit*

Insofar as petitioner complains that he was denied legal representation in violation of the principle announced in *Gideon v. Wainwright,* 372 U.S. 335, 342–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding Sixth Amendment was violated when state court refused to appoint counsel to represent indigent criminal defendant in a non-capital felony case), that complaint lacks any arguable merit. As was explained above, petitioner was represented by at least one court-appointed counsel at all times throughout petitioner's capital murder proceeding and, save for an eight-day period in July, 2002, was represented by two experienced criminal defense counsel. Petitioner's argument that he was deprived of counsel during a critical juncture in his state criminal proceeding is refuted by even a cursory review of the petitioner's trial court records and utterly without arguable merit.

Petitioner's reliance on *Cronic* is likewise unavailing. As was explained above, the presumed prejudice principle of *Cronic* arises only in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047.

The first of these three situations clearly does not apply to petitioner.

Petitioner's complaints about the performance of his trial counsel (detailed in petitioner's third claim herein) do not rise above the garden-variety type of complaints of ineffective assistance which must be evaluated under *Strickland's* dual prongs. *See Bell v. Cone,* 535 U.S. at 697–98, 122 S.Ct. at 1851–52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding); *United States v. Griffin,* 324 F.3d at 364 ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell,* 288 F.3d at 718 (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense).

Finally, petitioner has alleged no facts showing the circumstances of his capital murder trial were such as to render it impossible for his two, court-appointed, trial counsel to adequately represent petitioner within the parameters set forth in *Strickland* and *Cronic.* Attorney Callahan replaced attorney Fuchs more than a month before the pretrial hearing in petitioner's capital murder trial and almost

two months before individual voir dire began. Under such circumstances, petitioner is not entitled to the presumption of prejudice recognized in *Cronic. Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing).

Petitioner's complaints about the substitution of attorney Fuchs by attorney Callahan do not implicate the Sixth Amendment's right to counsel of one's choosing. *United States v. Gonzalez–Lopez*, 548 U.S. at 151, 126 S.Ct. at 2565.

### E. Conclusions

The Texas Court of Criminal Appeals' rejection on the permits of petitioner's primarily state-law complaints about the replacement of attorney Fuchs by attorney Callahan during the course of petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state court proceeding.

Furthermore, having examined *de novo* petitioner's federal constitutional arguments in support of his initial claim herein, which federal claims petitioner raised for the first time in his state habeas corpus proceedings and were summarily dismissed by the state habeas court, this Court concludes that because petitioner's federal constitutional complaints based upon *Gideon v. Wainwright* and *Cronic* (which the state habeas court summarily dismissed in the course of petitioner's first and second state habeas corpus proceedings) lack any arguable merit, petitioner's first ground for relief herein does not warrant federal habeas corpus relief.

### IV. Ineffective Assistance Claims

### A. The Claims

In his third ground for relief herein, petitioner argues that his trial counsel rendered ineffective assistance in violation of the Sixth Amendment by failing to (1) adequately voir dire the jury venire regarding their views on the death penalty, (2) adequately investigate petitioner's background and present available mitigating evidence, (3) call the defense team's investigator as a witness to contradict prosecution witness Erica Henderson, and (4) introduce petitioner's hospital records to show petitioner suffered facial injuries in his confrontation with Riojas.[74]

### B. State Court Disposition

Petitioner presented his third and fourth assertions of ineffective assistance in his third claim herein (i.e., failing to introduce petitioner's hospital records or call the defense investigator to testify), and an abridged version of his second assertion of ineffective assistance herein (i.e., inadequate mitigation investigation), to the state court in his first state habeas corpus application.[75] In the course of its findings of fact and conclusions of law in petitioner's first state habeas corpus proceeding, the state habeas trial court concluded, in pertinent part, that (1) there was no evidence before it showing any of the injuries reflected in the medical records had been caused by Riojas,[76] (2) the evidence at trial did not raise the issue of self-defense un-

---

**74.** Amended Petition, at pp. 54–106.

**75.** First State Habeas Transcript, at pp. 22–38.

**76.** First State Habeas Transcript, at p. 228.

der applicable state law,[77] (3) the hospital records showing petitioner's injuries would not have been admissible at petitioner's capital murder trial,[78] (4) there was no evidence showing the defense investigator (Jeff Mitchel) was available to testify at petitioner's trial,[79] (5) Erica Henderson admitted she told one of petitioner's defense attorneys that the fatal shooting might have been accidental,[80] (6) as a result, the petitioner's defense counsel could not have introduced extrinsic evidence that she had made the same statement,[81] (7) the testimony of petitioner's paternal uncle Raul Gonzales would have added nothing of substance to the testimony furnished by petitioner's three other family members who did testify during the punishment phase of petitioner's capital murder trial,[82] (8) Raul Gonzalez's many criminal convictions would have undermined any benefit from his testimony at trial,[83] (9) there was no evidence establishing that Dr. Allen was available to testify at petitioner's capital murder trial,[84] (10) Dr. Allen's opinions expressed during the state habeas corpus hearing were based solely upon her view of records and not upon any personal examination of petitioner,[85] (11) Dr. Allen's testimony strongly supported a conclusion that petitioner would engage in future violent acts,[86] and (12) Dr. Allen's testimony that petitioner was not properly diagnosed with social conduct disorder was not credible in light of the documentary evidence before the court regarding petitioner's back-ground, including petitioner's documented misconduct while in custody.[87] The Texas Court of Criminal Appeals adopted these findings and conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, WR 70797–01, 2008 WL 5245545, at *1.

Petitioner presented the state habeas court with the same four ineffective assistance claims he presents in his third claim herein in his second state habeas corpus application.[88] The Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application under state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

## C. *Clearly Established Federal Law*

■ The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16–17, 130 S.Ct. 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, 558 U.S. at 6–7, 130 S.Ct. at 16); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38–41, 130 S.Ct. 447, 452–53, 175 L.Ed.2d 398 (2009); *Wong*

---

77. *Id.*

78. *Id.*

79. *Id.*, at p. 227.

80. *Id.*

81. *Id.*

82. *Id.*, at p. 230.

83. *Id.*

84. *Id.*, at p. 230.

85. *Id.*, at pp. 230–31.

86. *Id.*, at p. 231.

87. *Id.*, at pp. 231–32.

88. Second State Habeas Transcript, at pp. 301–52.

*v. Belmontes,* 558 U.S. at 19–20, 130 S.Ct. at 386).

As was explained in Section III.C. above, the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064.

■ In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes,* 558 U.S. at 19–20, 130 S.Ct. at 386; *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes,* 558 U.S. at 26–29, 130 S.Ct. at 390–91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Porter v. McCollum,* 558 U.S.

at 38–39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

■ A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman,* 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied,* 558 U.S. 839, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman,* 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000), *cert. denied,* 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman,* 482 F.3d 815, 820 (5th Cir.2007), *stay denied,* 555 U.S. 1160, 129 S.Ct. 1305, 173 L.Ed.2d 482 (2009); *Sonnier v. Quarterman,* 476 F.3d 349, 356 (5th Cir.2007), *cert. denied,* 552 U.S. 948, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman,* 458 F.3d at 410; *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir.2006), *cert. denied,*

549 U.S. 1323, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007).

### D. Procedural Default on Inadequate Voir Dire Complaint

Respondent correctly points out that petitioner presented the Texas Court of Criminal Appeals with his first assertion of ineffective assistance herein, i.e., petitioner's complaint about the performance of his trial counsel during voir dire, in petitioner's second state habeas corpus application, which the state habeas court dismissed under state writ-abuse principles.

■■■ The Texas Court of Criminal Appeals' summary dismissal of petitioner's second state habeas corpus application (which included petitioner's first presentation of his initial assertion herein of ineffective assistance) on state writ-abuse principles constitutes a form of procedural default on same which bars federal habeas review of that claim. *See, e.g., Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("This court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar."), *cert. denied*, —— U.S. ——, 129 S.Ct. 2378, 173 L.Ed.2d 1299 (2009); *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir.2005) (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 U.S. 1136, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir.2004) (holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir.2003) (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir.2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004).

The Supreme Court's recent holding in *Martinez v. Ryan*, —— U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), affords petitioner no relief from his procedural default on his initial assertion of ineffective assistance herein. In *Martinez*, the Supreme Court carved out of its procedural default jurisprudence a narrow exception for claims of ineffective assistance by trial counsel which were not raised in a convicted criminal defendant's first state habeas corpus proceeding because of the deficient performance of the defendant's state habeas counsel. *See Martinez v. Ryan*, —— U.S. at ——, 132 S.Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default *of a claim of ineffective assistance at trial*"). For the reasons set forth hereinafter, there was nothing professionally deficient about the failure of petitioner's first state habeas counsel to present this same complaint to the state habeas court in the course of petitioner's first state habeas corpus proceeding.

### E. Failure to Adequately Voir Dire the Jury Venire

#### 1. The Complaint

Petitioner argues that his trial counsel failed to properly voir dire the jury venire regarding their views on the death penal-

ty.[89] For the reasons set forth herein, this Court alternatively concludes this complaint fails to satisfy either prong of *Strickland* analysis.

### 2. State Court Disposition

As explained above, however, petitioner did not present this specific complaint of ineffective assistance to the state courts until he included same in his second state habeas corpus application, which the Texas Court of Criminal Appeals summarily dismissed under state writ-abuse principles.

### 3. De Novo Review

Because no state court has ever addressed the merits of this aspect of petitioner's multi-faceted ineffective assistance claims herein, this Court's review of the merits of this complaint is necessarily *de novo*. *See Porter v. McCollum*, 558 U.S. at 38–39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

### a. No Deficient Performance

Petitioner summarizes the voir dire examination of each of the twelve venire members who served as his petit jurors but does not recite any facts concerning the voir dire of the venire as a whole. Significantly, petitioner has failed to furnish this Court with the juror questionnaires completed by the jury venire prior to the start of individual voir dire examina-

tion. As this Court has explained previously, without access to the extensive juror questionnaires routinely employed in Bexar County capital cases, it is virtually impossible to properly evaluate the efforts of either the prosecution or criminal defense counsel to screen biased or unqualified venire members. *See Jasper v. Thaler*, 765 F.Supp.2d 783, 816 n. 62 (W.D.Tex. 2011) (discussing the analytical hurdles to evaluating a *Batson* claim without access to the juror questionnaires completed by the venire members whom the petitioner claimed had been improperly struck by the prosecution), *affirmed* 466 Fed.Appx. 429 (5th Cir.2012). It is not an exaggeration to state that the extensive and detailed juror questionnaires routinely employed in Bexar County capital cases furnish the starting point for any objective analysis of the performance of either the prosecuting attorneys or defense counsel during voir dire in a capital case.

Petitioner's complaints about the performance of his trial counsel during voir dire do not furnish specific facts alleging objectively unreasonable conduct on the part of his trial counsel. For instance, petitioner repeatedly complains that his trial counsel failed to object to the prosecution's explanations of the terms employed in the Texas capital sentencing special issues.[90] Yet petitioner does not identify any legally valid objections his trial counsel could have made to the prosecution's explanations of the terms in question during voir dire examination of petitioner's jury venire. Petitioner's trial counsel cannot reasonably be faulted for failing to make fruitless or meritless objections to the prosecution's voir dire questions. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir.2009) (holding failure to raise a meritless objection does

---

**89.** Amended Petition, at pp. 59–73.

**90.** Amended Petition, at pp. 62–72.

not satisfy the deficient performance prong of *Strickland* ), *cert. denied*, —— U.S. ——, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir.2007) (failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314, 128 S.Ct. 1874, 170 L.Ed.2d 752 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998).

Petitioner also faults his trial counsel for failing to specifically question many of the venire members who served as petitioner's petit jurors regarding their views on the death penalty.[91] Yet petitioner's own summary of the voir dire of his petit jurors reveals that petitioner's trial counsel did, in fact, question many of those same individuals regarding their views on capital punishment. Furthermore, petitioner's summary fails to make any reference to the answers these venire members gave on their written juror questionnaires and only briefly touches on the responses these same venire members gave to the prosecution's explanations and questions regarding the Texas capital sentencing special issues. This Court's independent evaluation of the individual voir dire examination of petitioner's petit jurors reveals the prosecuting attorneys asked each of these venire members extensive questions regarding their views on the death penalty and made numerous references to the venire members' juror questionnaire answers.[92] It is readily apparent from this Court's independent review of the individual voir dire of petitioner's petit jurors that the questionnaire the venire members received and answered inquired extensively into the venire members' views on capital punishment. Petitioner's trial counsel cannot reasonably be faulted for failing to make inquiries that would have been repetitive

91. *Id.*

92. The prosecution began its voir dire examination of the venire members who became petitioner's petit jurors by inquiring, usually through reference to their questionnaire answers, as to the venire member's views on capital punishment and, after explaining the burden of proof in criminal cases, the defendant's right to remain silent, and other substantive law and procedures applicable to the guilt-innocence phase of trial (such as the law in Texas regarding self-defense), then proceeded to explain the Texas capital sentencing special issues, which had also been discussed in the juror questionnaires. *See, e.g.,* S.F. Trial, Volume 4, voir dire examination of Hazel Mattsen Knipp, at pp. 15, 28–38; S.F. Trial, Volume 7, voir dire examination of Keven Wayne Weber, at pp. 94–95, 104–11; S.F.

Trial, Volume 8, voir dire examination of Waring Lewis Worsham, at pp. 65–66, 80–88; S.F. Trial, Volume 9, voir dire examination of George Diaz Garza, at pp. 74–77, 92–104; S.F. Trial, Volume 10, voir dire examination of Charles Martin, at pp. 87–88, 107–12; S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 5–6, 19–28; S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 102–03, 121–30; S.F. Trial, Volume 14, voir dire examination of Robert Kravetz, at pp. 105–08; S.F. Trial, Volume 15, voir dire examination of Terry White, at pp. 83–85, 95–105; S.F. Trial, Volume 19, voir dire examination of Helen Clark Martin, at pp. 101–07, 122–34; S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at pp. 109, 124–34.

of the questions asked and answered on the jurors' questionnaire and during voir dire examination by the prosecution.

If petitioner wishes to attack the performance of his trial counsel during voir dire, petitioner must furnish this Court with specific facts showing why *in the context of the voir dire of the entire jury venire, including said counsels' review of the venire members' extensive juror ques-*

*tionnaire answers,* his trial counsel's efforts to identify disqualifying bias were objectively unreasonable.[93] This, petitioner has failed to do.

Petitioner admits that his trial counsel did, in fact, make challenges for cause against several of the venire members who served as petit jurors.[94] This Court's independent review of the individual voir dire confirms this fact.[95] This Court's in-

93. To reiterate Chief Judge Biery's admonition in his published opinion in *Jasper v. Thaler,* 765 F.Supp.2d at 816 n. 62, a federal habeas corpus petitioner's failure to furnish this Court with a complete set of the questionnaires answered by the petitioner's jury venire effectively deprives this Court of the ability to intelligently determine whether a prosecutor has engaged in impermissibly suggestive or biased questioning of venire members for purposes of *Batson* analysis. As this case so emphatically illustrates, the failure of petitioner to furnish this Court with the completed questionnaires filled out by petitioner's entire jury venire effectively derives this Court of the ability to rationally evaluate the performance of petitioner's trial counsel under the dual prongs of *Strickland* analysis, particularly under the objective reasonableness standard of the first prong of *Strickland.* The objective reasonableness of the extent to which petitioner's trial counsel chose to question individual venire members regarding their views on the death penalty and other subjects necessarily turns, in part, upon the answers those same venire members wrote on their juror questionnaires. In the absence of the juror questionnaires filled out by the entire jury venire, petitioner has completely failed to carry his burden of proof regarding his Sixth Amendment complaint about the performance of his trial counsel during voir dire.

94. Amended Petition, at pp. 67, 68, 72.

95. Petitioner raised two challenges for cause to venire member Jimmy Phelps but, when additional questioning of Mr. Phelps by the court and prosecution resulted in the denials of those challenges, petitioner's trial counsel ultimately accepted venire member Phelps as the seventh petit juror. S.F. Trial, Volume

13, voir dire examination of Jimmy Phelps, at pp. 133–40.

Petitioner's trial counsel also challenged venire member Manuel Pacheco's ability to answer the future dangerousness special issue impartially based upon Mr. Pacheco's answers to the state trial court's questionnaire (which petitioner failed to provide to this Court), despite not questioning Mr. Pacheco on that point but the prosecution pointed out Mr. Pacheco had identified himself as only a "five" on a scale of one to ten regarding whether he would always impose the death penalty for a capital murder conviction and the trial court denied the challenge for cause. S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at pp. 138–41. When Mr. Pacheco returned to the courtroom, the trial judge informed him that both parties had accepted him as a juror. *Id.,* at p. 141.

Petitioner also faults the performance of his trial counsel for failing to ask Mr. Pacheco questions regarding said venire member's views as to whether a conviction for capital murder, standing alone, would justify an affirmative finding as to future dangerousness. Yet, every time petitioner's trial counsel attempted to ask similar questions to other members of the petitioner's jury venire, the venire members' answers convinced the trial court they possessed no disqualifying bias. *See note 98, infra.* Petitioner does not allege any specific facts showing what answers Mr. Pacheco might have given had he been questioned further on this subject (beyond the information contained in his juror questionnaire answers). Furthermore, absent identification of exactly what information was actually contained in Mr. Pacheco's juror questionnaire answers which suggested Mr. Pacheco was biased in connection with the future dangerousness special is-

dependent review of the voir dire examination of petitioner's petit jurors also reveals that petitioner's trial counsel did, upon occasion, ask questions clearly designed to inquire into the possibility the venire members might possess potentially disqualifying bias.[96]

Petitioner does complain that his trial counsel failed to adequately inquire of the venire members (1) if someone convicted of murder of a police officer would automatically be a future danger within the meaning of the first capital sentencing special issue, (2) if a conviction for the murder of a police officer and a finding of future

dangerousness would cause the person to "not consider mitigating evidence," and (3) they would be able to consider and give effect to all relevant mitigating evidence offered by petitioner.[97]

■ In point of fact, however, at several points during the voir dire of the venire members who ultimately served as petitioner's petit jury, petitioner's trial counsel did make voir dire inquiry regarding whether a venire member felt that a conviction for capital murder, standing alone, would justify an affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue.[98] Ab-

---

sue, petitioner's complaint about his trial counsel's failure to further question Mr. Pacheco on this subject does not satisfy the first prong of *Strickland* analysis. The state trial judge, who unlike this Court had access to Mr. Pacheco's juror questionnaire answers, was convinced by the prosecution's argument and denied petitioner's challenge for cause to Mr. Pacheco.

96. For instance, petitioner's trial counsel inquired of venire member Weber regarding his questionnaire answer addressing a situation in which a criminal defendant chose not to testify at trial and his questionnaire answers on the burden of proof in a criminal case. S.F. Trial, Volume 7, voir dire examination of Kevin Wayne Weber, at pp. 120–21, 128–29.

Petitioner's trial counsel asked venire member, and later juror, Worsham about questionnaire answers he gave regarding his willingness to serve as jury foreperson and his understanding of the Texas Penal Code's provisions regarding self-defense. S.F. Trial, Volume 8, voir dire examination of Waring Lewis Worsham, at p. 93.

Petitioner's trial counsel conducted a discussion with juror Garza regarding his understanding of the Texas capital sentencing special issues. S.F. Trial, Volume 9, voir dire examination of George Diaz Garza, at pp. 106–12.

Petitioner's trial counsel questioned another juror regarding the venire member's answers to juror questionnaire questions about his ability to be a fair and impartial juror, that

juror's arrest on a charge of carrying a sword in his vehicle, and the juror's views on capital punishment. S.F. Trial, Volume 10, voir dire examination of Charles Martin, at pp. 120–25, 129–30, 140.

Petitioner's trial counsel questioned other venire members who ultimately served as petit jurors as well regarding their feelings about the death penalty. S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 35–36; Volume 13, voir dire examination of Jimmy Phelps, at pp. 132–33; Volume 15, voir dire examination of Terry White, at pp. 113–14; Volume 18, voir dire examination of Joel C. Link, at pp. 116–17, 119.

97. Amended Petition, at p. 72.

98. S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 133–35 (petitioner's trial counsel made a challenge for cause but further questioning by the prosecution demonstrated the venire member could answer the future dangerousness special issue negatively if the evidence showed same to be the case); Volume 15, voir dire examination of Terry White, at pp. 119–20 (voir dire questioning by petitioner's trial counsel revealed the venire member did not believe a conviction for capital murder should automatically result in a finding of future dangerousness); Volume 18, voir dire examination of Joel C. Link, at pp. 117–19 (questioning by petitioner's trial counsel revealed this venire member did not believe a capital murder conviction should automatically result in an affirmative finding of future dangerousness).

sent access to the venire members' juror questionnaires, this Court cannot determine intelligently whether it was objectively unreasonable for petitioner's trial counsel to have failed to ask the same or similar questions to all other members of the petitioner's jury venire. It is entirely possible the other venire members' answers to the trial court's questionnaire may have rendered similar voir dire questions reasonably unnecessary. Thus, petitioner has failed to carry his burden of showing it was objectively unreasonable for petitioner's trial counsel to have failed to ask each member of petitioner's petit jury voir dire questions regarding whether they would automatically answer the future dangerousness special issue affirmatively based solely upon a verdict of guilty on a capital murder charge.

As explained above, the prosecution carefully discussed the Texas capital sentencing special issues with almost every venire member who eventually served as a petit juror at petitioner's capital murder trial, including discussing the nature of mitigating evidence from the prosecution's perspective.[99] Thus, petitioner's trial counsel had the benefit of not only reading those venire members' juror questionnaire answers but also observing firsthand those potential jurors' demeanor and interaction with the prosecutor during the prosecutor's discussion of the nature of mitigating evidence. Moreover, inquiries into whether a venire member would disregard the presence of mitigating evidence when answering the mitigation special issue would have had the potential to offend potential jurors by suggesting they might disregard the trial court's foreseeable punishment-phase jury instructions and the plain language of the final capital sentencing special issue that the jury should consider "all the evidence" concerning the circumstances of the petitioner's offense and the petitioner's character, background, and personal moral culpability in answering that special issue. Thus, there were objectively reasonable reasons why petitioner's trial counsel may have chosen not to ask potential jurors whether they would disregard mitigating evidence the defense planned to introduce at the punishment phase of trial. Under the record currently before this Court, petitioner has failed to carry his burden of proving the failure of his trial counsel to ask either of these latter two questions during voir dire caused the performance of said counsel to fall below an objective level of reasonableness.

Finally, this Court's independent review of the voir dire examination of the petitioner's petit jurors reveals many objectively reasonable bases for most of the decisions by petitioner's trial counsel to accept those individuals as jurors. The first juror, Hazel Knipp, repeatedly described the burden of serving as a juror in a capital case as "a very serious thing," "a lot of responsibility," and "just overwhelming."[100] Until questioned very thoroughly by the prosecution, the second juror displayed clear reluctance to participate in a process that would ultimately lead to a criminal defen-

---

**99.** *See note 92, supra.*

**100.** S.F. Trial, Volume 4, voir dire examination of Hazel Mattsen Knipp, at pp. 40–43. Ms. Knipp also wept openly during her interrogation by the prosecution. *Id.,* at p. 40. During examination by petitioner's trial counsel, Ms. Knipp insisted she would follow her own conscience during deliberations and would not allow the other jurors to sway her opinion based upon the evidence. *Id.,* at p. 48. Petitioner's trial counsel could reasonably have believed Ms. Knipp would treat the capital murder charge against petitioner, as well as capital sentencing special issues, with great respect and would be reticent to return a verdict favorable to the prosecution absent strong evidence supporting same.

dant's death.[101] The third and fourth jurors both said in response to questions by petitioner's trial counsel that they believed mercy was a part of their own personal morality.[102] The fifth juror had a criminal conviction for carrying a sword in his vehicle and insisted he could be fair and impartial in returning a verdict at both phases of a capital trial.[103] The sixth juror was questioned extensively by both parties regarding her ability to remain fair during deliberations and base her verdict solely on the evidence but insisted she could remain fair.[104] The seventh juror informed the prosecutor during voir dire that he did not believe either the jury or the State had the right to take a life but insisted he could follow the trial court's instructions regarding the law.[105] The eighth juror informed the prosecutor during voir dire that he believed the legality of a police officer's conduct during an arrest was a critical aspect to a self-defense claim.[106] The ninth juror expressed the view that the death penalty should be imposed in only the worst cases.[107] The tenth juror, a gun owner, expressed a dislike for Glock pistols, stating he found them to be inaccurate weapons, and repeatedly asserted his ability to render a verdict based on the evidence, including a possible life sentence.[108] The eleventh juror expressed a distinction in her mind between the culpability associated with a premeditated murder as opposed to a merely intentional murder.[109] On his juror questionnaire, the twelfth juror apparently rated himself a "five" on a scale of one-to-ten regarding his willingness to always impose the death penalty.[110] Thus, there were objectively reasonable reasons why petitioner's trial counsel chose to accept each of the foregoing venire members as jurors.

Each of the twelve persons asserted during their voir dire examination by the prosecution that they could follow the trial court's instructions regarding the Texas capital sentencing scheme's special issues and render a verdict based upon the evidence. In such a context, this Court independently concludes the failure of petitioner's trial counsel to ask potentially offensive voir dire questions suggesting or implying that the venire member might willfully ignore the trial court's instructions or disregard the plain language of the mitigation special issue commanding

101. S.F. Trial, Volume 7, voir dire examination of Kevin Wayne Weber, at pp. 111–16. Mr. Weber described the death penalty as "not something I'm wild about" and agreed the capital sentencing process was "very serious." *Id.*, at pp. 112, 114–16,

102. S.F. Trial, Volume 8, voir dire examination of Waring Lewis Worsham, at p. 100; Volume 9, voir dire examination of George Diaz Garza, at pp. 111–12.

103. S.F. Trial, Volume 10, voir dire examination of Charles Martin, at pp. 88, 117–19, 124–25, 129–30.

104. S.F. Trial, Volume 11, voir dire examination of Juliette Frederick, at pp. 5–6, 28, 35–36.

105. S.F. Trial, Volume 13, voir dire examination of Jimmy Phelps, at pp. 132, 135, 137–38.

106. S.F. Trial, Volume 14, voir dire examination of Robert Kravetz, at pp. 105–08. Mr. Kravetz's voir dire examination made clear he was favorably disposed to the defendant's position regarding the applicability of self-defense to the capital murder charge against petitioner. *Id.*

107. S.F. Trial, Volume 15, voir dire examination of Terry White, at p. 83.

108. S.F. Trial, Volume 19, voir dire examination of Joel C. Link, at pp. 103, 109–11, 117–19.

109. S.F. Trial, Volume 19, voir dire examination of Helen Clark Martin, at pp. 103–05.

110. S.F. Trial, Volume 21, voir dire examination of Manuel Pacheco, at p. 139.

consideration of "all the evidence" before the jury when answering the mitigation or *Penry* special issue did not cause the performance of said counsel to fall below an objective level of reasonableness.[111]

Having independently reviewed the voir dire examination of all twelve members of petitioner's petit jury, and in light of the limited record in this proceeding (i.e., the absence from the record before this Court of the juror questionnaires completed by all of the petitioner's venire members), this Court concludes petitioner has failed to carry his burden of proving the performance of his trial counsel during voir dire fell below an objective level of reasonableness.

#### b. *No Prejudice*

Petitioner alleges no specific facts showing that any of the twelve persons who served as his petit jurors possessed any disqualifying bias. As this Court has explained on several occasions, the standard for determining the constitutional fitness of a capital sentencing juror is set forth in a series of Supreme Court opinions dating back several decades:

> In *Witherspoon v. Illinois*, 391 U.S. 510, 521–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, the Supreme Court held as follows:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

> In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526.

> In *Adams*, the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in cer-

---

**111.** This is not to say that it would have been improper for petitioner's trial counsel to inquire of venire members whether they would be capable of giving consideration to different types of potentially mitigating evidence which might be presented during the punishment phase of a capital trial. Such inquiries would necessarily have had to be narrowly limited under Texas law, however, to avoid efforts to commit a potential juror to render a particular verdict based upon a particular set of hypothetical facts. *See Sells v. State*, 121 S.W.3d 748, 755–757 (Tex.Crim.App.), *cert. denied*, 540 U.S. 986, 124 S.Ct. 511, 157 L.Ed.2d 378 (2003) (distinguishing between permissible voir dire inquiries and impermissible attempts to commit the juror to a particular verdict based on particular facts).

tain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *

[A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the "guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon*.

The State could, consistently with *Witherspoon*, use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *

[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reason-

able doubt. * * * [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas,* 448 U.S. at 46–50, 100 S.Ct. at 2527–29 (citations omitted).

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams,* holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852. In *Wainwright v. Witt,* the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.,* 469 U.S. at 430–35, 105 S.Ct. at 855–58.

More recently, in *Uttecht v. Brown,* 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), the Supreme Court reviewed its *Witherspoon–Witt* line of opinions and identified the following "principles of relevance":

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a

juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. at 9, 127 S.Ct. at 2224 (*citations omitted*).

The Supreme Court emphasized the critical inquiry for *Witherspoon–Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown*, 551 U.S. at 16–17, 127 S.Ct. at 2228. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown*, 551 U.S. at 20, 127 S.Ct. at 2230 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon–Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. at 22, 127 S.Ct. at 2231.

*Bartee v. Quarterman*, 574 F.Supp.2d 624, 662–64 (W.D.Tex.2008), *CoA denied*, 339 Fed.Appx. 429 (5th Cir.2009), *cert. denied*, 559 U.S. 1009, 130 S.Ct. 1882, 176 L.Ed.2d 370 (2010).

██ Having independently reviewed the entirety of the voir dire examination of the twelve venire members who served as petitioner's petit jurors, this Court concludes none of those individuals were properly subject to challenges for cause based upon any disqualifying bias or demonstrated inability to set aside their personal opinions and render a verdict based solely upon the law and evidence. All of the jurors in question asserted they could set aside their personal views and render a verdict at both phases of petitioner's capital murder trial based solely upon the evidence and the law as defined by the trial court. The Constitution requires nothing more.

Furthermore, the evidence presented by the prosecution at the guilt-innocence phase of petitioner's capital murder trial was more than compelling, it was overwhelming. Petitioner confessed in writing to fatally shooting officer Riojas while engaging in conduct which can most charitably be called a violent attempt to avoid apprehension. At no point in his written statements did petitioner indicate he had made any attempt to surrender to officer Riojas. On the contrary, petitioner's written statements are filled with petitioner's firm assertions that he did not want to be arrested despite petitioner's actual knowledge that warrants for his arrest were outstanding. None of the eyewitnesses to the confrontation between petitioner and officer Riojas, including petitioner's long time friend Jamie Martinez, claimed to have seen Riojas strike petitioner in the face as petitioner claimed. None of the relatives and friends with whom petitioner stayed in the days immediately after Rio-

jas' fatal shooting heard petitioner claim that he shot Riojas in self-defense. Finally, there is absolutely no evidence showing that, immediately after the shooting of Riojas, petitioner made any effort to obtain assistance for Riojas or to treat Riojas' injuries himself. Thus, there is no reasonable probability a rational juror would have ever accepted petitioner's claim that his fatal shooting of Riojas was accidental. Under such circumstances, there is no reasonable probability that, but for any act or omission by petitioner's trial counsel during voir dire, the outcome of the guilt-innocence phase of petitioner's capital murder trial would have been any different.

All of petitioner's jurors indicated they understood the Texas capital sentencing special issues, could follow the trial court's instructions regarding same, and render a verdict based upon the evidence.[112] The prosecution's evidence during the punishment phase of petitioner's capital murder trial included compelling evidence linking petitioner with no less than two dozen serious criminal offenses, both as a juvenile and adult, including multiple instances in which petitioner committed felonies while armed with a handgun and multiple episodes in which petitioner drove stolen vehicles in a reckless manner, showing a deliberate disregard for the safety of others on the road. Petitioner's second written statement attempted to assign blame to officer Riojas for his own fatal shooting (despite petitioner's repeated insistence in his same written statements that he was determined not to permit officer Riojas to arrest him). Thus, at no point in his written statements did petitioner express genuine contrition or remorse for his fatal shooting of officer Riojas. On the contrary, several San Antonio Police officers testified without contradiction that, in the

hours immediately following his arrest, petitioner made threats and threatening gestures toward officers. Under such circumstances, there is no reasonable probability that, but for any act or omission by petitioner's trial counsel during voir dire, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

### 4. Conclusions

Petitioner procedurally defaulted on this aspect of his multi-faceted ineffective assistance claim herein by failing to present this same complaint about the performance of his trial counsel during voir dire to the state courts until petitioner's second state habeas corpus proceeding.

Alternatively, after an independent, *de novo*, review, this Court concludes petitioner's complaints about the performance of his trial counsel during voir dire all fail to satisfy either prong of *Strickland* analysis. Petitioner's complaints about the performance of his trial counsel during voir dire do not warrant federal habeas corpus relief.

### F. Failure to Investigate and Present Mitigating Evidence

### 1. The Complaint

Petitioner argues that his trial counsel failed to adequately investigate petitioner's abused and neglected childhood and to present then-available mitigating evidence showing, among other things, that (1) petitioner suffers from Fetal Alcohol Syndrome as a result of his mother's heroin abuse and drinking alcohol during her pregnancy with petitioner, (2) petitioner's father was physically and emotionally abusive toward petitioner and petitioner's mother, (3) petitioner's father sexually assaulted petitioner's sister when she was six

---

112. *See note 92, supra.*

or seven, (4) petitioner's father (as well as virtually every other male relative of the petitioner) went to jail or prison when petitioner was young, (5) petitioner's childhood was chaotic and filled with destructive influences in the form of drug abuse and criminal activities by his relatives, (6) petitioner suffers from "affective disorder" accompanied by "an apparent chronic and ingrained paranoia and possible delusional features," (7) petitioner suffers from deficiencies in executive functions, severe mood disorder, delusional disorder, and hallucinations, (8) petitioner was a good student in elementary school, (9) petitioner began stealing cars when he was fifteen, after his father died of a heroin overdose, to get money for his family, (10) petitioner had a lot of anger in him after his father died, (11) petitioner's intellectual functioning was in the low average to borderline range, (12) petitioner has been involved with street gangs since age twelve, (13) petitioner has poor impulse control and a difficult time controlling his emotions, and (14) petitioner may lack coping skills and experience difficulty meeting the demands of daily life as well as problems with interpersonal relationships.[113]

### 2. State Court Disposition

Petitioner presented most of these same complaints during his first state habeas corpus proceeding.[114] More specifically, petitioner presented the state habeas court with (1) numerous juvenile probation reports and psychological evaluations documenting (a) petitioner's abused, neglected, and impoverished, childhood, (b) the difficulties petitioner experienced adjusting

following the death of his father, and (c) petitioner's unstable family situation,[115] (2) an affidavit dated October 21, 2004 from psychologist Dr. Jack Ferrell based upon a review of petitioner's criminal justice records, school records, and a clinical evaluation in which Dr. Ferrell opined that petitioner's history did not reflect a history of violence or a tendency toward a violent nature,[116] (3) an affidavit dated October 19, 2004 from psychologist Dr. Susana A. Rosin, in which she stated, in part, that her clinical interview of petitioner and review of petitioner's records led her to conclude petitioner possesses average intellectual ability, petitioner's fatal shooting of officer Riojas was accidental, petitioner had no prior history of violent crimes, and petitioner had adjusted very well to the structure and routine of death row,[117] (4) an unexecuted affidavit dated October 19, 2004 from sociologist Dr. Kate Allen (a) detailing petitioner's abusive, criminal, father's violent treatment of petitioner, petitioner's mother, and petitioner's sister Corinna, (b) concluding that petitioner derived a "rush" from engaging in high risk behaviors such as auto theft, burglary, and high-speed chases which "imprinted" petitioner's nervous system, (c) inexplicably concluding there was no violence in petitioner's family, criminal, or relationship history (apparently disregarding the same evaluation's detailed history of physical abuse and violence wrought upon petitioner's family by petitioner's father), (d) concluding petitioner grew up in a subculture at the intersection of poverty, racism, and the frailty of masculinity, (e) concluding petitioner "managed to become an essentially non-

---

**113.** Amended Petition, at pp. 73–103.

**114.** First State Habeas Transcript, at pp. 26–38, 117–86.

**115.** First State Habeas Transcript, at pp. 117–59.

**116.** First State Habeas Transcript, at p. 160.

**117.** First State Habeas Transcript, at pp. 162–67.

violent, even 'decent' criminal who specialized in stealing others' property in the place of working a legitimate job, as he was striving to find his way into adulthood," and (f) concluding petitioner "is not the type of criminal for which the death penalty was designed,"[118] (5) an affidavit dated October 22, 2004 from petitioner's paternal uncle Raul Gonzales, Jr., stating, in part, that (a) he witnessed petitioner's father physically abusing petitioner, (b) petitioner's father also physically abused petitioner's mother, (c) the accusation that petitioner's father sexually abused petitioner's sister was a lie, (d) petitioner's mother was unable to protect petitioner from his father and used drugs and had other boyfriends when petitioner's father was in jail or prison, (e) the only way the petitioner could help his mother and family financially was by stealing, (f) he was in prison himself several times during petitioner's childhood, and (g) he spoke with petitioner's trial counsel's mitigation specialist regarding petitioner's family background the foregoing subjects but was never called to testify at petitioner's trial,[119] (6) an affidavit dated October 20, 2004 from petitioner's mitigation specialist at trial, Ann Matthews, and unsigned copies of purported correspondence with petitioner's trial counsel, stating, in part, that (a) she urged petitioner's trial counsel to interview and present petitioner's uncle Raul Gonzales, petitioner's mother, petitioner's sister, and mental health and TDCJ experts as witnesses at trial but (b) she was discharged by petitioner's trial counsel over disagreements as to how mitigation was to proceed,[120] and (7) an affidavit dated October 20, 2004 from a former Texas Department of Criminal Justice ("TDCJ") employee discussing TDCJ procedures for classifying capital offenders.[121]

During the evidentiary hearing held in petitioner's first state habeas corpus proceeding, petitioner also presented live testimony from (1) petitioner's paternal uncle Raul Gonzales, Jr. describing (a) the severe physical and emotional abuse of petitioner and petitioner's mother he witnessed at the hands of petitioner's father and (b) the criminal history and drug abuse of petitioner's father,[122] (2) psychologist Dr. Jack Ferrell describing (a) his clinical and mental status evaluation of petitioner prior to trial, (b) his meeting with petitioner's trial counsel to discuss same on October 28, 2002, during which he explained that he did not believe petitioner's records showed a propensity for violence or significant disturbance, and (c) his professional opinion that petitioner did not have a history of violence or a tendency to act in a violent manner in the future,[123]

---

118. First State Habeas Transcript, at pp. 170–81.

119. First State Habeas Transcript, at pp. 183–86.

120. First State Habeas Transcript, at pp. 188–94.

121. First State Habeas Transcript, at pp. 196–98.

122. Statement of Facts from petitioner's first state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), Volume 2 of 5, proceedings March 24, 2008, testimony of Raul Gonzales, Jr., at pp. 20–44.

Mr. Gonzales also discussed (1) his own criminal history, which he admitted included seven or eight convictions for theft and drug offenses, (2) his conversations about petitioner with petitioner's mitigation specialist, and (3) his knowledge of petitioner's history of multiple auto thefts. *Id.*, at pp. 31–33, 36, 42.

123. S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 42–61.

Dr. Ferrell admitted on cross-examination that he was unaware of petitioner's 1998 conviction for unlawfully carrying a weapon and petitioner's conviction for burglary of a habitation in which petitioner employed a screwdriver. *Id.*, at pp. 54–56.

(3) petitioner's second-chair counsel at trial, attorney Ed Camara, who testified, in part, that (a) he had done no discovery or trial preparation by the time attorney Ray Fuchs was permitted to withdraw from petitioner's case, (b) he never discussed trial preparation for the punishment phase of trial with attorney Callahan (who replaced Fuchs), (c) he did not discuss Jack Ferrell with Callahan and did not recall Ferrell being present during trial, (d) the court-appointed investigator (Jeff Mitchel) suggested obtaining the services of a mitigation specialist (Ann Matthews), (e) he became upset with Matthews and terminated her services when she filed vouchers with the trial court instead of waiting until after the completion of the trial to seek payment, and (f) attorney Callahan did no preparation whatsoever for the punishment phase of trial,[124] and (4) sociologist, Dr. Katherine Allen, who testified, in part, that (a) petitioner's parents were teenagers who very quickly had two children, (b) criminal activity was "very standard" on both sides of petitioner's family, (c) petitioner's father was very abusive and extremely controlling of his wife and children, (d) petitioner's father molested petitioner's sister, (e) petitioner's father

was involved in criminal activity, drug abuse, and selling drugs, (f) children tend to mimic the behaviors they see in their home, (g) "stealing and drug use and abuse and selling was normalized in the family," (h) petitioner began shoplifting at age thirteen, prior to his father's death, (i) after his father's death, petitioner pursued the same criminal activities as his father, (j) petitioner's friend Ronald taught petitioner how to steal cars, (k) from ages fourteen to seventeen, petitioner's brain became "imprinted or entrained" for the rush petitioner received from stealing, (l) petitioner was not a violent youth and very non-confrontational in his crimes, (m) aside from stealing, petitioner did not act out, (n) petitioner did have a number of family risk factors for future violence by youthful offenders, including a family history of criminal behavior, substance abuse, family management problems, family conflict, and parental attitudes favorable toward crime and substance abuse, and (o) petitioner had the following risk factors from age six to adolescence: economic deprivation, community disorganization and low neighborhood attachment, family conflict, and parental attitudes favorable toward crime and substance abuse.[125]

124. S.F. State Habeas Hearing, Volume 2 of 5, testimony of Ed Camara, at pp. 62–100.

On cross-examination, attorney Camara also testified (1) he had only one capital murder trial prior to being appointed to help handle petitioner's case, (2) petitioner's comments to him about the fatal shooting of officer Riojas were consistent with petitioner's written statements to police, (3) Ann Matthews interview four or five members of petitioner's family, (4) Ms. Matthews reported what these witnesses said but he did not recall her making any recommendations, (5) he was unaware of any additional punishment phase witnesses, (6) Jeff Mitchel did not do any punishment phase investigation, (7) Ann Matthews did tender reports but he could not get additional information from her because she was not getting paid, (8) he spoke with petitioner's mother and sister but not about

mitigation subjects, and (9) he had access to petitioner's extensive juvenile and criminal records. *Id.*, at pp. 83–99.

125. S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 7–84.

On cross-examination, Dr. Allen testified (1) she had not read any of the police reports concerning petitioner's capital offense, (2) petitioner was, in her opinion, a "fleer" not a fighter, (3) she believed it was unlikely petitioner would again engage in violence, (4) she disagreed with the diagnosis of petitioner with a conduct disorder, (5) it is common for students with conduct disorders to develop antisocial personality disorder as adults, (6) many adolescents with conduct disorder later outgrow it, (7) she did not consider the screwdriver with which petitioner was arrested on one occasion to be a weapon, (8) she disa-

The state called petitioner's former first-chair trial counsel, attorney Vincent D. Callahan, who testified, in part, that (1) he prepared for petitioner's trial by reading the state's file, going to the scene of the offense, talking with petitioner's former lead trial counsel, and interviewing petitioner, (2) petitioner told him that he (petitioner) shot officer Riojas, (3) attorney Camara took the lead with regard to guilt-innocence phase of trial while he (attorney Callahan) took the lead with regard to the punishment phase of trial, pretrial motions, and petitioner's motion to suppress, (4) the two defense attorneys split responsibilities with regard to voir dire, (5) his voir dire strategy was to find a juror who would not vote in favor of the prosecution, (6) he asked Dr. Ferrell to prepare a mental health evaluation of petitioner and sent Dr. Ferrell the state's Rule 404(b) notice and a copy of his own discovery notes, (7) he believed Dr. Ferrell, if called to testify at trial, would say petitioner was a future danger, (8) the three members of petitioner's family who testified at the punishment phase of petitioner's capital murder trial were the only members of petitioner's family who showed up for trial, (9) he did not consider subpoenaing other members of petitioner's family because he believed forcing people to testify makes them "angry," reluctant witnesses who might hurt the party who issued the subpoena, (10) Ann Matthews seemed to be a money grubber whose letters all seemed to focus on her getting paid, (11) he spoke with five members of petitioner's family during lunch breaks at trial, (12) only three family members showed up for the punishment phase of petitioner's capital murder trial, (13) the jury heard everything he had been told by petitioner's family members regarding petitioner's troubled youth, (14) he hoped to convince the jury that petitioner had learned his criminal behavior from his family and the jury would hold petitioner less responsible for same, (15) he believed he conferred sufficiently with Dr. Ferrell and that Ferrell had communicated an opinion that petitioner was a future danger, (16) attorney Camara was upset that he was not the first chair trial counsel and unhappy with attorney Callahan's "punishment phase-oriented" voir dire, (17) Camara wanted a more "guilt-innocence phase-oriented" voir dire, (18) based upon his conversations with petitioner, however, attorney Callahan believed there was no chance of obtaining an acquittal, and (19) he did not feel it was necessary to have an expert witness develop the circumstances of petitioner's family history.[126]

The parties also agreed to the admission of extensive school and TDCJ records relating to petitioner.[127]

The state habeas trial court made the following findings and conclusions regard-

---

greed somewhat with the diagnosis of Dr. Sherman of conduct disorder because she does not consider the fights identified by Dr. Sherman as serious because they were juvenile fights and she places little value on petitioner's early onset drug and alcohol abuse, (9) she does not believe petitioner has a history of threatening or assaultive behavior, (10) petitioner has not been aggressive toward people or animals in her opinion, (11) she disregards petitioner's gang affiliation because petitioner has no gang tattoos and joined at age thirteen, (12) petitioner gets a rush like a runner's high from engaging in risky behavior, and (13) petitioner is not mentally retarded. *Id.*, at pp. 38–76.

**126.** S.F. State Habeas Hearing, Volume 4 of 5, testimony of Vincent D. Callahan, at pp. 5–38.

**127.** These documents are found in S.F. State Habeas Hearing. Volume 5 of 5. The documents in question include (1) petitioner's academic records from the Northeast I.S.D., (2) petitioner's TDCJ disciplinary records covering the years 2003–07, and (3) attorney Callahan's billing invoices for petitioner's case.

ing this aspect of petitioner's ineffective assistance claims: (1) petitioner demonstrated four of the seven risk factors for future violence by youthful offenders during the period from conception to age six,[128] (2) petitioner demonstrated ten of the fifteen risk factors from ages six to adolescence,[129] (3) petitioner's history did not evidence many of the preventive factors which tend to prevent an individual from having a delinquent or violent future,[130] (4) Dr. Allen's analysis of petitioner's propensity for future violence did not factor in petitioner's murder of officer Riojas and was dismissive with regard to the weapons petitioner had been found to possess, both inside prison and in the course of his criminal offenses,[131] (4) Dr. Allen's disagreement with Dr. Sherman's diagnosis of conduct disorder was based, in part, upon Dr. Allen's rejection of a number of factors relied upon by Dr. Sherman, including petitioner's possession of weapons during several offenses, petitioner's early sexual activity, petitioner's episodes of running away from home and running away from a halfway house, petitioner's involvement with gangs, and petitioner's involvement in fights as a juvenile,[132] (5) Raul Gonzales's testimony at the state habeas corpus hearing did not add anything substantive regarding petitioner's background to the trial testimony of petitioner's mother, sister, and uncle,[133] (6) Gonzales's lengthy criminal record undermined any benefit his testimony might have had at trial,[134] (7) there was no evidence Dr.

Allen was available to testify during petitioner's trial,[135] (8) Dr. Allen's testimony during the state habeas corpus hearing strongly supported a conclusion that petitioner would engage in future violent acts,[136] (9) sociologist Dr. Allen's opinion that petitioner had been improperly diagnosed by psychologist Dr. Sherman with social conduct disorder was not credible because Dr. Allen ignored several pieces of undisputed evidence, including evidence showing petitioner had run away from home and escaped from a juvenile halfway house, petitioner's early on-set sexual activity and drug and alcohol abuse, petitioner's possession of weapons on campus and during the commission of multiple crimes, petitioner's documented fighting, and petitioner's gang membership,[137] and (10) had Dr. Allen testified at petitioner's trial, the prosecution could have rebutted her testimony with that of Dr. Sherman and the jury would likely have learned the social disorder with which petitioner was diagnosed as a juvenile often develops into full=blown antisocial personality disorder.[138] Based upon the foregoing findings and conclusions, the state trial court recommended denial of petitioner's complaint about petitioner's ineffective assistance claim premised upon petitioner's trial counsels' alleged failure to adequately investigate and present mitigating evidence.[139] The Texas Court of Criminal Appeals expressly adopted the foregoing findings and conclusions when it denied

**128.** First State Habeas Transcript, at p. 216.

**129.** *Id.*

**130.** *Id.*

**131.** *Id.,* at pp. 217–18.

**132.** *Id.,* at pp. 218–19.

**133.** *Id.,* at p. 230.

**134.** *Id.*

**135.** *Id.*

**136.** *Id.,* at p. 231.

**137.** *Id.*

**138.** *Id.,* at pp. 231–32.

**139.** *Id.,* at p. 232.

petitioner's first state habeas corpus application. *Ex parte Manuel Garza*, WR 70797–01, 2008 WL 5245545, at *1.

In his second state habeas corpus proceeding, petitioner re-presented all of the allegations, affidavits, and other documents he had presented to the state habeas court during his first state habeas corpus proceeding.[140] In addition, petitioner also presented the state habeas court with a plethora of new affidavits and documents purportedly supporting this aspect of his ineffective assistance claim, including (1) an affidavit dated December 15, 2009, in which clinical psychologist Dr. Jack Ferrell (a) summarizes various juvenile records of petitioner which Dr. Ferrell states he had not seen at the time of petitioner's trial, (b) identifies a number of factors which negatively influenced petitioner during childhood (including petitioner's abusive father, petitioner's father's sexual abuse of petitioner's sister, and petitioner's "abusive, non-supportive, and rejecting" family environment), (c) recites findings from earlier psychological evaluations stating petitioner had engaged in a pattern of antisocial behavior, displayed poor impulse control, and had difficulty controlling his emotions, and (d) criticizes petitioner's trial counsel for failing to further explore these subjects and obtain expert testimony regarding same[141]; (2) an affidavit dated December 10, 2009 from clinical social worker Gerald L. Byington in which he (a) criticizes the extent of pretrial investigation by Ann Matthews and petitioner's trial counsel into petitioner's family background, (b) identifies additional areas of investigation for mitigating evidence which he claims

petitioner's defense team failed to adequately explore, (c) criticizes the investigation into petitioner's background done by petitioner's first state habeas counsel ("no evidence was presented at the writ hearing about what information and individual testimony could have been made available to the trial jury had someone bothered to look"), (d) claims that a minimum of one hundred hours of investigation is necessary in every mitigation investigation, (e) claims that between 150 and 200 hours of mitigation investigation was necessary in petitioner's case (at a rate of $100 per hour), (f) asserts without citation to any specific evidence in the record that petitioner's mother might have used alcohol or drugs during her pregnancy with petitioner and petitioner suffers from IQ deficits, (g) discusses the head injuries petitioner suffered as a child which were mentioned in various juvenile psychological evaluations, (h) argues neuropsychological testing should have been performed on petitioner, and (i) argues developmental and gang experts should have been involved in the investigation of petitioner's background[142]; (3) an affidavit dated June 14, 2010 from petitioner's paternal uncle Raul Gonzales, Jr. in which he (a) asserts he gave Ann Matthews all of the information he knew about petitioner's background, (b) repeats most of the information about the criminal and abusive behavior of petitioner's father to which he testified during petitioner's first state habeas corpus proceeding, (c) asserts petitioner's mother used heroin during her pregnancy with petitioner, (d) asserts petitioner, petitioner's sister, and petitioner's mother all helped petitioner's

---

140. Second State Habeas Transcript, at pp. 432–793.

141. Second State Habeas Transcript, at pp. 795–98.

142. Second State Habeas Transcript, at pp. 800–07. Attached to Mr. Byington's affidavit are unverified copies of what he represents to be Ann Matthews' investigative notes and reports. *Id.,* at pp. 808–39.

father sell drugs, (e) asserts petitioner and his sister observed petitioner's father using and selling drugs, (f) asserts all of the men in petitioner's family have been to prison, some multiple times, (g) once again claims the allegations of petitioner sexually abusing petitioner's sister were "a complete lie," (h) complains that petitioner's mother sold a motorcycle petitioner's father left to petitioner, and (i) admits all of the men in his family "were more interested in getting money to buy things than they were in continuing to go to school"[143]; (4) an affidavit dated June 13, 2010 from petitioner's mother Maria Gonzales in which, in part, she (a) states she spoke with Ann Matthews prior to petitioner's trial but had only brief telephone conversations with petitioner's trial counsel, (b) states Raul Gonzales, Jr. used and sold drugs with her late husband, (c) identifies most members of her and her late husband's families as high school dropouts who used drugs and committed criminal offenses, (d) states that shortly after their first child, Corinna, was born, her late husband was selling marijuana and other drugs and stealing cars to support their family, (e) describes petitioner's father as unfaithful, frequently absent (due to his numerous incarcerations and arrests), physically abusive, and very controlling toward her, (f) admits she drank alcohol while pregnant with petitioner, sometimes to excess, (g) petitioner's father often gave petitioner beer to drink when petitioner was a toddler, (h) there were no problems with petitioner's pregnancy and petitioner's delivery went fine, (i) describes petitioner's father as physically abusive toward their children, (j) describes petitioner's paternal grandfather as unsympathetic to her and her children when petitioner's father beat them, (k) asserts petitioner never had any problems growing up and did fine in elementary school, and (l) states petitioner earned his GED while in the custody of the Texas Youth Commission[144]; (5) an affidavit dated June 15, 2010 from petitioner's sister Corinna Garza in which she states, in part, that (a) her father was physically abusive, forced their family to move frequently when she was growing up, and kept her mother and the rest of their family isolated from the rest of the world, (b) their parents showed little interest in petitioner when he was growing up, (c) their father used drugs in their presence and left drug paraphernalia lying around their house, (d) their parents frequently argued violently, (e) as he grew up, petitioner spent more time with their father and frequently came home with stories about how he and his father had stolen things and gotten into fights, (f) their home was not safe due to their father's violent temper, (g) when their father was in jail the last time, their mother let petitioner run wild, and practically abandoned their family, (h) when she was six or seven her father sexually assaulted her, (i) petitioner was angry with her when she reported their father's sexual assault upon her to their mother, (j) there was no family support for petitioner during times when petitioner attempted to turn his life around, and (k) *prior to petitioner's trial, she spoke with both Ann Matthews and petitioner's attorney and gave them all of the foregoing information*[145]; (6) a quartet

**143.** Second State Habeas Transcript, at pp. 841–45.

Whoever typed the affidavit in question apparently misspelled Mr. Gonzales' name with a "z." The signature on this affidavit appears to show his last name ends with an "s." *Id.*, at p. 845.

**144.** Second State Habeas Transcript, at pp. 847–53.

**145.** Second State Habeas Transcript, at pp. 856–60.

of affidavits, all dated June 12, 2010, from petitioner's maternal aunts Maria Francisca Uribe, petitioner's maternal cousin Emma Uribe, petitioner's maternal cousin Viola Martinez, and petitioner's maternal aunt Vicenta G. Arvizu, which collectively (a) reiterate the statements of petitioner's mother and sister describing the controlling and physically, verbally, and emotionally abusive behavior of petitioner's father toward petitioner, petitioner's mother, and petitioner's sister, (b) describe the drug use of petitioner's father, (c) describe the detrimental impact of petitioner's father's conduct on the emotional well-being of petitioner's mother, (d) admit all of the men and some of the women in their family had problems with criminal conduct, usually arising from their involvement with drugs, (e) describe petitioner's family as suffering financially to the point they lacked essential food at times because of the cavalier attitude of petitioner's father toward the rest of his family, (f) described how petitioner's mother learned, after petitioner's father died of a drug overdose, that petitioner's father had a second family, (g) state that petitioner's father taught petitioner how to sell drugs, burglarize houses, and steal cars, (h) state that petitioner's father introduced petitioner's mother to cocaine abuse, (i) state that, after petitioner's father died, petitioner's mother could not control petitioner, (j) describe the tension inside petitioner's household when petitioner was growing up—which resulted from the violent temper and drug abuse of petitioner's father, and (k) describe petitioner as abusive toward his mother after his father's death [146]; (7) a lengthy affidavit dated June 16, 2010 from clinical psychologist Dr. Joann Murphey which, in part, (a) reiterates the same history of physical, emotional, and verbal abuse of petitioner by petitioner's father recited by petitioner's mother and sister at petitioner's trial, albeit in more detail than most previous reports in the record, (b) states petitioner became sexually active at fifteen, (c) states petitioner reported leaving a number of legitimate jobs during the time period 1997–2001 to "hustle/steal," (d) states petitioner reported he did not intentionally kill officer Riojas but, rather, the gun discharged when he struggled with officer Riojas, (e) summarizes extensive educational, TDCJ, and medical records of petitioner, the autopsy records of petitioner's father, petitioner's juvenile criminal records, and petitioner's IQ and academic achievement test results, all of which Dr. Murphey reviewed,[147] (f) reiterates the assertion that petitioner's mother abused alcohol during petitioner's pregnancy, (g) identifies a learning disability in math and other adaptive behavior deficits (including executive functioning and impulse control) consistent with Fetal Alcohol Syndrome displayed by petitioner, (h) suggests additional evaluation of petitioner for Fetal Alcohol Syndrome is warranted, as is evaluation of petitioner for possible medication, (i) concludes petitioner "has not experienced more than a few months without some criminal justice involvement," (j) describes petitioner as "functioning well in custody," functioning "appropriately in custody where external structure is available," and having a history which "does not include a pattern of criminal violence before the capital offense for which he is awaiting execution," (k) states petitioner "is factually unable to

---

**146.** Second State Habeas Transcript, at pp. 862–65, 867–68, 870–74, 876–81.

**147.** There is no indication in her report/affidavit that Dr. Murphey ever reviewed the

testimony or other evidence presented during either phase of petitioner's capital murder trial.

plan and carry out even minor crimes effectively, but he does not have a history of violent conduct," (*l*) describes petitioner as "a chronic offender" but "not a chronically violent offender," (m) describes petitioner as possessing "impaired cognitive function, specifically impaired executive functions, originating in the developmental period and prenatally. He is severely impaired in adaptive functioning and historically has never functioned successfully in any capacity in adaptive functioning outside of custodial settings," and (n) concludes as follows: "circumstances of Manuel's abusive childhood environment and lack of appropriate paternal guidance, the absence of prior significant violence in his pattern of conduct since the onset of criminal behaviors, and the presence of evident adaptive behavior deficits beyond his control, suggest mitigation of his current sentence." [148]; (8) an affidavit dated June 16, 2010 from social worker Gerald L. Byington which (a) details the extensive history of drug abuse and criminal misconduct on the part of members of petitioner's paternal and maternal families, (b) repeats suggestions of Dr. Murphey that petitioner should be evaluated for the presence of Fetal Alcohol Syndrome, and (c) criticizes the failure of petitioner's mitigation specialist and trial counsel to develop evidence showing the extensive drug abuse and criminal misconduct engaged in by petitioner's family members and the disruptive circumstances of petitioner's childhood [149]; (9) an affidavit dated June 17, 2010 from Ann Matthews again criticizing the efforts

of petitioner's trial counsel to investigate and develop mitigating evidence and repeating hearsay statements allegedly made to her by others, including petitioner's mother, regarding their pretrial contact with petitioner's trial counsel [150]; and (10) voluminous educational records, juvenile and adult criminal records, along with numerous affidavits from records custodians, [151] which collectively emphasize, among other things (a) the multiple occasions on which petitioner was arrested while in possession of guns, knives, and other weapons, [152] (b) the petitioner's low average to borderline intellectual functioning did not prevent petitioner from performing adequately academically while in custody of the Texas Youth Commission, [153] and (c) petitioner was diagnosed as a juvenile with ongoing, serious, problems with violations of institutional norms and in need of anger management therapy. [154]

The Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application pursuant to state writ-abuse principles. *Ex parte Manuel Garza*, WR 70–797–02, 2011 WL 4826968, at *1.

### 3. *Shifting Standards of Review*

Despite the voluminous additional documentation and new affidavits petitioner furnished to the state habeas court in support of this aspect of his multi-faceted ineffective assistance claim during petitioner's second state habeas corpus proceeding

**148.** Second State Habeas Transcript, at pp. 883–923.

**149.** Second State Habeas Transcript, at pp. 931–37.

**150.** Second State Habeas Transcript, at pp. 939–40.

**151.** Second State Habeas Transcript, at pp. 942–1930.

**152.** Second State Habeas Transcript, at pp. 1647, 1649, 1656, 1663–64.

**153.** *Id.*, at pp. 1676, 1698, 1708.

**154.** *Id.*, at pp. 1703, 1709.

(which transformed the petitioner's *Wiggins* claim raised in his first state habeas corpus proceeding into an altogether different complaint), respondent does not request dismissal of this portion of petitioner's supplemented ineffective assistance claim on procedural default grounds.[155]

As the foregoing summary demonstrates, this Court has carefully reviewed the voluminous new material petitioner presented to the state habeas court during petitioner's second state habeas corpus proceeding and concludes that, with the exception of evidence showing petitioner's mother drank alcohol and may have ingested narcotics during her pregnancy with petitioner (and Dr. Murphey's opinion that further investigation into whether petitioner may suffer from Fetal Alcohol Syndrome is warranted), petitioner's "new" purported mitigating evidence offers very little more than the same information about (1) the abusive, criminal, misconduct of the petitioner's father, (2) the rampant criminal and drug-related behavior of petitioner's family, and (3) the abused, neglected, and chaotic nature of the petitioner's childhood detailed in either State Exhibit no. 188 (i.e., petitioner's TYC file) or in the testimony of petitioner's mother and sister during the punishment phase of petitioner's capital murder trial.[156] Likewise, other than suggesting the need for further inquiry into whether petitioner suffers from Fetal Alcohol Syndrome, petitioner's "new" expert opinions (i.e., those expressed in the June 16, 2010 affidavit of Dr. Murphey and Dr. Ferrell's December 15, 2009 affidavit) offer very little truly "new" substantive material beyond those expert opinions expressed by Dr. Ferrell and Dr. Allen during their testimony in petitioner's first state habeas corpus proceeding.[157]

Because no state court has ever addressed the merits of an ineffective assistance claim arguing the failure of petitioner's trial counsel to investigate whether petitioner suffers from Fetal Alcohol Syndrome rose to the level of ineffective assistance, this Court must address the latest version of petitioner's *Wiggins* claim *de novo*. See *Porter v. McCollum*, 558 U.S. at 38–39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

Petitioner has presented this Court with a *Wiggins* claim that petitioner presented to the state courts in two, entirely separate, state habeas corpus proceedings. In the first of those state habeas proceedings, the state habeas court rejected petitioner's claim on the merits. Petitioner then supplemented his original *Wiggins* claim in his

---

155. Respondent's Answer, filed March 26, 2012, docket entry no. 31, at pp. 25–30.

156. The punishment phase trial testimony of petitioner's mother and sister Corinna is found at S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41–54; testimony of Maria Gonzalez, at pp. 54–61. This testimony was summarized in Section I.E.2. above. *See notes 56–57, supra, and accompanying text.*

157. The testimony of Dr. Jack Ferrell and Dr. Katherine Allen during petitioner's first state habeas corpus proceeding appears at S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 42–61, and S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 7–84.

second state habeas corpus application with voluminous documents and new evidence (regarding his mother's abuse of alcohol and possibly drugs while she was pregnant with petitioner) which rendered that claim significantly different from the claim petitioner had presented in his first state habeas proceeding. With regard to the state habeas court's denial on the merits of petitioner's initial *Wiggins* claim during petitioner's first state habeas corpus proceeding, the deferential standard of review set forth in the AEDPA applies. Because respondent failed to request dismissal on procedural default grounds of the "Fetal Alcohol Syndrome" version of petitioner's supplemented *Wiggins* claim contained in petitioner's Amended Petition, this Court must engage in *de novo* review of this supplemented claim.

4. *AEDPA Review of Wiggins Claim Presented in First State Habeas Corpus Proceeding*

a. *No Deficient Performance*

With regard to the arguments and evidence petitioner presented to the state habeas court during his first state habeas corpus proceeding, the Texas Court of Criminal Appeals' rejection on the merits of this aspect of petitioner's multi-faceted ineffective assistance claim was eminently reasonable. As was explained above, during petitioner's first state habeas corpus proceeding, petitioner presented the state habeas court with generic arguments that petitioner's trial counsel had failed to adequately investigate petitioner's background for mitigating evidence.[158] More specifically, petitioner argued his trial counsel failed to adequately investigate petitioner's troubled childhood and attached the affida-

vits of Dr. Jack Ferrell, Dr. Katherine Allen, and Dr. Susana Rosin in support of that assertion.[159]

The initial problem with this complaint is that the affidavits in question and the testimony petitioner offered during the evidentiary hearing in his first state habeas corpus proceeding furnished no new "facts" about petitioner's background that had not already been presented to the petitioner's capital sentencing jury through either the admission into evidence of State Exhibit no. 188 (i.e., petitioner's 350–page TYC file) or the punishment phase trial testimony of petitioner's uncle, mother, and sister. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.1994) (holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

More specifically, when called upon to present actual evidence and testimony showing what additional mitigating evidence or testimony could have been presented (had petitioner's trial counsel undertaken a more thorough investigation of petitioner's background), petitioner offered only (1) the testimony of his paternal uncle, Raul Gonzales, which the state habeas trial court accurately described as cumulative of the trial testimony of petitioner's

---

**158.** First State Habeas Transcript, at pp. 26–38.

**159.** First State Habeas Transcript, at pp. 160, 162–67, 170–81. The affidavits in question

were summarized in Section IV.F.2. above. *See notes 116–18, supra, and accompanying text.*

three punishment phase witnesses [160] and (2) expert testimony from Dr. Ferrell and Dr. Allen suggesting they could have testified that they did not believe petitioner posed a risk of future dangerousness (which expert testimony the state habeas trial court accurately pointed out was not supported by the record of petitioner's violent criminal misconduct, including the numerous instances in which petitioner committed crimes while armed with a gun, a knife, or other weapon such as a screwdriver). In fact, the state habeas trial court reasonably concluded that Dr. Allen's testimony before the state habeas trial court strongly supported a conclusion that petitioner would engage in future violent acts.[161] Dr. Ferrell's testimony before the state habeas court was undermined by his admissions that he had reviewed only a few documents concerning petitioner's background and had performed only a limited clinical examination of petitioner focused primarily on ascertaining petitioner's mental status.[162] More significantly, there was no evidence before the state habeas court establishing that either Dr. Allen or Dr. Ferrell were ever given access to most of the records from petitioner's trial (including petitioner's written

**160.** Raul Gonzales, Jr.'s testimony during petitioner's first state habeas corpus proceeding appears at S.F. State Habeas Hearing, Volume 2 of 5, testimony of Raul Gonzales, Jr., at pp. 20–44. The state habeas trial court made factual findings, which the Texas Court of Criminal Appeals adopted, that Raul Gonzales's testimony did not add anything substantive to the trial testimony of petitioner's three family members. First State Habeas Transcript, at p. 230. Having independently reviewed the entire record from petitioner's trial and state habeas corpus proceedings, this Court concludes the state habeas trial court's factual finding on this subject was objectively reasonable and amply supported by the record then before that court. With one exception, Raul Gonzales simply reiterated the same accusations about petitioner's father's criminal misconduct, child abuse, and drug use that petitioner's mother and sister testified to at petitioner's trial. That one exception was Raul Gonzales's insistence that the petitioner's sister's accusations that petitioner's father had sexually assaulted her as a child were untrue.

**161.** First State Habeas Transcript, at p. 231.
Having reviewed the entirety of the record from petitioner's trial and first state habeas corpus proceeding, this Court concludes the state habeas trial court's conclusion in this regard was eminently reasonable. Dr. Allen was forced to admit that her expert opinion regarding petitioner's non-violence was based on an extremely circumscribed view of the nature of petitioner's criminal conduct and disregarded several significant, undisputed, facts, including petitioner's gang membership, youthful sexual activity, participation in fights while a juvenile, running away from home, and escaping from a juvenile halfway house. *Id.*, at pp. 231–32.

**162.** S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 45–48, 54–56.

This point is brought home by Dr. Ferrell's admissions during his testimony that he was unfamiliar with the circumstances of petitioner's 1998 conviction for unlawfully carrying a weapon and with the circumstances of the burglary of a habitation for which petitioner was convicted and in which petitioner was found to be carrying a weapon (i.e., a screwdriver). *Id.*, at pp. 54–56. As if to drive the same point home even further, Dr. Ferrell's affidavit dated December 15, 2009 currently before this Court complains that he was not furnished with copies of many documents he considered relevant to a proper evaluation of petitioner's psychological condition (including many documents included in petitioner's Texas Youth Commission file which was admitted into evidence at trial as State Exhibit no. 188 and is found at S.F. Trial, Volume 36) until long after petitioner's 2002 capital murder trial. Second State Habeas Transcript, at pp. 795–98. Thus, in his latest affidavit, Dr. Ferrell has admitted he was unprepared at the time of petitioner's capital murder trial to testify or render an expert opinion upon petitioner's psychological condition based upon all of the evidence that was presented to the jury at the punishment phase of petitioner's trial.

confessions, the trial testimony from eyewitnesses describing the petitioner's fatal shooting of officer Riojas, or the extensive trial testimony concerning petitioner's lengthy criminal record) prior to their testimony at the petitioner's state habeas corpus hearing.[163]

Perhaps because neither of them had reviewed the actual testimony from petitioner's trial, the efficacy of the expert opinions offered by Dr. Allen and Dr. Ferrell during petitioner's first state habeas corpus proceeding (i.e., that petitioner was essentially a non-violent offender who posed little risk of future violence) quickly dissipated when both were subjected to cross-examination. For instance, Dr. Allen repeatedly insisted that, because of petitioner's non-violent criminal history prior to the murder of officer Riojas, petitioner was not likely to engage in violence when confronted.[164] However, numerous law enforcement officers who had arrested petitioner had already testified at the punishment phase of petitioner's trial about many instances in which petitioner aggressively resisted arrest or made violent attempts to avoid apprehension or to escape from custody.[165] Moreover, numerous vic-

**163.** While Dr. Allen's testimony before the state habeas court did show her familiarity with a pair of psychological evaluations performed on petitioner by Dr. Furgeson and Dr. Sherman that had been included among petitioner's TYC file, Dr. Allen did not appear to be familiar with the testimony offered during either phase of petitioner's capital murder trial. This fact is significant because, had they been called to testify during the punishment phase of petitioner's capital murder trial, Dr. Ferrell and Dr. Allen would necessarily have testified following the jury's rendition of a guilty verdict (thus negating petitioner's assertion that his shooting of officer Riojas had been accidental) and following the jury's receipt of multiple days of testimony from petitioner's victims and the law enforcement officers who arrested petitioner (in several cases after petitioner engaged in high speed chases that could not reasonably have been described as "non-violent").

Petitioner's capital sentencing jury also had before it a complete copy of petitioner's Texas Youth Commission file, including multiple psychological evaluations, which was admitted into evidence as State Exhibit no. 188. S.F. Trial, Volume 32, testimony of Juan Antonio DeLeon, at pp. 150–51. A copy of State Exhibit no. 188 appears in S.F. Trial, Volume 36.

**164.** S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 23–24, 29, 31–32, 34, 41, 45, 63, 70.

**165.** S.F. Trial, Volume 31, testimony of Ken Tuttle, at pp. 7–13, and testimony of Jeff Crabb, at pp. 16–23 (petitioner and his ac-complices broke into a home in February, 1996, attempted to flee when police entered the residence, petitioner refused to comply with directives to come out of hiding, and a handgun was found next to the location where petitioner was arrested); Volume 31, testimony of Michael F. Helle, at pp. 53–58, testimony of Richard Cuellar, at pp. 62–68, and testimony of Lawrence Patrick Saiz, at pp. 69–79 (late on New Year's Eve 1998 into the early morning hours of January 1, 1999, petitioner led police on a high speed chase in a stolen vehicle during which petitioner drove more than twenty miles an hour above the posted speed limit, without any lights, and swerved dangerously in and out traffic; petitioner finally crashed the stolen vehicle into a school back stop and, violently resisted efforts of police to arrest him; after his arrest, a handgun was discovered in petitioner's pants pocket); testimony of Dennis Kifer, at pp. 103–05 (petitioner led police on a high speed chase on March 6, 1999 and successfully fled the stolen vehicle in question); Volume 31, testimony of Lloyd Lopez, at pp. 154–58 and testimony of Ramiro Escamilla, at pp. 163–66 (on July 1, 1999 petitioner led police on yet another high speed chase, this time through a residential neighborhood, which did not end until petitioner drove into a stone fence and after which petitioner fled the scene on foot and had to be wrestled to the ground by his arresting officer); Volume 32, testimony of Chris Meehan at pp. 24–27 (on April 2, 1995 petitioner stole another vehicle and led police on another high speed chase, during which petitioner ran stop signs and drove erratically); Volume 32, testimony of Kenneth Mahl,

tims of petitioner testified regarding the extensive damage done to their homes and vehicles done by petitioner.[166] Finally, there was uncontradicted testimony from law enforcement officers describing (1) the damage petitioner had done to an elementary school back stop when he deliberately crashed a stolen vehicle into same [167] and (2) the damage petitioner did to the football field at MacArthur High School when he trenched the field in a stolen jeep.[168]

at pp. 85–95 and testimony of James Fiste, at pp. 102–05 (on July 6, 2000, petitioner escaped from a patrol car while handcuffed, led police on a foot chase, and was not re-apprehended until a helicopter and police canine unit located petitioner in a nearby apartment complex); Volume 32, testimony of Jeffrey Cole Hastings, at pp. 106–14 (on October 20, 1997, after police were called to the residence of petitioner's aunt and uncle, police conducted a search and discovered a Glock pistol with two thirteen-round magazines under petitioner's bed, a Smith & Wesson pistol, and numerous items of stolen property); Volume 32, testimony of Ramiro Sanchez, at pp. 114–17 (on October 10, 1997, petitioner was arrested at MacArthur High School on a Texas Youth Commission warrant and found to have three knives and a screwdriver in his school backpack); and Volume 32, testimony of Carlos Garza, at pp. 161–72 and testimony of Russell King, at pp. 181–86 (on November 29, 2000, petitioner and at least three others burglarized several vehicles in an apartment complex parking lot before leading a civilian eyewitness and police on a high speed chase down Blanco Road at speeds in excess of eighty miles per hour before a Castle Hills Police officer finally pulled the suspect vehicle over).

166. S.F. Trial, Volume 31, testimony of Cecil Wright, at pp. 26–31 (petitioner and accomplices pried open the door from his garage to his kitchen with a crowbar and screwdriver, went through every closet and drawer in his house, tore apart his televisions, ransacked the house, and left a pistol in his eight-year-old daughter's bedroom); Volume 31, testimony of Linda Dettloff, at p. 35 (petitioner knocked out a window of her vehicle while attempting to steal same); Volume 31, testimony of Claudio Velasquez, at pp. 83–84 (his truck window was broken and his tool box stolen from inside the truck); Volume 31, testimony of Abel Palacios, at pp. 89–90 (back window and steering column of his car both broken when petitioner stole same); Volume 31, testimony of Walter Lentz, at pp. 91–92 (his vehicle's steering column was torn loose and the vehicle had several dents in the front

and side after petitioner stole same); Volume 31, testimony of Russell Knoebel, at pp. 111–13 (his Jeep Cherokee was found in the middle of the MacArthur High School football field after petitioner stole it with the backseat, ignition system and steering column all broken and his vehicle spent six or seven weeks at the dealer getting repaired); Volume 31, testimony of Jorge Tablis, at pp. 118–20 (only six or seven hours after he reported his Chevy Blazer stolen, it was found stripped of seats, dashboard, stereo, CD's, and with a broken window and steering column); Volume 31, testimony of Heidi Crabtree Dunlop, at pp. 124–26 (her BMW was recovered after petitioner stole same with the driver's window removed and the wheels and tires stripped from the vehicle); Volume 32, testimony of T.J. Barnes, at pp. 19–21 (his vehicle's front wheel was bent and his undercarriage damaged when it was recovered after petitioner's theft of same); Volume 32, testimony of Mercial White, at pp. 56–57 (his patio door was broken and all drawers in his bedroom strewn around, along with clothing after petitioner's burglary of his residence).

A reasonable jury could easily have concluded the level of violence inflicted upon the residences and vehicles petitioner burglarized went well beyond the level necessary to steal the vehicles or to gain entrance to the residences in question.

167. S.F. Trial, Volume 31, testimony of Richard Cuellar, at pp. 64–68 (petitioner observed laughing after arrest following high speed chase which culminated in petitioner destroying an elementary school back stop by crashing the stolen vehicle he was driving into same); Volume 31, testimony of Lawrence Patrick Saiz, at pp. 71–73 (suspect vehicle hopped curb and slammed into back stop with sufficient force to jam driver's side door).

168. S.F. Trial, Volume 31, testimony of Roman DeLeon, at p. 116 (Jeep petitioner stole was found in the middle of high school football field where the jeep had made doughnuts

Dr. Allen's opinion testimony before the state habeas court was further undermined when she testified on cross-examination that (1) she did not consider a screwdriver to be a weapon, (2) she disregarded evidence showing petitioner had made a sharped edged weapon from a piece of metal while in prison, and (3) she did not consider petitioner's gang membership, admission of early sexual activity, escape from a juvenile halfway house, running away from home, or participation in multiple fights as a juvenile to be significant to the issue of petitioner's future dangerousness.[169] Had Dr. Ferrell or Dr. Allen testified during the punishment phase of petitioner's capital murder trial in the same manner they testified during petitioner's first state habeas corpus proceeding (i.e., by mimicking petitioner's assertion that his fatal shooting of officer Riojas had been "accidental" and asserting that petitioner's criminal history showed petitioner to be non-violent offender), there is every reason to believe their expert opinions would have been viewed as less than credible by the petitioner's capital sentencing jury, which had already (1) found beyond a reasonable doubt the petitioner was guilty of capital murder, (2) heard extensive testimony concerning petitioner's lengthy history of violent criminal conduct, and (3) had received petitioner's TYC file detailing petitioner's many acts of criminal violence during his middle and late teenage years. As the state habeas trial court correctly pointed out, careful scrutiny of Dr. Allen's testimony before the state habeas court revealed strong support for a finding that petitioner would likely pose a risk of future violent criminal behavior. There were, therefore, objectively reasonable bases for not calling either Dr. Ferrell or Dr. Allen to the stand during the punishment phase of petitioner's capital murder trial and eliciting testimony similar to the testimony they gave during petitioner's first state habeas corpus proceeding.

In his latest wave of affidavits, petitioner and his new experts criticize petitioner's trial counsel for not presenting expert testimony establishing petitioner's chaotic, abused, and neglected childhood. However, petitioner's lead trial counsel testified during petitioner's first state habeas corpus proceeding that he preferred to present such evidence through petitioner's family members.[170] The state habeas trial court reasonably concluded it was objectively reasonable for petitioner's trial counsel to present their mitigating evidence through family members, rather than experts.[171] This Court concludes the state habeas court's conclusion in this regard was eminently reasonable. Under the circumstances of petitioner's capital murder trial, the decision to present the jury with the circumstances of petitioner's abused, chaotic, childhood through petitioner's family members, rather than through an expert witness's recitation of hearsay information, was objectively reasonable. At least one member of petitioner's petit jury had declared during voir dire examination that he believed all mental health profes-

---

in the middle of the field and torn up the field).

**169.** S.F. State S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 55, 63–65, 70.

**170.** S.F. State Habeas Hearing, Volume 4 of 5, testimony of Vincent D. Callahan, at p. 33.

**171.** First State Habeas Transcript, at pp. 229 ("These witnesses [i.e., petitioner's family members] were used because the defense believed they would best be able to humanize Garza and invoke the jury's sympathy.").

sionals were "quacks." [172] It was objectively reasonable for petitioner's trial counsel to consider the possibility that other members of petitioner's jury might share similarly negative views of mental health professionals or other experts called to testify regarding petitioner's background. Furthermore, as the state habeas trial court reasonably concluded, the opinions expressed by both Dr. Ferrell and Dr. Allen during their testimony at petitioner's state habeas corpus hearing were readily subject to attack based upon the petitioner's lengthy history of criminal conduct, repeated possession of weapons during criminal offenses, and episodes of violence which included numerous high speed chases resulting in crashed vehicles. Under such circumstances, the decision by petitioner's trial counsel to present petitioner's life history through family members, as opposed to expert witnesses, did not cause the performance of said counsel to fall outside the broad range of objectively reasonable legal representation.

■■■ Thus, there was more than ample evidence before the state habeas court upon which to base that court's conclusions (either implicit or explicit) that (1) the petitioner's trial counsel managed to present petitioner's capital sentencing jury with all of the factual information regarding petitioner's abused childhood and deprived background petitioner offered the state habeas court during petitioner's first

state habeas corpus proceeding and (2) it was objectively reasonable for petitioner's trial counsel to choose to present its mitigating evidence through petitioner's family members (and State Exhibit no. 188) than by presenting expert witnesses. Moreover, having independently reviewed the entirety of the records from petitioner's trial, direct appeal, and first state habeas corpus proceedings, this Court agrees with the state habeas court that the performance of petitioner's trial counsel in presenting petitioner's capital sentencing jury with then-available mitigating evidence did not fall below an objective level of reasonableness.[173]

### b. *No Prejudice*

■■■ For similar reasons, the state habeas court reasonably concluded petitioner was not "prejudiced" within the meaning of *Strickland* by the failure of petitioner's trial counsel to call either petitioner's paternal uncle Raul Gonzales, Dr. Ferrell, or Dr. Allen to testify during the punishment phase of petitioner's capital murder trial in the same manner that they testified during petitioner's first state habeas corpus proceeding.

To satisfy the "prejudice" prong of *Strickland,* a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wig-*

---

**172.** S.F. Trial, Volume 10, voir dire examination of Charles Martin, at p. 142.

**173.** The focus of petitioner's *Wiggins* complaint during petitioner's first state habeas corpus proceeding was upon the alleged failure of petitioner to adequately interview petitioner's family members and investigate potentially mitigating evidence. However, as the state habeas trial court correctly pointed out, the evidence presented during the evidentiary hearing in petitioner's state habeas corpus proceeding showed that court-appointed

mitigation specialist Ann Matthews had spoken with several members of petitioner's family and that petitioner's lead trial counsel had also spoken with several members of petitioner's family during breaks in the guilt-innocence phase of petitioner's capital murder trial. Furthermore, as was explained above at length in Section I.F.2., petitioner's trial counsel did present extensive mitigating evidence concerning petitioner's abusive, deprived childhood and the pernicious influence of petitioner's father's criminal behavior.

*gins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

The state habeas court reasonably concluded that, during his testimony before the state habeas court, Raul Gonzales, Jr. offered no "new" mitigating evidence not already presented to the petitioner's capital sentencing jury by either State Exhibit no. 188 or the punishment phase trial testimony of petitioner's mother, sister, and uncle Louis Garza. Jr. Having independently reviewed the records from the petitioner's trial, direct appeal, and first state habeas corpus proceeding, this Court finds that neither Dr. Ferrell nor Dr. Allen offered any "new" facts concerning petitioner's background which were not otherwise presented to petitioner's capital sentencing jury.

Insofar as Dr. Ferrell and Dr. Allen offered the state habeas court *expert opinions* suggesting petitioner would not pose a risk of future violent criminal acts, those opinions were substantially undermined, if not completely refuted, by the detailed records of petitioner's lengthy criminal history contained in State Exhibit no. 188 and by the almost sixty witnesses the prosecution presented during the punishment phase of petitioner's capital murder trial. It is readily apparent to this Court from their testimony during petitioner's first state habeas corpus proceeding that both Dr. Ferrell and Dr. Allen were unfamiliar at the time they gave their testimony in that proceeding with the petitioner's written statements or the eyewitness testimo-

ny at the guilt-innocence phase of petitioner's trial describing the fatal shooting of officer Riojas. It is also readily apparent to this Court that, when they testified in petitioner's first state habeas corpus proceeding, neither Dr. Ferrell nor Dr. Allen were familiar with the extensive testimony regarding petitioner's criminal history given by a small army of prosecution witnesses who testified during the punishment phase of petitioner's capital murder trial. The reason for this Court's conclusions on these points is that both Dr. Ferrell and Dr. Allen presented the state habeas court with affidavits and testimony in which they relied apparently exclusively on information which was either refuted by the evidence introduced during petitioner's trial or by the contents of petitioner's TYC file admitted into evidence as State Exhibit no. 188.

More specifically, Dr. Ferrell testified he had found nothing in petitioner's records to suggest petitioner had ever been aggressive or violent.[174] In contrast, multiple entries existed in petitioner's TYC case file reporting petitioner's involvement in at least three fights in a single year and petitioner's transfer to an alternative school as a result of fighting with peers.[175] Moreover, Dr. Ferrell was forced to admit on cross-examination that he was unfamiliar with petitioner's 1998 conviction for unlawfully carrying a weapon and could not recall any of the details concerning petitioner's conviction for burglary of a habitation while carrying a screwdriver.[176]

Dr. Allen expressed opinions during petitioner's state habeas hearing that her review of petitioner's record and interviews of petitioner and petitioner's family

---

**174.** S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 48, 51–53.

**175.** State Exhibit no. 188, S.F. Trial, Volume 36, at pp. 193–95, 208, 296–99.

**176.** S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at pp. 55–56.

led her to conclude petitioner had not manifested violence as an adolescent and that it was unlikely petitioner would act violently.[177] Dr. Allen also testified, however, that (1) criminal activity was very standard on both sides of petitioner's family, (2) petitioner personally witnessed his father physically abusing his mother, (3) children mimic what they see at home, (4) petitioner was shoplifting at age thirteen, (5) after his father died, petitioner pursued the same criminal career as his father, (6) at ages fourteen to seventeen, petitioner's brain was imprinted for the rush of stealing, (7) petitioner became depressed after his father's death, (8) adolescent boys will "behavioralize" their depression and act out, and (9) petitioner did have many of the risk factors for future violence, including associating with peers who engage in delinquency and violence.[178] The state habeas court also reasonably concluded Dr. Allen's disagreement with Dr. Sherman's and Dr. Furgeson's diagnoses of petitioner with conduct disorder was not credible.[179] The state habeas court identified numerous factors which Dr. Allen either ignored or disregarded in her analysis of petitioner's background, including petitioner's documented gang membership, fighting, early sexual activity, use of weapons during criminal offenses, truancy, running away from home, escape from a juvenile halfway facility, and drug and alcohol abuse.[180] This Court would add there was no evidence before the state habeas court suggesting Dr. Allen, a *sociologist* by training, was even qualified to second-guess the diagnoses contained in the reports of *psy-chologists* Dr. Sherman and Dr. Furgeson contained in petitioner's TYC file.[181]

The prosecution presented extensive evidence at trial showing petitioner's lengthy history of criminal misconduct, including eyewitness testimony from law enforcement officers who observed petitioner leading police officers on multiple high speed chases, driving without lights and in a very dangerous manner, crashing stolen vehicles into other vehicles and stationary objects such as a back stop and stone fence, and violently resisting arrest following those chases. That same evidence made clear Rocky Riojas was not the first police officer who had faced violent resistance while attempting to arrest petitioner. Several of petitioner's burglary and auto theft victims testified regarding the extensive damage petitioner had done to their vehicles and homes. Petitioner's TYC file documented (1) petitioner's gang membership, sexual activity, and drug and alcohol abuse from an early age, (2) petitioner's unstable, abused, and deprived, childhood, (3) petitioner's lengthy list of criminal misconduct, including truancy, running away from home, and escaping from a juvenile halfway house, (4) petitioner's frequent possession of weapons, including guns and knives, and (5) the criminal, drug-abusing, subculture in which petitioner grew up. Several law enforcement officers testified regarding the threatening gestures and comments petitioner made to them following petitioner's arrest for capital murder. Finally, petitioner offered his capital sentencing jury very little evidence showing sincere expression of remorse or contrition

---

177. S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 24, 31, 34, 45.

178. *Id.*, at pp. 13–20, 23, 25, 32–33.

179. First State Habeas Transcript, at pp. 231–32.

180. *Id.;* S.F. State Habeas Hearing, Volume 3 of 5, testimony of Katherine Allen, at pp. 48–65.

181. The reports with which Dr. Allen took issue appear in State Exhibit no. 188. S.F. Trial, Volume 36, at pp. 296–99, 304–11.

for his fatal shooting of officer Riojas.[182] On the contrary, petitioner's second written statement to police, admitted into evidence during the guilt-innocence phase of petitioner's capital murder trial (and quoted at length above at the beginning of this memorandum opinion), concluded with petitioner's assertion that the actions of officer Riojas, and not petitioner, were the real cause of officer Riojas' murder. This represented the very antithesis of sincere contrition or remorse for officer Riojas' murder. Petitioner's written statements to police made clear that he knew full well he was subject to a lawful arrest by officer Riojas on multiple outstanding warrants and that petitioner was determined to do whatever he felt necessary to avoid arrest.

Under such circumstances, this Court independently concludes there was no reasonable probability that, but for the failure of petitioner's trial counsel to present any of the testimony of Raul Gonzales, Jr., Dr. Ferrell, or Dr. Allen given during petitioner's first state habeas corpus proceeding, the outcome of the punishment phase of petitioner's capital murder trial would have been any different. The state habeas court's conclusion on this same point was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

### c. Conclusions

The *Wiggins* claim petitioner presented to the state habeas court in his first state habeas corpus proceeding fails to satisfy either prong of *Strickland* analysis. The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Wiggins* claim during the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

### 5. De Novo Review of Supplemented Wiggins Claim

■ Absent some showing that a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland*. *See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir.2002) (recognizing that, in

---

**182.** Defendant's Exhibit no. 10, admitted into evidence during the punishment phase of petitioner's capital murder trial included petitioner's BCADC medical records covering, among other periods, the days immediately after petitioner's arrest. This voluminous exhibit appears in S.F. Trial, Volume 37, at pp. 125–229. Among the observations of BCADC medical personnel recorded therein are entries on February 4, 2001 (petitioner described as "sad/tearful") [at p. 127], February 5, 2001 (petitioner complained of being anxious and depressed since his arrest, that other inmates were taunting him that he was going to die, and his complaints of insomnia) [at p. 127]; February 6, 2001 (petitioner crying uncontrollably, complaining of insomnia and loss of appetite, and complaining that he is being haunted by the deceased officer whose presence petitioner felt) [at p. 129], and an entry on February 6, 2001 in which petitioner is recorded having repeatedly told a BCADC medical staffer how sorry he was and how it was an accident and in which petitioner was described as "crying, very emotional, shaking, depressed, polite, appears very remorseful" [at p. 130].

evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003); *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 875–76 (W.D.Tex.2005) (recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were *objectively* unreasonable), *CoA denied,* 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied,* 549 U.S. 1227, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007).

### a. *No Deficient Performance*

In his second state habeas corpus proceeding, and in his Amended Petition herein, petitioner presents the same allegations and evidence he presented in support of his *Wiggins* claim in his first state habeas corpus proceeding but supplements that evidence with numerous new affidavits and documents.[183] As was explained above, however, with the exception of the new allegation that petitioner's mother abused alcohol and possibly drugs during her pregnancy with petitioner (and the suggestions of petitioner's new experts that petitioner should have been evaluated by petitioner's trial defense team for Fetal Alcohol Syndrome), the voluminous additional documents petitioner presents to supplement his original *Wiggins* claim of-

fer no truly "new" evidence regarding petitioner's childhood, family background, character, or criminal history that was not otherwise presented to petitioner's capital sentencing jury during the punishment phase of petitioner's trial.

While the new affidavits furnished by petitioner's family members and experts offer additional details concerning the abused and neglected circumstances in which petitioner grew up, petitioner neither alleges any facts nor furnishes this Court with any evidence showing that his trial counsel were unaware of these additional details at the time of petitioner's trial. Petitioner's co-counsel at trial, attorney Ed Camara, testified without contradiction during petitioner's first state habeas corpus proceeding that (1) he interviewed petitioner and found petitioner's account of the fatal shooting of officer Riojas consistent with petitioner's statements to police, (2) the defense's mitigation specialist, Ann Matthews, interviewed four or five members of petitioner's family, including petitioner's mother, sister, and uncle, (3) he and Ann Matthews met with Dr. Ferrell prior to trial, (4) *he personally spoke with both petitioner's mother and sister,* (5) he had access to petitioner's juvenile and extensive criminal records, and (6) nothing the prosecution developed during the punishment phase of trial came as a surprise to him.[184] Petitioner's lead trial counsel, attorney Vincent D. Callahan, testified in the same state habeas corpus proceeding that (1) he spoke with five members of petitioner's family during breaks in the guilt-innocence phase of trial about their possibly testifying during the punishment phase of trial, (2) *petitioner's capital sentencing*

---

**183.** *See notes 140–54, supra, and accompanying text.*

**184.** S.F. State Habeas Hearing, Volume 2 of 5, testimony of Ed Camara, at pp. 85–86, 88, 90–92, 93–97.

*jury heard everything he was told by petitioner's family members*, (3) he attempted to develop evidence showing petitioner's troubled youth through the punishment phase testimony of petitioner's sister, (4) he hoped to show the jury that petitioner had learned his criminal behavior from his family and hoped the jury would hold petitioner less responsible for his criminal conduct, and (5) he had a meeting with Dr. Ferrell during the guilt-innocence phase of petitioner's trial on October 24, 2002 before deciding not to call Dr. Ferrell as a punishment-phase witness.[185] Petitioner's trial counsel had access to petitioner's Texas Youth Commission file prior to trial and interviewed petitioner's sister Corinna, mother, and uncle Louis Garza, Jr., all three of whom testified during the punishment phase of petitioner's trial regarding petitioner's father's criminal behavior and physically abusive treatment of petitioner and his mother, as well

as petitioner's father's drug abuse and sexual assault upon petitioner's sister. In her latest affidavit now before this Court, dated June 15, 2010, petitioner's sister Corinna furnishes a lengthy description of all the abuse and neglect which petitioner suffered as a child but makes clear she informed petitioner's trial counsel of all this information *prior to trial*.[186]

Turning to the one truly "new" factual allegation presented in support of petitioner's "supplemented" *Wiggins* claim, i.e., the allegation petitioner's mother abused alcohol and drugs during her pregnancy with petitioner, the fundamental problem with this supplemented *Wiggins* claim is that petitioner has not provided this Court with any fact-specific allegations, much less any evidence, establishing that petitioner's trial counsel was ever made aware of this "new" allegation *prior to petitioner's trial*.[187] On the contrary, that asser-

185. S.F. State Habeas Hearing, Volume 4 of 5, testimony of Vincent D. Callahan, at pp. 19–23, 25–26, 31, 33, 36–37.

Petitioner spends considerable energy pointing out the discrepancy between attorney Callahan's state habeas testimony, in which attorney Callahan testified he chose not to call Dr. Ferrell to testify at trial because he believed Dr. Ferrell would testify petitioner posed a danger of future violence (*Id.*, at pp. 9–10, 22–24) and with Dr. Ferrell's testimony during the same state habeas corpus proceeding that he was prepared to testify at trial that petitioner would not pose a risk of future violence (S.F. State Habeas Hearing, Volume 2 of 5, testimony of Jack Ferrell, at p. 51). It is unnecessary to resolve this apparent conflicting testimony because, for the reasons set forth at length in Section IV.F.4.a. above, there were valid, rational, objectively reasonable reasons why attorney Callahan's decision not to call Dr. Ferrell to testify during the punishment phase of petitioner's capital murder trial was itself objectively reasonable. More specifically, as was explained at length above, the opinions regarding petitioner's future dangerousness Dr. Ferrell was prepared to express at trial would have been subject to a potentially devastating cross-examination

based upon the information contained in petitioner's TYC case file and the extensive testimonial evidence the prosecution presented during the punishment phase of petitioner's trial. Thus, even if attorney Callahan misunderstood the opinions regarding petitioner's future dangerousness expressed by Dr. Ferrell during their meeting on October 24, 2002, that mistake on attorney Callahan's part did not render his subsequent decision not to call Dr. Ferrell to testify during the punishment phase of petitioner's trial objectively unreasonable.

186. Second State Habeas transcript, at pp. 856–60. Petitioner attached another copy of this same affidavit as Exhibit N to his Amended Petition herein.

187. A letter dated October 16, 2002 from Ann Matthews to petitioner's co-counsel, attorney Ed Camara, and copies of Ms. Matthews' interview notes appear among the documents presented to state habeas court in petitioner's second state habeas corpus proceeding. Second State Habeas Transcript, at pp. 826–39. A pair of lines appear in Ms. Matthews' interview notes from an August 28 (presumably 2002) interview of petitioner's aunt Sonia

tion only appears clear in the record now before this Court for the first time in the affidavits of Raul Gonzales, Jr. and petitioner's mother, both executed in June 13, 2010.[188] In neither of these affidavits, however, do either of these affidavits claim they ever specifically informed petitioner's trial counsel *prior to trial* of petitioner's mother's alleged alcohol and drug abuse while pregnant with petitioner. Nor do they assert they informed petitioner's defense team *prior to trial* of any other information which would reasonably have put said counsel on notice of the possible benefits of investigating whether petitioner suffers from Fetal Alcohol Syndrome.

Furthermore, these eleventh hour accusations of alleged alcohol and drug abuse by petitioner's mother while she was pregnant with petitioner must be viewed in the context of the other information which was available to petitioner's trial counsel *prior to and at the time of petitioner's trial.* Petitioner's Texas Youth Commission case file, which was available to petitioner's tri-

al counsel, included (1) psychological evaluations by Dr. Ben Ferguson and Dr. Roger Sherman, and a separate evaluation by a master's level psychologist, none of which mentioned any alleged alcohol or drug abuse by petitioner's mother (during her pregnancy with petitioner or otherwise)[189]; and (2) a Bexar County Juvenile Probation Department report on petitioner dated June 20, 1996 which included a statement that petitioner's mother reported petitioner's "birth and development were normal" but no mention of any alleged alcohol or drug abuse by petitioner's mother.[190] At petitioner's trial, petitioner's sister Corinna, petitioner's mother, and petitioner's uncle Louis Garza, Jr., all testified extensively regarding petitioner's childhood but none mentioned any alleged alcohol or drug abuse by petitioner's mother. On the contrary, all three of these witnesses described petitioner's mother as caring and having done her best to raise petitioner in spite of the pernicious influence of petitioner's father.[191]

---

Gonzales which read as follows "Maria currently using Cocaine" and "Possible prenatal drug use." *Id.*, at p. 837.

**188.** Second State Habeas Transcript, at p. 841 (affidavit of Raul Gonzales, Jr.) and at p. 849 (affidavit of Maria Gonzalez). The new affidavits of Raul Gonzales, Jr. and Maria Gonzalez also appear as exhibits L and M to petitioner's Amended Petition herein.

The October 19, 2004 report of Dr. Katherine Allen which was presented to the state habeas court during petitioner's first state habeas corpus proceeding does include a mention of petitioner and his sister having witnessed "consistent drug use by their parents and friends of their parents in the home." First State Habeas Transcript, at p. 171. However. nothing in Dr. Allen's lengthy report suggests petitioner's mother abused alcohol or drugs while pregnant with petitioner. *Id.*, at pp. 169–81.

**189.** State Exhibit no. 188, S.F. Trial, Volume 36, at pp. 296–311.

**190.** *Id.*, at pp. 61–65.

Another copy of the same report appears herein at First State Habeas Transcript, at pp. 123–28.

**191.** More specifically, petitioner's maternal uncle testified at petitioner's trial, in pertinent part, that (1) petitioner's mother was a good person who raised her children correctly, (2) petitioner had every advantage his mother could furnish him, (3) he was proud of his sister's efforts to raise petitioner and her other children, and (4) petitioner and his siblings always had a roof over their head and were never hungry. S.F. Trial, Volume 33, testimony of Louis Garza. Jr., at pp. 36–37.

Petitioner's sister testified at petitioner's trial that (1) their mother was a good mother, (2) in contrast to most of her relatives, their mother had never been to prison, and (3) their mother taught her and petitioner right from wrong. S.F. Trial, Volume 33, testimony of Corinna Garza, at pp. 41, 47–48.

Petitioner's mother testified during the punishment phase of petitioner's capital murder

During his first state habeas corpus proceeding, petitioner furnished the state habeas court with (1) a psychological evaluation by Dr. Susana A. Rosin dated October 19, 2004,[192] (2) a lengthy mitigation affidavit by sociologist Dr. Kate Allen dated October 19, 2004,[193] (3) an affidavit dated October 22, 2004 from petitioner's paternal uncle Raul Gonzales, Jr.,[194] and (4) an affidavit dated October 20, 2004 from Ann Matthews with accompanying correspondence,[195] none of which specifically accused petitioner's mother of abusing alcohol or drugs while pregnant with petitioner. Petitioner also presented live testimony during his first state habeas corpus proceeding from his paternal uncle Raul Gonzales, Jr., Dr. Ferrell, Dr. Allen, and petitioner's co-counsel at trial, attorney Ed Camara, none of whom made any specific accusation during their testimony that petitioner's mother had abused alcohol or drugs while pregnant with petitioner.

Thus, other than a single line in one of Ann Matthews' interview notes apparently transmitted to petitioner's co-counsel on or about October 16, 2002 (i.e., after the commencement of the guilt-innocence phase of petitioner's capital murder trial),[196] there does not appear to be any evidence in the record now before this Court suggesting petitioner's trial counsel were ever alerted *prior to the punishment phase of petitioner's capital murder trial* to the possibility that petitioner's mother might have abused drugs or alcohol while pregnant with petitioner.

Moreover, as this Court has recently noted in another capital habeas case, as of the date of petitioner's capital murder trial, i.e., 2002, "fetal alcohol syndrome" and "fetal alcohol effects" were terms only just beginning to find acceptance among the mainstream within the mental health community. *Sells v. Thaler*, 2012 WL 2562666, *59 (W.D.Tex. June 28, 2012). Neither term appears in the 2000 edition of the DSM–IV–TR.[197] Moreover, in her report and affidavit, Dr. Murphey states "[p]hysical features associated with severe manifestations of this condition are uncertain."[198] Thus, it is far from clear how petitioner's trial counsel can be faulted for failing to themselves identify any signs of Fetal Alcohol Syndrome or Fetal Alcohol Effects which petitioner might have allegedly displayed prior to trial.

---

trial, in pertinent part, that (1) petitioner was a happy child who had done very well in school until his father died, (2) she was unaware petitioner had ever used drugs, and (3) petitioner began acting out after his father died. S.F. Trial, Volume 33, testimony of Maria Gonzalez, at pp. 57–60,

192. First State Habeas Transcript, at pp. 162–67.

193. *Id.*, at pp. 169–81.

194. *Id.*, at pp. 183–86. Mr. Gonzales' affidavit does include the following passage: "Manuel's mother was young when they started having children; she was unable to protect Manuel from his father. She too was using drugs and when Fernie [petitioner's father] was not in the home she would have other boyfriends. I think this confused Manuel."

*Id.*, at p. 184. Nonetheless, these statements do not specifically accuse petitioner's mother of abusing alcohol or drugs *while she was pregnant with petitioner*.

195. First State Habeas Transcript, at pp. 188–94.

196. Second State Habeas Transcript, at p. 837.

197. **American Psychiatric Association,** *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM–IV–TR)(2000), at pp. 143–46, 168–70, 177–80, 212–23, 338–43, 405–09, 479–83, 562–65, 655–61.

198. Second State Habeas Transcript, at p. 921.

Petitioner's complaint is further undermined by the absence of any fact-specific allegations, much less any evidence, in the record now before this Court showing that petitioner does, in fact, suffer from Fetal Alcohol Syndrome. Petitioner's mother admits in her latest affidavit that "[t]hough I didn't drink much while I was pregnant with Manuel there were some times when I drank more than I should have." [199] Petitioner's seven-or-eight-time convicted uncle Raul Gonzales, Jr. alleges cryptically in his latest affidavit "[w]hile they were living with her mother, Fernie [petitioner's father] and Maria started to do heroine [sic] and sell heroine [sic] and other drugs. This was during the time that Maria was pregnant with Manuel." [200] There is no evidence, however, now before this Court establishing with specificity either (1) the amount or frequency of Maria Gonzalez's consumption of alcohol when she was pregnant with petitioner or (2) any details concerning her alleged ingestion of heroin, cocaine, or any other drugs during her pregnancy with petitioner.

More significantly, while Dr. Ferrell's latest affidavit [201] and Dr. Joann Murphey's lengthy report and affidavit [202] both contain criticisms (both express and implied) of petitioner's trial counsel for their failure to investigate whether petitioner suffers from Fetal Alcohol Syndrome, neither of those two clinical psychologists purports to definitely diagnose petitioner with Fetal Alcohol Syndrome or Fetal Alcohol Effects.

Even more significantly, mitigating evidence showing petitioner actually suffers from Fetal Alcohol Syndrome or Fetal Alcohol Effects would necessarily have been double-edged in nature and might well have helped convince petitioner's capital sentencing jury to answer the future dangerousness special issue affirmatively. *See Sells v. Thaler*, 2012 WL 2562666, at *58 (discussing expert opinions associating prenatal alcohol exposure to damaged executive functioning with attendant socially inappropriate behavior, inability to apply consequences from past actions (i.e., an inability to learn from one's mistakes), lack of impulse control, rage reactions, physical aggression, high risk behaviors, and the inability to experience or display remorse). Presenting a Fetal Alcohol Syndrome or Fetal Alcohol Effects defense at the punishment phase of petitioner's capital murder trial would, in all reasonable likelihood, have reinforced the prosecution's arguments that petitioner was likely to pose a risk of future dangerousness for the rest of his life. *Sells v. Thaler*, 2012 WL 2562666, at *59–*60.

■ Under these circumstances, this Court independently concludes after *de novo* review that petitioner's complaints about his trial counsel's failure to investigate whether petitioner suffers from Fetal Alcohol Syndrome and to present evidence establishing same did not cause the performance of said counsel to fall below an *objective* level of reasonableness. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of

---

**199.** Second State Habeas Transcript, at p. 849.

**200.** *Id.,* at p. 841.

**201.** Second State Habeas Transcript, at pp. 795–98.

**202.** *Id.,* at pp. 883–923. More specifically, Dr. Murphey reported "Manuel's mother consumed alcohol during her pregnancy with Manuel. Manuel may exhibit features of fetal alcohol syndrome." *Id.,* at p. 921. Dr. Murphey also opined "further medical evaluation is needed to finally determine the full extent of any physical manifestations of FAS." *Id.*

counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). That evidence showing petitioner's mother might have abused alcohol or drugs while pregnant with petitioner might have been available at the time of petitioner's trial did not render the failure of petitioner's trial counsel to pursue such potentially mitigating evidence professionally deficient. The defense of a criminal case is not one in which every potentially available defensive theory must be pursued without regard to the potential downside of asserting such a defense.[203] "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins,* 977 F.2d 951, 960 (5th Cir.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993).

### b. *No Prejudice*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes,* 558 U.S. at 19–20, 130 S.Ct. at 386; *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes,* 558 U.S. at 26–29, 130 S.Ct. at 390–91. A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman,* 555 F.3d at 489; *Blanton v. Quarterman,* 543 F.3d at 235; *Montoya v. Johnson,* 226 F.3d at 408.

As was explained above in Section IV.F.4., the expert opinions which petitioner argued in his first state habeas corpus proceeding should have been presented at the punishment phase of petitioner's capital murder trial were premised upon views of the petitioner's capital offense and criminal record which were refuted by the prosecution's evidence actually introduced at petitioner's trial. The same can be said for the new opinions expressed by Dr. Ferrell in his latest affidavit and by Dr. Murphey in her lengthy affidavit and report.[204] Likewise, with the exception of

---

**203.** Licensed social worker and mitigation specialist Gerald L. Byington opines in his affidavits now before this Court that (1) a minimum of 100 hours of investigation is mandatory in every capital case and (2) 150 and 200 hours of mitigation investigation were necessary in petitioner's case are unsubstantiated by any specific facts. Second State Habeas Transcript, at pp. 800–07, 931–37. Moreover, no federal court has adopted a rule mandating a minimum number of investigation hours as necessary to avoid a finding of professionally deficient performance under the first prong of *Strickland.* On the contrary, the Supreme Court has made clear that the objective reasonableness of trial counsel's investigation for mitigating evidence is a high-

ly context-driven determination, unconstrained by arbitrary concerns over specific numbers of hours of investigation. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

**204.** Dr. Murphey expressly cautioned readers of her report at the outset as follows: "This evaluator has made no effort to independently verify the accuracy of information Mr. Garza provided in regard to his personal history and

the allegations regarding petitioner's mother's alcohol and drug abuse while pregnant with petitioner, the voluminous new documents petitioner presented to the state habeas court in his second state habeas corpus proceeding (and now presents to this Court as exhibits to his Amended Petition herein) present very little new potentially mitigating evidence beyond that which petitioner presented to the his capital sentencing jury at trial through his family members or State Exhibit no. 188. As was also explained above, however, petitioner has presented this Court with no specific facts, much less any evidence, showing petitioner actually does suffer from Fetal Alcohol Syndrome or Fetal Alcohol Effects. More than a decade has passed since petitioner's capital murder trial. A showing of *Strickland* prejudice requires more than speculation by Dr. Ferrell, Dr. Murphey, and Mr. Byington that additional psychological evaluation of petitioner at the time of trial might have shown petitioner suffers from Fetal Alcohol Syndrome or Fetal Alcohol Effects.

 Finally, as was explained above in Section IV.F.4.b., the evidence presented at trial showed petitioner (1) had a lengthy history of criminal conduct that included numerous episodes in which he possessed weapons while committing crimes, (2) led police on multiple high speed chases resulting in crashes of stolen vehicles, (3) learned from his father how to commit crimes such as auto theft, (4) displayed little remorse or sincere contrition for officer Riojas' murder,[205] (5) escaped from a juvenile halfway facility and repeatedly failed to fulfill requirements imposed upon him as conditions to release on juvenile probation, (6) was found in possession of weapons while on juvenile probation and

while incarcerated, (7) was active sexually, used drugs, and participated in gangs from an early age, and (8) after his arrest for fatally shooting officer Riojas, made verbal threats and threatening gestures toward other police officers. Under such circumstances, this Court concludes after a *de novo* review there is no reasonable probability that, but for the failure of petitioner's trial counsel to further investigate petitioner's background and present the "new" mitigating evidence accompanying petitioner's Amended Petition herein (including petitioner's evidence showing that he *might* suffer from Fetal Alcohol Syndrome or Fetal Alcohol Effects), the outcome of the punishment phase of petitioner's capital murder trial would have been different. Petitioner's *Wiggins* claim does not warrant federal habeas corpus relief.

### c. *Conclusions*

Petitioner's complaint about his trial counsel's failure to more thoroughly investigate petitioner's background and to present the "new" mitigating evidence accompanying petitioner's Amended Petition herein fails to satisfy either prong of *Strickland* analysis.

### G. *Failure to Call Defense Investigator as a Witness*

#### 1. *The Complaint*

Petitioner argues his trial counsel should have called defense investigator Jeff Mitchel to impeach or contradict the trial testimony of prosecution witness Erica Henderson.[206]

#### 2. *State Court Disposition*

During her direct examination on October 15, 2002, prosecution witness Erica

---

current circumstances." Second State Habeas Transcript, at p. 883.

**205.** *See note 182, supra.*

**206.** Amended Petition, at pp. 103–05.

Henderson testified, in part, (1) when she looked back, she saw the suspect and officer struggling for the gun, (2) the officer appeared to be attempting to get the gun away from the suspect, (3) the suspect appeared to be trying to keep the gun away from the officer, (4) the suspect raised the gun up over his head, the suspect ducked his head, and she then heard and saw the gunshot, (5) the suspect ducked away from the gun before it fired, and (6) the officer's hands were nowhere near the gun when it went off.[207] On cross-examination that same date, she reiterated that it appeared to her the suspect was attempting to keep the gun away from the officer and it appeared the officer was attempting to get the gun out of the suspect's hand.[208] She also reiterated her description of the fatal shooting, i.e., explained that she saw the gun in the suspect's left hand rise and the shot fired.[209] When petitioner's trial counsel asked her whether it appeared to her the shot was fired accidentally or unintentionally, the trial court sustained the prosecution's objections to those questions.[210] On re-direct examination, Ms. Henderson reiterated her earlier testimony that officer Riojas' hands were nowhere near the gun when it fired and that she saw the suspect pull the trigger.[211]

The following date, i.e., on October 16, 2002, Ms. Henderson returned to the witness stand and testified on redirect that (1) she was only ten feet away from the two men she watched struggling for the gun, (2) the suspect appeared to be trying to get away, (3) it appeared the suspect did not want to allow the officer to have the gun, and (4) the suspect raised the gun, ducked, and then fired.[212] On re-cross examination, Ms. Henderson admitted (1) *she had previously told petitioner's trial counsel the shooting might have been an accident* [213] and (2) she had been mistaken when she told petitioner's trial counsel where she stopped her vehicle to look at the two men struggling.[214]

Petitioner presented this same ineffective assistance complaint as his third ground for relief in his first state habeas corpus proceeding.[215] The state habeas trial court (1) found Jeff Mitchel had not testified before the state habeas court, (2) found there was no evidence before that court establishing that Mitchel was available to testify at petitioner's trial, (3) found Ms. Henderson admitted during her cross-examination that she had told petitioner's defense attorney that the shooting might have been accidental, (4) concluded that, under the Texas Rules of Evidence, because Ms. Henderson admitted making the statement in question, petitioner's trial counsel would not have been able to introduce extrinsic evidence of her statement, and (5) concluded petitioner's trial counsel were not ineffective for failing to attempt to introduce inadmissible evidence.[216] The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it rejected petitioner's first state ha-

---

207. S.F. Trial, Volume 23, testimony of Erica Henderson, at pp. 202–03, 205–09, 215.

208. *Id.,* at pp. 232–34.

209. *Id.,* at pp. 233–34.

210. *Id.,* at pp. 233–34.

211. *Id.,* at p. 239.

212. S.F. Trial, Volume 24, testimony of Erica Henderson, at pp. 11–13, 16.

213. *Id.,* at p. 22.

214. *Id.,* at pp. 30–31.

215. First State Habeas Transcript, at pp. 22–25.

216. First State Habeas Transcript, at p. 227.

beas corpus application on the merits. *Ex parte Manuel Garza,* 2008 WL 5245545, at *1.

Petitioner re-presented the same complaint as his third assertion of ineffective assistance in his third claim for relief in his second state habeas corpus application.[217] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza,* 2011 WL 4826968, at *1.

### 3. *AEDPA Analysis*

#### a. *No Deficient Performance*

The Texas Court of Criminal Appeals' conclusion that Jeff Mitchel's testimony contradicting (or arguably impeaching) Ms. Henderson's trial testimony would have been inadmissible under applicable Texas rules of evidence is binding upon this Court in this federal habeas corpus proceeding. *See Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman,* 574 F.3d at 291 (a state court's interpretation of state law binds a federal court sitting in habeas corpus); *Amador v. Quarterman,* 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law); *Fuhrman v. Dretke,* 442 F.3d 893, 901 (5th Cir.2006) (holding the same); *Young v. Dretke,* 356 F.3d 616, 628 (5th Cir.2004) ("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson v. Cain,* 215 F.3d 489, 494 (5th Cir.2000) (holding a federal habeas court may not review a

state court's interpretation of its own law); *Gibbs v. Johnson,* 154 F.3d 253, 259 (5th Cir.1998) (holding the same), *cert. denied,* 526 U.S. 1089, 119 S.Ct. 1501, 143 L.Ed.2d 654 (1999).

 Because the state habeas court determined the testimony of Jeff Mitchel proffered through an affidavit during petitioner's first state habeas corpus proceeding was inadmissible under applicable state law rules of evidence, the failure of petitioner's trial counsel to attempt to present such testimony did not cause the performance of said counsel to fall below an objective level of reasonableness. Counsel cannot be faulted for their failure to offer testimony which, under applicable state evidentiary rules, was inadmissible. *See Paredes v. Quarterman,* 574 F.3d at 291 n. 13 (failure to raise a meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman,* 503 F.3d 408, 413 (5th Cir.2007) (failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied,* 552 U.S. 1314, 128 S.Ct. 1874, 170 L.Ed.2d 752 (2008); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003). "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic,* 466 U.S. at 656 n. 19, 104 S.Ct. at 2045 n. 19.

#### b. *No Prejudice*

 Likewise, the failure of petitioner's trial counsel to attempt to present the

---

**217.** Second State Habeas Transcript, at pp. 350–52.

legally inadmissible testimony of Jeff Mitchel did not "prejudice" petitioner within the meaning of *Strickland.* *Paredes v. Quarterman,* 574 F.3d at 291; *United States v. Kimler,* 167 F.3d 889, 893 (5th Cir.1999). Even if petitioner's trial counsel had called Jeff Mitchel to testify during the guilt-innocence phase of petitioner's capital murder trial, there is no reasonable probability the outcome of petitioner's trial would have been any different. *See Knowles v. Mirzayance,* 556 U.S. 111, 127–28, 129 S.Ct. 1411, 1422, 173 L.Ed.2d 251 (2009)(holding no prejudice could be shown by defendant complaining about his counsel's failure to urge an insanity defense after the same jury had ruled in favor of the prosecution after hearing the same evidence petitioner claimed should have been re-urged in support of his insanity defense).

### 4. Conclusions

Petitioner's complaint about the failure of his trial counsel to attempt to introduce the testimony of court-appointed investigator Jeff Mitchel at the guilt-innocence phase of petitioner's capital murder trial satisfies neither prong of *Strickland* analysis. The Texas Court of Criminal Appeals' rejection on the merits of this ineffective assistance complaint in the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

### H. Failure to Present Petitioner's Medical Records

#### 1. The Complaint

In his final assertion of ineffective assistance, petitioner argues his trial counsel should have sought to admit petitioner's hospital records, which petitioner argues would have shown petitioner was beaten during his confrontation with officer Riojas and would have supported petitioner's self-defense claim.[218]

#### 2. State Court Disposition

Petitioner presented this same complaint as his fourth claim for relief in his first state habeas corpus application.[219] The state habeas trial court concluded (1) petitioner's medical records in question would not have been admissible under applicable Texas evidentiary rules because (a) there was no evidence showing officer Riojas caused the petitioner's purported injuries reflected therein and (b) the evidence adduced at trial did not raise the issue of self-defense under applicable state law and (2) petitioner's trial counsel were not ineffective for failing to seek admission of inadmissible documents.[220] The Texas Court of Criminal Appeals adopted the foregoing conclusions when it denied petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza,* 2008 WL 5245545, at *1.

Petitioner re-presented the same complaint as his third assertion of ineffective assistance in his third claim for relief in his second state habeas corpus application.[221] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas

**218.** Amended Petition, at pp. 105–06.

**219.** First State Habeas Transcript, at pp. 25–26.

**220.** First State Habeas Transcript, at p. 228.

**221.** Second State Habeas Transcript, at p. 352.

corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza,* 2011 WL 4826968, at *1.

### 3. *AEDPA Analysis*
#### a. *No Deficient Performance*

As was explained above, the Texas Court of Criminal Appeals' conclusion that the medical records in question were not admissible under applicable state evidentiary rules binds this Court in this federal habeas corpus proceeding. *See Bradshaw v. Richey,* 546 U.S. at 76, 126 S.Ct. at 604 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman,* 574 F.3d at 291 (a state court's interpretation of state law binds a federal court sitting in habeas corpus); *Amador v. Quarterman,* 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law).

▮ Because the state habeas court held that petitioner's hospital records were inadmissible under Texas evidentiary rules, the failure of petitioner's trial counsel to seek admission of those same records at the guilt-innocence phase of petitioner's trial did not cause the performance of said counsel to fall below an objective level of reasonableness. Counsel cannot

be faulted for their failure to offer testimony or other evidence which, under applicable state evidentiary rules, was inadmissible. *See Paredes v. Quarterman,* 574 F.3d at 291 n. 13 (failure to raise a meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman,* 503 F.3d at 413 (failure to raise futile or meritless objections is not ineffective lawyering); *Johnson v. Cockrell,* 306 F.3d at 255 (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent).

Moreover, any documentary evidence addressing alleged physical injuries petitioner sustained during his August 2, 2001 confrontation with officer Riojas would have been cumulative of the extensive testimony already before the petitioner's jury showing petitioner had sustained at least some facial and neck injuries during that confrontation. There was no genuine dispute at the guilt innocence phase of petitioner's capital murder trial that, in the hours immediately after the petitioner's fatal confrontation with officer Riojas, petitioner appeared to several of his friends and relatives to have been in an altercation of some kind and showed obvious signs of injury.[222] Petitioner's trial counsel cannot

---

**222.** For instance, petitioner told both Tanya Dominguez and Nosario Alvarez, Jr. that he had been in a fight, a statement wholly consistent with their observations about petitioner's appearance and demeanor in the minutes after the fatal shooting. S.F. Trial, Volume 25, testimony of Tanya Dominguez, at pp. 54, 56, 104, 107–09 (describing petitioner as looking "frazzled" and "upset," with his mouth bleeding, petitioner's neck described as red and bruised, and petitioner complained of a headache); testimony of Nosario Alvarez, Jr., at pp. 120, 122–23, 141–42 (petitioner appeared to have been in a struggle, said he had been

in a fight, had marks or scratches on his face and neck, was breathing hard, looked nervous, and talked very fast)

Ben Parovel testified, in pertinent part, that, when petitioner arrived at petitioner's sister's apartment later that same night (1) petitioner's face appeared a little bloody, (2) there were scratches and bruises on petitioner's face, (3) petitioner had a busted lip and cuts on his face, and (4) petitioner had a lump on his head, a bruised arm, and a cut on his neck. S.F. Trial, Volume 26, testimony of Den David Parovel, at pp. 8–10, 40, 50.

reasonably be faulted for failing to present medical records which (1) did not link any of petitioner's physical injuries to petitioner's altercation with officer Riojas and (2) would, at best, have been cumulative of the trial testimony of three prosecution witnesses.

### b. *No Prejudice*

Petitioner presented the state habeas court with no new "hospital" records supporting this aspect of his ineffective assistance claims which petitioner complained should have been admitted during the guilt-innocence phase of his capital murder trial. Instead, petitioner pointed to only those medical records admitted into evidence during the punishment phase of petitioner's trial, i.e., Defendant's Exhibit no. 10.[223] Nothing in these records reflects examination or treatment for any facial or other *physical* injuries petitioner allegedly received during his August 2, 2001 confrontation with officer Riojas. Even if petitioner had included additional evidence with these records somehow linking petitioner's complaints of claustrophobia and depression (petitioner's primary complaints in the days immediately after his arrest) with petitioner's struggle with officer Riojas, there is nothing in these records establishing petitioner voiced complaints about any such physical injuries until after his August 12, 2001 physical confrontation with several other inmates.

The state habeas court correctly found the *inadmissible* records in question did not link any of petitioner's physical injuries to his altercation with officer Riojas. Moreover, petitioner's jury already had before it the testimony of three prosecution witnesses describing petitioner's facial and neck injuries in the hours immediately after petitioner's fatal confrontation with officer Riojas. Even without the *inadmissible* medical records in question, petitioner's jury was already well aware of the petitioner's physical condition in the hours immediately after his fatal confrontation with officer Riojas.

■ Under such circumstances, there is no reasonable probability that, but for the failure of petitioner's trial counsel to seek admission of petitioner's *inadmissible* BCADC medical records during the guilt-innocence phase of petitioner's capital murder trial, the outcome of either phase of petitioner's trial would have been any different.

### 4. *Conclusions*

Petitioner's complaint about the failure of his trial counsel to seek admission at the guilt-innocence phase of trial of petitioner's BCADC medical records fails to satisfy either prong of *Strickland* analysis. The Texas Court of Criminal Appeals' rejection on the merits of this same ineffective assistance complaint in the course of petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable

---

Thus, no less than three prosecution witnesses described petitioner as displaying obvious injuries to his face and neck shortly after the fatal confrontation with officer Riojas.

**223.** Defendant's Exhibit no. 10 appears in S.F. Trial, Volume 37 and consists of BCADC medical records addressing (1) petitioner's initial health screening upon admission to that facility, (2) petitioner's routine medical treatment at that facility, as well as (3) the injuries petitioner sustained as a result of an altercation between petitioner and three of three other inmates on August 12, 2001. The state habeas court correctly found that nothing in those records linked any of petitioner's physical injuries to his confrontation with officer Riojas on August 2, 2001. *See note 182, supra.*

determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

## V. *Violation of Right to Confront Adverse Witnesses*

### A. *The Claim*

In his second claim herein, petitioner complains that his Sixth Amendment right to confront adverse witnesses was violated when the state trial court refused to permit petitioner to cross-examine prosecution witness Erica Henderson regarding her opinion as to whether the fatal shooting of officer Riojas could have been accidental.[224] In support of this claim, petitioner argues the Texas Court of Criminal Appeals erroneously construed Rule 701 of the Texas Rules of Evidence when it denied petitioner's analogous claim in the course of petitioner's direct appeal and first state habeas corpus proceedings.

### B. *State Court Disposition*

As was explained above in Section IV. G.2., the state trial court initially refused to permit petitioner to cross-examine prosecution witness Erica Henderson concerning her opinion as to whether the fatal shooting of officer Riojas might have been accidental but, the following day, permitted petitioner's trial counsel to elicit as admission from Ms. Henderson that she had told petitioner's trial counsel she believed the shooting might have been accidental.[225]

Petitioner presented the same complaint as his second point of error on direct appeal, albeit as a purely state-law claim, arguing only that the trial court's ruling was an erroneous application of state evidentiary rules.[226] The Texas Court of Criminal Appeals held that any error by the state trial court in initially excluding the cross-examination inquiries in question was rendered harmless by virtue of the petitioner's trial court's elicitation of Ms. Henderson's testimony the following day. *Garza v. State*, 2005 WL 395442, at *2–*3.

Petitioner re-urged the same complaint, this time as a Sixth Amendment Confrontation Clause claim, as his second claim for relief in petitioner's first state habeas corpus application.[227] The state habeas trial court concluded petitioner had procedurally defaulted on this complaint by failing to present it on direct appeal.[228] The Texas Court of Criminal Appeals adopted that conclusion when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-urged the same Confrontation Clause argument as his second ground for relief in his second state habeas corpus application.[229] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1. Respondent does not, however, urge this Court to dismiss this claim on procedural default principles.[230]

---

**224.** Amended Petition, at pp. 45–54.

**225.** *See notes 207–14, supra, and accompanying text.*

**226.** Brief for Appellant, at pp. 13–19.

**227.** First State Habeas Transcript, at pp. 12–22.

**228.** First State Habeas Transcript, at p. 224.

**229.** Second State Habeas Transcript, at pp. 292–301.

**230.** Respondent's Answer, at pp. 15–19.

### C. Clearly Established Federal Law

The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically. "Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination." *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Professor Wigmore stated:

> 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' (Emphasis in original.) 5 J. Wigmore, Evidence s 1395, p. 123 (3d ed.1940).

*Davis v. Alaska,* 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). ■ "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). Violations of the Confrontation Clause are subject to harmless error analysis. *Coy v. Iowa,* 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988); *United States v. El-Mezain,* 664 F.3d 467, 491 (5th Cir.2011),

*cert. denied,* —— U.S. ——, 133 S.Ct. 525, —— L.Ed.2d ——, 2012 WL 1835124 (2012).

### D. AEDPA Analysis

Insofar as petitioner asks this Court to re-evaluate the Texas Court of Criminal Appeals' analysis and application of Rule 701 of the Texas Rules of Evidence in the course of petitioner's direct appeal and state habeas corpus proceedings, that request is *non sequitur.* As this Court explained above, the state court's interpretation of state procedural and evidentiary rules is binding on this Court. *See Bradshaw v. Richey,* 546 U.S. at 76, 126 S.Ct. at 604 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman,* 574 F.3d at 291 (a state court's interpretation of state law binds a federal court sitting in habeas corpus); *Amador v. Quarterman,* 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law).

■ Determining whether the exclusion of impeachment evidence is of constitutional concern depends upon the reasons for and effect of the exclusion, which typically includes an inquiry into the admissibility of the evidence under the applicable rules of evidence. *United States v. Hale,* 685 F.3d 522, 538 (5th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 559, 184 L.Ed.2d 343, 2012 WL 4438817 (2012). As was explained above, while petitioner's trial counsel were precluded from asking Ms. Henderson what her opinions were regarding whether petitioner's fatal shooting of officer Riojas was accidental, they were permitted to elicit on cross-examination that Ms. Henderson had previously told petitioner's trial counsel she believed the

shooting might have been accidental. Under such circumstances, there does not appear to have been any constitutionally erroneous restriction upon petitioner's Sixth Amendment right to confront adverse witnesses.

The jury had before it both of petitioner's written statements describing his fatal shooting of officer Riojas, neither of which genuinely contradicted Ms. Henderson's eyewitness testimony regarding the same subject. Moreover, given the fact petitioner's trial counsel were permitted to elicit Ms. Henderson's previously stated opinion regarding the possibly accidental nature of the shooting, any error in preventing her from testifying more directly about her opinions on that subject was harmless, at best. The state trial court's initial rulings limiting the cross-examination of Ms. Henderson did not prevent petitioner's trial counsel from soliciting impeachment testimony from Ms. Henderson on this same subject. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). Thus, the state trial court's initial restriction on the cross-examination of Ms. Henderson did not have a substantial or injurious effect or influence on the outcome of the jury's verdict at the guilt-innocence phase of petitioner's capital murder trial.

E. *Conclusions*

■ In view of that same court's subsequent allowance of almost identical cross-examination the following day, the state trial court's initial ruling limiting the scope of petitioner's cross-examination of Ms. Henderson did not violate the Sixth Amendment's Confrontation Clause. Any error committed by the state trial court in initially limiting or restricting the scope of petitioner's cross-examination of prosecution witness Erica Henderson was rendered harmless by virtue of the cross-examination of Ms. Henderson which the state trial court permitted the following day.

■ The Texas Court of Criminal Appeals' rejection on the merits of petitioner's state law and Confrontation Clause complaints about the state trial court's rulings limiting the scope of cross-examination of prosecution witness Erica Henderson during the course of petitioner's direct appeal and first state habeas corpus proceeding were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

VI. *Erroneous Exclusion of Evidence of Riojas' Character*

A. *The Claim*

In his fourth claim herein, petitioner argues the state trial court erred in refusing to permit petitioner to introduce evidence during the guilt-innocence phase of trial showing officer Riojas' character for violence.[231] While phrasing this claim as a Sixth and Fourteenth Amendment claim, petitioner cites only state-law legal authorities in support of this claim.

B. *State Court Disposition*

At trial, petitioner proffered the testimony of some nine witnesses regarding their

---

**231.** Amended Petition, at pp. 106–13.

observation of officer Riojas's alleged use of excessive force while arresting or stopping themselves or other individuals.[232] The state trial court held a hearing on the prosecution's motion in limine and concluded petitioner had failed to present any evidence showing officer Riojas had engaged in an conduct which threatened petitioner with serious bodily injury or death and excluded the proffered testimony.[233]

Petitioner's fourth point of error on direct appeal raised a purely state-law argument that the trial court had erred when excluding proffered testimony showing officer Riojas had been aggressive or even violent while arresting or attempting to arrest other individuals.[234] The Texas Court of Criminal Appeals concluded (1) Riojas' actions were in direct response to petitioner's attempt to resist arrest, (2) the evidence did not raise an issue as to self-defense, and (3) the trial court reasonably excluded petitioner's proffered testimony. *Garza v. State*, 2005 WL 395442, at *5–*6.

Petitioner re-urged this same complaint as his sixth claim for relief in his first state habeas corpus application, vaguely alluding to the Sixth and Fourteenth Amendments but once more citing only state-law legal authorities in support of his arguments.[235] The state habeas trial court concluded (1) this claim was foreclosed from state habeas review because the Texas Court of Criminal Appeals had already rejected same on the merits in petitioner's direct appeal and (2) petitioner had procedurally defaulted on any new aspects to this same claim by failing to present same on direct appeal.[236] The Texas Court of Criminal

Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented the same state-law claim (including only a single sentence vaguely alluding to the Sixth and Fourteenth Amendments and no citations to any federal legal authorities) as his fourth ground for relief in his second state habeas corpus application.[237] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1. Respondent does not, however, urge this Court to dismiss this claim on procedural default principles.[238]

### C. *Clearly Established Federal Law*

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the

**232.** S.F. Trial, Volume 29, at pp. 109–64.

**233.** S.F. Trial, Volume 29, at pp. 3–10.

**234.** Brief for Appellant, at pp. 31–36.

**235.** First State Habeas Transcript, at pp. 39–46.

**236.** First State Habeas Transcript, at pp. 232–33.

**237.** Second State Habeas Transcript, at pp. 105–11.

**238.** Respondent's Answer, at pp. 15–19.

basis of a perceived error of state law); *Goodrum v. Quarterman,* 547 F.3d 249, 261 (5th Cir.2008) (" 'it is not the province of a federal habeas court to reexamine state court determinations on state-law questions' such as the admissibility of evidence under state procedural rules"), *cert. denied,* —— U.S. ——, 129 S.Ct. 1612, 173 L.Ed.2d 1000 (2009).

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874.

When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*

*Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

 A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Darden v. Wainwright,* 477 U.S. 168, 179–83, 106 S.Ct. 2464, 2470–72, 91 L.Ed.2d 144 (1986); *Goodrum v. Quarterman,* 547 F.3d at 261; *Wood v. Quarterman,* 503 F.3d 408, 414 (5th Cir.2007), *cert. denied,* 552 U.S. 1314, 128 S.Ct. 1874, 170 L.Ed.2d 752 (2008); *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006).

The question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir.2005) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied,* 546 U.S. 900, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005).

Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."

The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not " 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' " This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler,* 643 F.3d 425, 430–31 (5th Cir.2011) (*Footnotes omitted*).

### D. *AEDPA Analysis*

Insofar as petitioner complains about the manner the state appellate and state habeas courts applied Texas law during his direct appeal and first state habeas corpus proceeding, those complaints do not furnish a basis for federal habeas corpus relief.

The Texas Court of Criminal Appeals ruled that the evidence proffered by petitioner was legally insufficient to raise the issue of self-defense under applicable Texas law and, therefore, evidence showing officer Riojas' prior physical contact with others was not admissible at petitioner's trial. *Garza v. State*, 2005 WL 395442, at *5–*6. As was explained above, this interpretation of state law is binding upon this Court in this federal habeas corpus proceeding. *Bradshaw v. Richey*, 546 U.S. at 76, 126 S.Ct. at 604; *Paredes v. Quarterman*, 574 F.3d at 291; *Amador v. Quarterman*, 458 F.3d at 412. This Court is bound by the state appellate court's conclusion that petitioner's evidence did not raise the issue of self-defense under applicable Texas law.

 The issue remaining for this Court is whether the state trial court's exclusion of petitioner's proffered testimony rendered petitioner's capital murder trial fundamentally unfair. At the guilt-innocence phase of petitioner's capital murder trial, the jury had before it both of petitioner's written statements describing his fatal shooting of officer Riojas, both of which made clear petitioner vigorously resisted officer Riojas' efforts to arrest petitioner before officer Riojas allegedly employed any excessive force toward petitioner. In addition, petitioner's friend Jamie Martinez testified (1) she saw officer Riojas grab petitioner, attempt to push petitioner up against a car, and attempt to place petitioner in handcuffs, (2) petitioner turned around and resisted the efforts of officer Riojas to apply handcuffs, (3) petitioner jerked away from officer Riojas, and (4) she later saw petitioner running and officer Riojas chasing petitioner.[239] Petitioner presented the state trial court with no evidence showing petitioner ever attempted to surrender to, or submit to arrest by, officer Riojas. Finally, petitioner presented no evidence showing he was personally aware as of August 2, 2001 of any alleged excessive force officer Riojas had ever applied toward any other person.

The evidence before the jury at the guilt-innocence phase of trial tended to show (1) petitioner was well aware that he was lawfully subject to arrest on August 2, 2001 because of outstanding warrants, (2) he recognized officer Riojas as a law enforcement officer, (3) he was determined not to be arrested, (4) he not only gave officer Riojas a false name when asked but actively resisted the efforts of officer Riojas to place him in handcuffs, (5) he fled from officer Riojas, ignored a cry from officer Riojas to halt, and only stopped when he became fatigued, (6) he assumed a stance Detective Matjeka described as a fighting stance, and (7) when officer Riojas reached him, petitioner engaged in a physical confrontation which culminated in petitioner grabbing officer Riojas handgun and fatally shooting officer Riojas.

Since the affirmative defense of self-defense was not raised by the evidence presented or proffered during the guilt-innocence phase of petitioner's trial, the only purported justification presented by petitioner in his Amended petition for introducing evidence showing officer Riojas' alleged character for violence has no basis in reality.[240] Petitioner's inability to present character evidence relevant exclusively to an affirmative defense which was not raised by the other evidence before the

---

**239.** S.F. Trial, Volume 29, testimony of Jamie Martinez, at pp. 44–45, 54–55, 85.

**240.** Amended Petition, at p. 112 ("Manuel's entire defense was that he acted in self-defense from the complainant who was the violent aggressor in this instance, and had been a violent aggressor with prior suspects who fled from the complainant.").

state trial court did not render petitioner's capital murder trial fundamentally unfair. Nothing in the Constitution mandates permitting a murder defendant to attack the character of his victim when the victim's character has no relevance under applicable law to the issues properly before the jury.

### E. Conclusions

The exclusion of petitioner's proffered character evidence did not render petitioner's capital murder trial fundamentally unfair. The other evidence before the jury at the guilt-innocence phase of petitioner's capital murder trial did not raise the defense of self-defense under applicable Texas law. The Texas Court of Criminal Appeals' rejections on the merits of petitioner's complaints about the exclusion of petitioner's proffered character evidence during petitioner's direct appeal and first state habeas corpus proceedings were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

### VII. Challenges to the Texas Capital Sentencing Scheme

### A. Overview of the Claims

In his fifth through ninth claims herein, petitioner argues (1) several terms included in the Texas capital sentencing special issues are unconstitutionally vague,[241] (2) constitutional notions of due process require proportionality review of petitioner's

death sentence,[242] (3) the Texas capital sentencing statute unconstitutionally fails to assign the burden of proof on the mitigation special issue to the prosecution,[243] (4) the Texas capital sentencing statute unconstitutionally fails to inform the jury of the effect of a single holdout juror,[244] and (5) the Texas capital sentencing scheme is unconstitutional because juries are incapable of accurately predicting future dangerousness.[245]

### B. Clearly Established Federal Law: A Brief History of Eighth Amendment Jurisprudence

Until fairly recently, the Supreme Court's opinions addressing capital punishment offered a wide array of rather ambiguous analytical approaches to resolving Eighth Amendment claims, none of which claimed adherence from a clear majority of the Supreme Court. For instance, in *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Supreme Court addressed the issue of a former soldier sanctioned for desertion with loss of his citizenship. In the course of an opinion that reflected little more than his own views on the subject, Chief Justice Earl Warren wrote as follows:

> The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo–American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth

---

241. Amended Petition, at pp. 113–15.

242. Amended Petition, at pp. 116–32.

243. Amended Petition, at pp. 133–35.

244. Amended Petition, at pp. 135–59.

245. Amended Petition, at pp. 160–64.

Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 [ (1910) ]. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

*Trop v. Dulles,* 356 U.S. at 99–101, 78 S.Ct. at 597–98 (*Footnotes omitted*).

Though often cited in subsequent Supreme Court opinions, Chief Judge Warren's "evolving standards of decency" Eighth Amendment test proved to be as difficult to apply consistently as Justice Stewart's classic definition of obscenity ("I know it when I see it") from his famous concurring opinion in *Jacobellis v. State of Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964). For example, in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a bare majority of the Supreme Court struck down capital sentencing schemes in several southern States but failed to reach any degree of consensus in terms of an analyt-

ical approach to the Eighth Amendment. The result was nine separate opinions issued from the Supreme Court in *Furman,* each reflecting a different analytical approach to the Eighth Amendment claims presented therein.

The situation changed little when, four years later, a less than cohesive majority of the Supreme Court upheld the new capital scheme adopted by the Texas Legislature in response to *Furman. See Jurek v. Texas,* 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976) (holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription of "cruel and unusual punishment" in an opinion issued by Justice Stevens writing for himself and Justices Powell and Stewart with Chief Justice Burger and Justices White and Rehnquist concurring separately). During the same term, the Court was equally divided when it upheld Georgia's effort to re-institute capital punishment in that jurisdiction following *Furman. See Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976) (distinguishing the role of judicial review of capital punishment from that of legislative prerogative in an opinion issued by Justice Stewart for himself and Justices Powell and Stevens with Chief Justice Burger and Justices White and Rehnquist concurring separately).

The lack of Supreme Court consensus on an analytical approach to the Eighth Amendment continued for more than a decade thereafter, including a case rejecting an "as applied" challenge to the Texas capital sentencing scheme. *See Franklin v. Lynaugh,* 487 U.S. 164, 172–73, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988) (holding there is no constitutional right to have a capital sentencing jury consider "residual doubts" as to the defendant's guilt in an opinion by Justice White for

himself, Chief Justice Burger, and Justices Scalia and Kennedy, with Justices O'Connor and Blackmun concurring separately).

A degree of consensus did begin to appear within the Supreme Court early the following decade when five Justices finally agreed on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California,* 494 U.S. 370, 380–381, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) (*Footnotes omitted* ).

True consensus on an overarching analytical approach to Eighth Amendment claims did not appear, however, until eight Supreme Court Justices agreed in *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), on the principle that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa,* 512 U.S. at 971, 114 S.Ct. at 2634 (Justice Kennedy writing for himself, Chief Justice Rehnquist, and Justices O'Connor, Scalia, Souter, and Thomas, with Justices Stevens and Ginsburg concurring separately but not rejecting the analytical approach offered by Justice Kennedy). The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. * * *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

In *Tuilaepa*, the Supreme Court clearly declared its view that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court also concluded, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some

schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998):

Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. *Ibid.* In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. *Id.*, at 972, 114 S.Ct. at 2634–2635. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. See, *e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 206–207, 96 S.Ct. 2909, 2940–2941, 49 L.Ed.2d 859 (1976). He further argues that the Eighth Amendment therefore requires the court to instruct the jury on

its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa, supra,* at 971–973, 114 S.Ct. at 2634–2636; *Romano v. Oklahoma,* 512 U.S. 1, 6–7, 114 S.Ct. 2004, 2008–2009, 129 L.Ed.2d 1 (1994); *McCleskey v. Kemp,* 481 U.S. 279, 304–306, 107 S.Ct. 1756, 1773–1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878–879, 103 S.Ct., at 2743–2744.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 317–318, 109 S.Ct. 2934, 2946–2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 113–114, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–2965, 57 L.Ed.2d 973 (1978). However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109 S.Ct. at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198; see also *Johnson, supra,* at 367–368, 113 S.Ct. at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. See *Tuilaepa, supra,* at 978–979, 114 S.Ct. at 2638–2639 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens, supra,* at 875, 103 S.Ct. at 2741–2742 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg, supra* ).

*Buchanan v. Angelone,* 522 U.S. at 275–277, 118 S.Ct. at 761–62.

With these principles in mind, the Court now turns to petitioner's attacks upon the Texas capital sentencing scheme.

## C. Vague "Aggravating Factors" Complaint

### 1. The Claim

Petitioner argues in his fifth claim herein that the Texas capital sentencing scheme is constitutionally defective because several key terms employed in the Texas capital sentencing special issue are unconstitutionally vague, i.e., undefined.[246]

### 2. State Court Disposition

Petitioner presented these same arguments in his sixth point of error on direct appeal.[247] The Texas Court of Criminal Appeals rejected these arguments on the merits. *Garza v. State*, 2005 WL 395442, at *8.

Petitioner re-urged the same arguments as his seventh ground for relief in his first state habeas corpus application. The state habeas trial court concluded (1) this claim was foreclosed from state habeas review because the Texas Court of Criminal Appeals had already rejected same on the merits in petitioner's direct appeal and (2) petitioner had procedurally defaulted on any new aspects to this same claim by failing to present same on direct appeal.[248] The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner presented the same arguments a third time as his fifth ground for relief in his second state habeas corpus application.[249] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

### 3. AEDPA Review

The fundamental problem with petitioner's fifth claim herein is that various terms the Texas capital special issues which petitioner identifies as unconstitutionally vague "aggravating terms" are not, in fact "aggravating terms" at all. Texas is not a "weighing jurisdiction" where capital sentencing jurors must balance "aggravating" versus "mitigating" factors before rendering a verdict at the punishment phase of a capital trial. *See Hughes v. Johnson*, 191 F.3d 607, 621–23 (5th Cir.1999) (holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000). Rather, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of

---

**246.** Amended Petition, at pp. 113–15.

**247.** Brief for Appellant, at pp. 36–38.

**248.** First State Habeas Transcript, at pp. 233–34.

**249.** Second State Habeas Transcript, at pp. 360–62.

offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988) (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. at 268–75, 96 S.Ct. at 2955–57 (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty). The Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365–67 (5th Cir.2007) (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied*, 552 U.S. 948, 128 S.Ct. 431, 169 L.Ed.2d 259 (2007).

Both this Court and the Fifth Circuit have repeatedly rejected the exact same arguments raised by petitioner in his fifth claim herein regarding the purported necessity for definitions of the terms in question as utterly lacking in any arguable merit. *See, e.g., Paredes v. Quarterman*, 574 F.3d at 294 (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir.) (rejecting claims the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S. 1193, 128 S.Ct. 34, 168 L.Ed.2d 810 (2007); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir.2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society"), *cert. denied*, 547 U.S. 1073, 126 S.Ct. 1771, 164 L.Ed.2d 522 (2006); *Jasper v. Thaler*, 765 F.Supp.2d 783, 835 (W.D.Tex.2011) (holding none of the terms included in the Texas capital sentencing special issues identified by petitioner herein required definitions), *affirmed*, 466 Fed.Appx. 429 (5th Cir.2012), *cert. denied*, —— U.S. ——, 133 S.Ct. 788, 184 L.Ed.2d 584 (2012); *Bartee v. Quarterman*, 574 F.Supp.2d at 694–94 (citing numerous Fifth Circuit opinions and opinions of this Court rejecting the same arguments contained in petitioner's fifth claim herein); *Moore v. Quarterman*, 526 F.Supp.2d 654, 720–21 (W.D.Tex. 2007) (discussing the long line of Fifth Circuit opinions, as well as numerous opinions from this Court, rejecting the same arguments raised by petitioner's fifth claim herein), *CoA denied*, 534 F.3d 454 (5th Cir.2008).

The allegedly vague terms in the Texas capital sentencing special issues identified by petitioner in his fifth claim herein all contain a common sense core of meaning which do not require further definition. *See James v. Collins,* 987 F.2d 1116, 1120 (5th Cir.) ("To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system.... The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean."), *cert. denied,* 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993) (*quoting Milton v. Procunier,* 744 F.2d 1091, 1096 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985)).

### 4. *Conclusions*

Petitioner's arguments supporting his fifth claim herein have repeatedly been rejected by both the Fifth Circuit and this Court. The Supreme Court's opinion in *Kansas v. Marsh, supra,* implicitly rejected these same arguments as well.

 The Texas Court of Criminal Appeals' rejections in the course of petitioner's direct appeal and first state habeas corpus proceedings of petitioner's Eighth Amendment complaints about the lack of definitions of key terms in the Texas capital sentencing special issues were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the peti-

tioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

### D. *Proportionality Review*

#### 1. *The Claim*

In his sixth claim herein, petitioner argues the Texas Constitution and the Due Process Clause of the Fourteenth Amendment mandate judicial proportionality review of all capital sentences.[250] More specifically, petitioner argues he possesses a constitutional right to proportionality review of his capital sentence analogous to the type of review mandated in civil cases for punitive damages awards by the Supreme Court's opinion in *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

#### 2. *State Court Disposition*

Petitioner presented the same arguments as his eighth ground for relief in his first state habeas corpus application.[251] The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[252] The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza,* 2008 WL 5245545, at *1.

Petitioner re-urged the same arguments as his sixth claim for relief in his second state habeas corpus application.[253] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas

---

**250.** Amended Petition, at pp. 116–32.

**251.** First State Habeas Transcript, at pp. 49–66.

**252.** First State Habeas Transcript, at p. 234.

**253.** Second State Habeas Transcript, at pp. 363–79.

corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza,* 2011 WL 4826968, at *1. Respondent does not, however, urge this Court to dismiss this claim on procedural default princi-ples.[254]

### 3. *Teague Foreclosure*

No federal court has ever held the Con-stitution mandates judicial proportionality review of a Texas capital sentence. Thus, adopting the rule advocated by petitioner in his sixth claim herein would constitute adoption of a new rule of constitutional criminal procedure.

 The non-retroactivity doctrine of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), forecloses adoption of the new principles advocated by petitioner in his sixth claim herein. Under the holding in *Teague,* fed-eral courts are generally barred from ap-plying new constitutional rules of criminal procedure retroactively on collateral re-view. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's convic-tion became final. *See O'Dell v. Nether-land,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dic-tated by precedent existing at the time the defendant's conviction became final"). Un-der this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must deter-mine when the petitioner's conviction be-came final; second, the court must survey the legal landscape as it then existed and determine whether a state court consider-ing the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to con-clude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow excep-tions to the non-retroactivity principle. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

 The only two exceptions to the *Teague* non-retroactivity doctrine are re-served for (1) new rules forbidding crimi-nal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants be-cause of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teag-ue* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

Petitioner's conviction became final for *Teague* purposes no later than May 18, 2005, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on di-rect appeal and the date the deadline for

---

**254.** Respondent's Answer, at pp. 15–19.

the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *See Beard v. Banks,* 542 U.S. 406, 411–12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 21 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup.Ct. Rule 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought).

▪▪▪ *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003) (recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

As of the date petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas criminal defendant was entitled to have his capital sentence judicially reviewed for proportionality. The Supreme Court has never mandated such review of capital sentences. Nor was such a constitutional re-

quirement arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's sixth claim herein is foreclosed by the non-retroactivity doctrine of *Teague.* The new rule proposed by petitioner in his sixth claim herein falls within neither of the recognized exceptions to the *Teague* doctrine. Even assuming the Supreme Court might one day rule a constitutional duty exists on state appellate judges to review all capital sentences for proportionality, that day has not yet arrived.

The Fourteenth and Eighth Amendment arguments asserted by petitioner in his sixth claim herein constitutes a proposed "new rules of criminal procedure" which the non-retroactivity rule of *Teague v. Lane* precludes this Court from recognizing or applying in a federal habeas context. *See Martinez v. Dretke,* 426 F.Supp.2d 403, 532 (W.D.Tex.2006) (holding *Teague* foreclosure applicable to these same complaints), *CoA denied,* 270 Fed.Appx. 277 (5th Cir.2008); *Cordova v. Johnson,* 993 F.Supp. 473, 509 (W.D.Tex.1998) (holding *Teague* foreclosed claims that the Constitution mandated proportionality review of the jury's answers to the Texas capital sentencing scheme's special issues), *appeal denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

### 4. *AEDPA Review*

This Court has repeatedly rejected the same arguments presented by petitioner in his sixth claim herein. *See, e.g., Jasper v. Thaler,* 765 F.Supp.2d at 837–38:

> This claim lacks merit. The United States Supreme Court has expressly rejected the argument that a state appellate court is required to independently re-weigh aggravating and mitigating evidence. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879, 79 L.Ed.2d

29 (1984) ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."). Both before and after the Supreme Court mandated judicial proportionality review of punitive damage awards in civil cases, the Fifth Circuit has consistently held no such "proportionality review" of a capital sentence is constitutionally mandated. *See Martinez v. Johnson,* 255 F.3d 229, 241 n. 17 (5th Cir.2001) (recognizing there is no constitutional right to proportionality review), *cert. denied,* 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002); *Hughes v. Johnson,* 191 F.3d 607, 622 (5th Cir.1999) (holding a state appellate court was not required to conduct proportionality review of a capital sentence), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *United States v. Webster,* 162 F.3d 308, 354 (5th Cir.1998) (holding the Constitution does not require a comparison of the penalties imposed in similar criminal cases), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999); *Evans v. McCotter,* 790 F.2d 1232, 1243 (5th Cir.) (holding there is no federal constitutional right to any type of proportionality review, so long as the state's capital punishment scheme protects against arbitrary and capricious imposition of the death penalty), *cert. denied,* 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986).

This Court has rejected the same argument urged by petitioner in his eleventh claim—the Supreme Court's holding mandating proportionality review of punitive damage awards in civil cases necessarily requires similar judicial scrutiny of capital sentences. *See Bartee v. Quarterman,* 574 F.Supp.2d at 695–98 (rejecting contention that due process concerns mandate proportionality review in capital criminal cases); *Martinez v. Dretke,* 426 F.Supp.2d 403, 530–32 (W.D.Tex.2006) (holding the Supreme Court's opinion in *Tuilaepa* permits states to adopt capital sentencing schemes which vest the sentencing jury with virtually unfettered discretion at the selection phase of a capital trial), *CoA denied,* 270 Fed.Appx. 277 (5th Cir. 2008); *see Cordova v. Johnson,* 993 F.Supp. 473, 509 (W.D.Tex.1998) (then District Judge Prado wrote, "Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the 'eligibility decision' described in *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function.").

An analysis of comparing punitive damage awards in civil cases with one another has never been applied by the Supreme Court in the context of criminal sentencing. Thus, there is no clearly established federal case law requiring proportionality review of a state capital sentence. Furthermore, as demonstrated by the Federal Sentencing Guidelines' focus on the specific aspects of an offender and his particular offense, criminal sentencing requires careful consideration of a host of individual characteristics relevant to a particular defendant and a particular criminal offense. Contrary to the assumption underlying petitioner's eleventh claim, neither all capital murders nor all capital murderers can easily be grouped into a single category for purposes of "proportionality review." The arguments underlying petitioner's eleventh claim would override

the long-standing principle of individualized sentencing which supports the Supreme Court's entire Fifth Amendment and Eighth Amendment jurisprudence. *See Cordova v. Johnson*, 993 F.Supp. at 508 ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head.").

There is no clearly established federal law mandating judicial proportionality review of capital sentences. The Fifth Circuit has specifically rejected the same Eighth and Fourteenth Amendment arguments premised upon *Honda Motor v. Oberg* underlying petitioner's sixth claim herein. *See Hughes v. Johnson*, 191 F.3d at 622–23 (emphasizing Texas is not a weighing jurisdiction which requires an appellate court or jury to "weigh" aggravating factors against mitigating ones).

Insofar as petitioner attempts to rely upon provisions of the Texas Constitution to support his sixth claim herein, that effort has no arguable merit. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. at 67–68, 112 S.Ct. at 480 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874 (holding a federal court may not issue the writ on the basis of a perceived error of state law).

**255.** Amended Petition, at pp. 133–35.

### 5. *Conclusions*

Petitioner's sixth claim herein advocates adoption of a new rule of constitutional criminal procedure, a rule foreclosed by the non-retroactivity principle announced in *Teague*. There is no clearly established federal legal authority mandating the type of judicial proportionality review requested by petitioner in his sixth claim herein.

 The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of petitioner's request for judicial proportionality review of his capital sentence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

### E. *No Burden of Proof on Mitigation Special Issue*

#### 1. *The Claim*

In his seventh claim herein, petitioner argues the Supreme court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), mandates imposition of a burden of proof on the prosecution in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue.[255]

#### 2. *State Court Disposition*

Petitioner raised this complaint for the first time as his ninth ground for relief in his first state habeas corpus application.[256]

**256.** First State Habeas Transcript, at pp. 66–69.

The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[257] The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-urged the same arguments as his seventh claim for relief in his second state habeas corpus application.[258] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

### 3. AEDPA Review

In *Apprendi v. New Jersey, supra*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252–

53, 119 S.Ct. 1215, 1228–29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[259] *Ring v. Arizona*, 536 U.S.

---

**257.** First State Habeas Transcript, at pp. 234–35.

**258.** Second State Habeas Transcript, at pp. 380–82.

**259.** In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's

marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595–96, 122 S.Ct. at 2435–36.

at 609, 122 S.Ct. at 2443. The Supreme Court emphasized, as it had in *Apprendi*, "the dispositive question "is not one of form, but of effect": [i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439. "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439–40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359. Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.

The essential elements of the offense of capital murder, as defined by Texas law, are set forth in Sections 19.02(b) and 19.03 of the Texas Penal Code.[260] Capital murder, as so defined by Texas law, is punishable by a sentence of either life imprisonment or death.[261] Applicable Texas law does not include any of the sentencing factors included in the Texas capital sentencing special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure as "essential elements" of the offense of capital murder: "In Texas, the statutory maximum for a capital offense is death. The mitigation issue does not increase the statutory minimum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory

maximum." *Rayford v. State*, 125 S.W.3d 521, 534 (Tex.Crim.App.2003), *cert. denied*, 543 U.S. 823, 125 S.Ct. 39, 160 L.Ed.2d 35 (2004). The nature of petitioner's capital sentencing proceeding was vastly different from the sentencing proceedings the Supreme Court addressed in *Ring*.

In *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U.S. at 303–04, 124 S.Ct. at 2537. In so ruling, the Supreme Court relied upon its prior holding in *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona, supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. at 303, 124 S.Ct. at 2537. None of the foregoing legal principles were violated when petitioner's *jury* rendered its verdict during the punishment phase of petitioner's capital murder trial.

Petitioner's capital sentencing *jury* made a key factual determination at the punishment phase of petitioner's trial *beyond a reasonable doubt*; more specifically, finding a probability petitioner would

---

**260.** Tex. Pen.Code Ann. § 19.02(b) (Vernon 2003); Tex. Pen.Code Ann. § 19.03 (Vernon Supp.2010).

**261.** Tex. Pen.Code Ann. § 12.31(a) (Vernon Supp.2010).

commit criminal acts of violence that would constitute a continuing threat to society.[262] Petitioner's *jury* also determined, after taking into consideration all the evidence, including the circumstances of the offense, petitioner's character and background, and petitioner's personal moral culpability, there was insufficient mitigating circumstance to warrant a life sentence.[263] Thus, the capital sentence imposed upon petitioner pursuant to Texas law was based on jury findings, unlike the judicially-imposed sentences struck down in *Apprendi, Ring, Jones*, and *Blakely*.

Moreover, the Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function. In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman,* 476 F.3d 349, 365–67 (5th Cir.2007) (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh,* 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eli-

gible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied,* 552 U.S. 948, 128 S.Ct. 431, 169 L.Ed.2d 259 (2007).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps,* 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988) (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas,* 428 U.S. 262, 268–75, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976) (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

---

**262.** Trial Transcript, at p. 225.

**263.** Trial Transcript, at p. 226.

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring.* By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt,* petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman,* 476 F.3d at 365–67. In contrast, *Ring*'s jury made no analogous factual findings. Instead, *Ring*'s Arizona jury found beyond a reasonable doubt only that *Ring* was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's *jury* made that determination. Thus, no violation of the principles set forth in *Apprendi, Jones, Ring,* or *Blakely* occurred during petitioner's trial. Insofar as petitioner argues his jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty, that argument is foreclosed by the Supreme Court's *express* recognition the Texas capital sentencing scheme accomplishes the eligibility determination, i.e. the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial. *Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666; *Jurek v. Texas,* 428 U.S. at 270–71, 96 S.Ct. at 2956.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa,* i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh,* 548 U.S. at 174, 126 S.Ct. at 2524–25; *Sonnier v. Quarterman,* 476 F.3d at 365; *Garcia v. Thaler,* 2009 WL 4931069, *14 (W.D.Tex. December 14, 2009), *CoA denied,* 389 Fed.Appx. 396 (5th Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 1604, 179 L.Ed.2d 505 (2011). "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh,* 548 U.S. at 174, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh,* 548 U.S. at 174–75, 126 S.Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa,* 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-

defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh*, 548 U.S. at 174, 126 S.Ct. at 2525 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process.

"[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa*, 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

■■ "[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (*quoting Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*, 548 U.S. at 175, 126 S.Ct. at 2525 (*quoting Franklin v. Lynaugh*, 487 U.S. at 179, 108 S.Ct. at 2330).

As explained above, the "eligibility" decision required by the Eighth Amendment is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *Sonnier v. Quarterman*, 476 F.3d at 365–67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Apprendi* and *Ring*.

Consistent with the Supreme Court's holdings in *Kansas v. Marsh*, *Tuilaepa v. California*, and *Johnson v. Texas*, a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or miti-

gation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the *selection* phase of a capital trial.[264]

### 4. Conclusions

Neither the Supreme Court's opinion in *Apprendi* nor any of the Supreme Court's subsequent opinions construing its holding in *Apprendi* mandate imposition of a burden of proof on the prosecution with regard to the Texas capital sentencing scheme's mitigation special issue.

 The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of petitioner's complaint about the absence of a burden of proof in the Texas capital sentencing scheme's mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's seventh claim herein does not warrant federal habeas corpus relief.

### F. No Jury Instruction on Hung Jury

#### 1. The Claim

In his eighth claim herein, petitioner argues the Texas capital sentencing

scheme violates the Eighth and Fourteenth Amendment because it fails to inform a capital sentencing jury of the effect of a single holdout juror on any of the capital sentencing special issues.[265] More specifically, petitioner argues the Texas twelve/ten rule deprived him of individualized sentencing and his constitutional right to a fair and impartial jury.

#### 2. State Court Disposition

Petitioner presented these arguments for the first time as his tenth ground for relief in his first state habeas corpus application.[266] The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[267] The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza*, 2008 WL 5245545, at *1.

Petitioner re-urged the same arguments as his eighth claim for relief in his second state habeas corpus application.[268] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza*, 2011 WL 4826968, at *1.

#### 3. AEDPA Review

In a multifaceted attack, petitioner argues, in part, that the provisions of Article

---

**264.** It can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to enure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particular burden of proof on this special issue permits the jury to answer the *Penry* special issue affirmatively if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue.

**265.** Amended Petition, at pp. 135–59.

**266.** First State Habeas Transcript, at pp. 70–98.

**267.** First State Habeas Transcript, at pp. 235–36.

**268.** Second State Habeas Transcript, at pp. 382–406.

37.071, Section 2(d) violate the principles set forth in the Supreme Court's opinions in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), as well as a number of opinions addressing the capital sentencing scheme employed by the state of South Carolina. Because there is no clearly established federal legal authority mandating jury instructions advising the jury of the impact of a single holdout juror, petitioner's eighth claim herein lacks any arguable merit.

The Supreme Court has implicitly rejected petitioner's arguments underlying his eighth claim herein. *See Jones v. United States,* 527 U.S. 373, 382, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370 (1999)(holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).

On numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying petitioner's eighth claim herein, i.e., the argument a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g., Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir.2005) (holding the same arguments underlying petitioner's eighth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability), *cert. denied,* 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Alexander v. Johnson,* 211 F.3d 895, 897–98 (5th Cir. 2000) (holding the *Teague v. Lane* nonretroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott,* 51 F.3d 457, 466–67 (5th Cir.1995) (holding the same), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); *Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (5th Cir.1994) (rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding), *cert. denied,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995).

Petitioner's reliance upon the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), is misplaced. In *Caldwell,* the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, the jury was *not* the final arbiter of the defendant's fate.[269] To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). Both the Fifth Circuit and this Court have repeatedly rejected efforts identical to petitioner's to shoe-horn the Supreme Court's

---

**269.** In *Caldwell,* the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they

> know—they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi,* 472 U.S. at 325 & 329, 105 S.Ct. at 2637 & 2639.

holding in *Caldwell v. Mississippi*, into the wholly dissimilar context of a Texas capital trial. *See, e.g., Turner v. Quarterman*, 481 F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander v. Johnson*, 211 F.3d at 897 n. 5 (holding the same); *Moore v. Quarterman*, 526 F.Supp.2d 654, 729–30 (W.D.Tex.2007) (holding there is no constitutional requirement that a capital sentencing jury be informed of the consequences of a hung jury or of a single holdout juror), *CoA denied*, 534 F.3d 454 (5th Cir.2008); *Blanton v. Quarterman*, 489 F.Supp.2d 621, 644–45 (W.D.Tex.2007) (holding the same), *affirmed*, 543 F.3d 230 (5th Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Martinez v. Dretke*, 426 F.Supp.2d at 534–36 (holding the same).

Likewise, petitioner reliance upon the Supreme Court's holdings in *McKoy* and *Mills* is unpersuasive. Petitioner's argument that the Texas twelve-ten rule violates the due process principles set forth in these opinions has repeatedly been rejected by both the Fifth Circuit and this Court. *See Blue v. Thaler*, 665 F.3d 647, 669–70 (5th Cir.2011) (rejecting an Eight Amendment challenge to the Texas twelve-ten rule), *cert.* denied, —— U.S. ——, 133 S.Ct. 105, 184 L.Ed.2d 49 (2012); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir.2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir.2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S.

849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir.1996) (holding the same), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Hughes v. Johnson*, 191 F.3d 607, 628–29 (5th Cir.1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir.1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."), *cert. denied*, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995); *Bartee v. Quarterman*, 574 F.Supp.2d at 700–01 (rejecting reliance upon *Mills* and *McKoy* as bases for challenging the very different Texas capital sentencing scheme).

Because the Texas capital sentencing scheme is vastly different from those employed on Maryland and North Carolina, petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir.2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir.1996) (holding the same), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); and *Jacobs v. Scott*, 31 F.3d at 1328–29 (holding the same).

Petitioner's reliance upon a number of Supreme Court opinions from the state of

South Carolina is likewise unpersuasive. In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Supreme Court addressed capital sentencing in South Carolina and other jurisdictions which authorized capital sentencing juries to impose sentences of either death or life without the possibility of parole. *See Simmons v. South Carolina*, 512 U.S. at 168–69 & n. 8, 114 S.Ct. at 2196 & n. 8 (plurality opinion specifically explaining that, as of that date, Texas courts traditionally kept capital sentencing juries unaware of the availability of parole for those sentenced to serve terms of life imprisonment). Representing the views of three members of the Supreme Court, Justice O'Connor's concurring opinion in *Simmons* is significant because it emphasized South Carolina law provided a capital defendant faced the possibility of life without parole. *Id.*, 512 U.S. at 176–78, 114 S.Ct. at 2200–01 (concurring opinion).

The Supreme Court's subsequent opinion in *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), continued the vitality of this distinction, as the Supreme Court plurality specifically limited the holding in *Simmons* to "only those instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.*, 530 U.S. at 169, 120 S.Ct. at 2121. In her separate, pivotal, concurring, opinion in *Ramdass*, Justice O'Connor once again emphasized her view of the continued vitality of the rule in *Simmons*, as enunciated by the plurality in *Ramdass*, and also pointed out *Ramdass* came before the Supreme Court in the context of a federal habeas corpus proceeding, in which the Supreme Court's review, like this Court's review in the present cause, is circumscribed by the terms of the AEDPA. *Id.*, 530 U.S. at 179, 120 S.Ct. at 2126 (concurring opinion).

More recently, the Supreme Court's opinion in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), at least implicitly acknowledged the continued vitality of the distinction first noted in *Simmons* by holding South Carolina's new capital sentencing scheme was guilty of the same constitutional defect identified in *Simmons because,* at least under some circumstances, the sentencing jury would be faced with a choice between a sentence of death and a sentence of life without the possibility of parole. *See Shafer v. South Carolina*, 532 U.S. at 51, 121 S.Ct. at 1273 ("We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.").

In *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), the Supreme Court reiterated its holding in *Shafer*, emphasizing once again South Carolina capital sentencing juries which unanimously found the presence of an aggravating circumstances were left to select between one of only two possible sentences: death or life imprisonment without the possibility of parole. *Kelly v. South Carolina*, 534 U.S. at 252 & n. 2, 122 S.Ct. at 730 & n. 2.

While Texas has recently joined South Carolina and other jurisdictions which provide capital sentencing juries the option of sentencing a convicted capital murderer to a term of life without parole, at the time of petitioner's offense and trial, Texas law did not provide for a sentence of life imprisonment without the possibility of parole. The Supreme Court's Fourteenth Amendment jurisprudence, including *Simmons, Ramdass, Shafer*, and *Kelly,* makes an express distinction between the rule applied in *Simmons* and *Shafer* and the due

process requirements in jurisdictions such as Texas at the time of petitioner's crime and capital murder trial, where sentences of either death or life without parole were *not* the only choices facing a capital sentencing jury. The legal premise underlying this aspect of petitioner's arguments underlying his eighth claim herein ignores this critical distinction. There is simply no "clearly established" federal law, as enunciated by the United States Supreme Court, holding the Fourteenth Amendment's Due Process Clause required potential jurors at the time of petitioner's capital murder trial to be informed of the impact of a single holdout juror on any of the Texas capital sentencing special issues.

On the contrary, the Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone,* 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States,* 527 U.S. 373, 390 & n. 9, 119 S.Ct. 2090, 2102–03 & n. 9, 144 L.Ed.2d 370 (1999) (holding the same); *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 503, 142 L.Ed.2d 521 (1998) (holding the same); *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (holding the same); *Johnson v. Texas,* 509 U.S. 350, 367, 113

S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury ·interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas,* 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. at 1198. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of .the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas,* 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 381, 110 S.Ct. at 1198.

 Nothing in petitioner's punishment-phase jury charge can reasonable be construed as foreclosing the consideration by petitioner's jury of any of the potentially mitigating evidence actually presented during · petitioner's capital murder trial. None of petitioner's jurors could rationally have been led to believe by petitioner's punishment-phase jury charge that either (1) they lacked the authority· to answer either of the Texas capital special issues in a manner consistent with their conscience and the evidence regardless of the votes of other jurors or (2) their determination to

vote in a manner inconsistent with other jurors would have no legal impact. Thus, there is no reasonable likelihood any of petitioner's jurors construed their punishment phase jury instructions in a manner which prevented them from considering or giving effect to any constitutionally relevant mitigating evidence.

Likewise, nothing in petitioner's punishment-phase jury charge misled petitioner's capital sentencing jury regarding its role as the ultimate arbiter of petitioner's fate. Insofar as petitioner complains that his jury was not specifically instructed that a failure by the jury to answer either of Texas capital sentencing issue (based upon the jury's inability to reach unanimity in favor of answers favorable to the prosecution or to marshal at least ten votes for answers favorable to the defense), that argument is foreclosed by both Supreme Court and Fifth Circuit precedent recognizing there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Jones v. United States*, 527 U.S. at 382, 119 S.Ct. at 2099 (the Eighth Amendment does *not* require a capital sentencing be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir.2011)(holding an argument that a Texas capital defendant had a constitutional right to an instruction informing the jury of the impact of a hung jury barred under the non-retroactivity doctrine of *Teague v. Lane* ), *cert. denied*, —— U.S. ——, 132 S.Ct. 1550, 182 L.Ed.2d 180 (2012); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir.) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict), *cert. denied*, 551 U.S. 1193, 128 S.Ct. 34, 168 L.Ed.2d 810 (2007); *Barrientes v. Johnson*, 221 F.3d 741, 776–78 (5th Cir.2000) (holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation), *cert. denied*, 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Hughes v. Johnson*, 191 F.3d 607, 618 (5th Cir.1999) (holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their punishment-phase verdict), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *Alexander v. Johnson*, 211 F.3d 895, 897 n. 5 (5th Cir. 2000) (holding the same).

This Court has likewise repeatedly rejected the constitutional arguments underlying petitioner's eighth claim herein. *See Jasper v. Thaler*, 765 F.Supp.2d at 838–39 (there is no constitutional right to a jury instruction informing the jurors of the effect of a hung jury or a single hold-out juror); *Bartee v. Quarterman*, 574 F.Supp.2d at 702–03 (holding there is no constitutional right to have a capital sentencing jury informed of the effect of a hung jury); *Moore v. Quarterman*, 526 F.Supp.2d 654, 729–30 (W.D.Tex.2007) (holding there is no constitutional requirement that a capital sentencing jury be informed of the consequences of a hung jury or of a single holdout juror), *CoA*

*denied,* 534 F.3d 454 (5th Cir.2008); *Blanton v. Quarterman,* 489 F.Supp.2d 621, 644–45 (W.D.Tex.2007) (holding the same), *affirmed,* 543 F.3d 230 (5th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Martinez v. Dretke,* 426 F.Supp.2d at 534–36 (holding the same).

There is no arguable legal merit to any of the petitioner's constitutional arguments in support of his eighth claim in this cause. The petitioner's punishment-phase jury charge accurately informed petitioner's capital sentencing jury of their responsibility under Texas law to reach a verdict favorable to the prosecution only if they agreed unanimously on both of the Texas capital sentencing special issue and to return a verdict favorable to the defense on either of those special issue only if ten or more jurors agreed to do so. The Constitution's Eighth and Fourteenth Amendments required nothing more. Insofar as petitioner argues otherwise, his arguments herein amount to advocacy of a "new rule" of federal constitutional criminal procedure and are foreclosed by the *Teague* nonretroactivity doctrine.

### 4. *Conclusions*

Petitioner's eighth claim advocates adoption of a new rule of constitutional criminal procedure and is foreclosed by the principle announced in *Teague v. Lane.* There is no clearly established federal legal rule mandating jury instructions advising the jury of the effect of a hung jury or a single holdout juror at the punishment phase of a Texas capital trial prior to the adoption by the State of Texas of a "life without parole" sentencing option.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's first state habeas corpus proceeding of the constitutional arguments underlying petitioner's eighth claim herein was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's eighth claim herein does not warrant federal habeas corpus relief.

### G. *Unreliability of Predictions of Future Dangerousness*

### 1. *The Claim*

In his ninth and final claim herein, petitioner argues the inherent unreliability of predictions of a criminal defendant's propensity for future violent misconduct renders the Texas capital sentencing scheme's first special issue unconstitutional.[270]

### 2. *State Court Disposition*

Petitioner raised this same argument for the first time as his eleventh ground for relief in his first state habeas corpus application.[271] The state habeas trial court held petitioner procedurally defaulted on this complaint by failing to raise the same arguments on direct appeal and, alternatively, rejected the claim on the merits.[272] The Texas Court of Criminal Appeals adopted those conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Manuel Garza,* 2008 WL 5245545, at *1.

---

**270.** Amended Petition, at pp. 160–64.

**271.** First State Habeas Transcript, at pp. 99–104.

**272.** First State Habeas Transcript, at p. 236.

Petitioner re-urged the same argument as his ninth claim for relief in his second state habeas corpus application.[273] The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application based upon state writ-abuse principles. *Ex parte Manuel Garza,* 2011 WL 4826968, at *1.

### 3. *AEDPA Review*

The Supreme Court implicitly rejected the petitioner's ninth claim herein when it held as follows in *Jurek v. Texas:*

Focusing on the second statutory question that Texas requires a jury to answer in considering whether to impose a death sentence, the petitioner argues that it is impossible to predict future behavior and that the question is so vague as to be meaningless. It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

*Jurek v. Texas,* 428 U.S. at 274–76, 96 S.Ct. at 2957–58 (*Footnotes omitted*).

The Fifth Circuit has likewise at least implicitly rejected the underpinnings of the petitioner's ninth claim herein. *See Lincecum v. Collins,* 958 F.2d 1271, 1281 (5th Cir.1992): "The Supreme Court has never intimated that the factual correctness of the jury's prediction on the issue of future dangerousness, either in a particular case or over time, bears upon the constitutionality of the Texas capital sentencing statute."

This Court's independent research has disclosed no legal authority declaring the practical difficulty with predicting future violence by a criminal defendant, i.e., accurately answering the first capital sentencing special issue, renders capital sentencing as practiced in Texas inherently unconstitutional. On the contrary, given the broad scope of the Texas capital sentencing scheme's mitigation special issue, the Supreme Court's opinions discussing the nature of the Texas capital sentencing scheme suggest the Texas capital sentencing scheme's future dangerousness special issue may be constitutionally superfluous. *See Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666 (the Texas capital sentencing scheme accomplishes the eligibility determination, i.e., the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial); *Jurek v. Texas,* 428 U.S. at 270–71, 96 S.Ct. at 2956 (holding the same). "[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a

---

**273.** Second State Habeas Transcript, at pp. 407–11.

more rational and equitable administration of the death penalty.' " *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (*quoting Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*, 548 U.S. at 175, 126 S.Ct. at 2525 (*quoting Franklin v. Lynaugh*, 487 U.S. at 179, 108 S.Ct. at 2330).

Because no federal court has ever declared the Texas capital sentencing scheme's future dangerousness special issue inherently unconstitutionally unreliable, adoption of the rule advocated by petitioner in his final claim herein is a "new rule" of constitutional criminal procedure which is foreclosed by the principle announced in *Teague v. Lane, supra.*

### 4. Conclusions

Adoption of the new rule advocated by petitioner in his ninth claim herein is foreclosed by the non-retroactivity principle of *Teague v. Lane.* There is no clearly established federal legal authority precluding Texas capital sentencing juries from answering the future dangerousness special as currently configured within the Texas capital sentencing statute.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's first state habeas corpus proceeding of the arguments underlying petitioner's ninth claim herein was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings. Petitioner's

ninth claim herein does not warrant federal habeas corpus relief.

### VIII. *Request for Evidentiary Hearing*

Petitioner has requested an evidentiary hearing to develop new facts and new evidence relevant to petitioner's claims herein. Petitioner is not entitled to an evidentiary hearing to develop new facts and new evidence in support of those of his claims which the state habeas court rejected on the merits. *See Cullen v. Pinholster*, —— U.S. ——, ——, 131 S.Ct. 1388, 1398–1400, 179 L.Ed.2d 557 (2011) (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by § 2254(d)(1)); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir.2011) (holding the same), *cert. denied*, —— U.S. ——, 132 S.Ct. 1100, 181 L.Ed.2d 987 (2012). Thus, petitioner is not entitled to a federal evidentiary hearing on his first, second, and fourth through ninth claims herein.

In addition, this Court has independently reviewed petitioner's ineffective assistance complaints contained in his third claim herein and finds petitioner has failed to allege sufficient specific facts to satisfy either prong of *Strickland* analysis on any of those claims. Petitioner is not entitled to an evidentiary hearing on his *Wiggins* claim, i.e., his complaint that his trial counsel rendered ineffective assistance by failing to adequately investigate petitioner's background and present additional mitigating evidence establishing the extremely abused and deprived circumstances of petitioner's childhood. After having reviewed the entirety of petitioner's purportedly "new" mitigating evidence, this Court has concluded petitioner has alleged no facts in support of this claim which, if proved, would satisfy the either prong of *Strickland.* The remainder of petitioner's claims herein are those which, by their very na-

ture, require no new factual development, i.e., they are challenges to the state trial court's evidentiary or procedural rulings or present purely legal challenges to the Texas capital sentencing scheme. Such claims must be evaluated based upon the record as it existed at the time of trial. Further factual development of such claims at this juncture is unnecessary. Thus, petitioner is not entitled to a federal evidentiary hearing to develop new facts and new evidence supporting any of his claims herein.

### IX. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997) (holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

■■■ Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

■■■ A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282,

124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

■■■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable

jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■■■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman,* 560 F.3d 299, 304 (5th Cir.), cert. denied, 558 U.S. 993, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman,* 534 F.3d 454, 460 (5th Cir.2008); *Foster v. Quarterman,* 466 F.3d 359, 364 (5th Cir.2006); *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d 782, 787 (5th Cir.2005); *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), cert. denied, 548 U.S. 909, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller–El v. Cockrell,* 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman,* 476 F.3d at 364–69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Reasonable minds could not disagree over this Court's conclusions as to petitioner's first, second, and fourth claims herein. Petitioner failed to allege any facts showing he was harmed by the substitution of his lead trial counsel almost two months prior to the commencement of voir dire. Petitioner's second and fourth claims herein are foreclosed by state appellate and state habeas court conclusions on matters of state procedural or evidentiary law, matters committed to the province of the state courts.

This Court independently reviewed the entire record from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings and concluded petitioner's ineffective assistance complaints all fail to satisfy either prong of the *Strickland*

test. Even if it were possible to quibble over this Court's analysis of the first prong of the *Strickland* test, petitioner has alleged no facts showing he was prejudiced within the meaning of *Strickland* by any of his trial counsels' allegedly deficient performance. Petitioner's trial counsel helped select a jury which could reasonably have been believed to include multiple members who were reluctant to impose the death penalty and one who expressed an almost extreme suspicion of the police. Petitioner's capital sentencing jury was furnished with a wealth of information concerning petitioner's background, including extensive documentation concerning petitioner's juvenile justice involvement, juvenile probation records, and psychological evaluations, as well as testimony from petitioner's family members. Having carefully reviewed all of the records and trial testimony that was before petitioner's capital sentencing jury, there can be no reasonable disagreement with this Court's conclusion that there is no "new" mitigating evidence of substance included in the voluminous new records petitioner has furnished to this Court. The new affidavits from petitioner's family members submitted to the state habeas court in petitioner's first and second state habeas corpus proceedings added very little new information to the testimony of petitioner's mother, sister, and uncle given during the punishment phase of petitioner's capital murder trial. The additional documents petitioner presented to the state habeas court in his first and second state habeas corpus proceedings also contained very little truly "new" information about petitioner's background that was not contained in the voluminous Texas Youth Commission file admitted into evidence at trial as State Exhibit no. 188. The expert opinions offered during petitioner's first state habeas corpus proceeding by Dr. Rosin, Dr. Allen, and Dr. Ferrell were all readily subject to impeachment based upon their unfamiliarity with the evidence actually admitted during the punishment phase of petitioner's capital murder trial, as well as their reliance upon petitioner's self-serving descriptions of his capital offense rather than the evidence regarding same admitted during petitioner's trial. The opinions offered by Dr. Murphey and Dr. Ferrell in the latest batch of affidavits submitted by petitioner suffer from the same defects as well as their inability to definitively diagnose petitioner with Fetal Alcohol Syndrome. Had Dr. Ferrell, Dr. Rosin, Dr. Allen, and Dr. Murphey testified at the punishment phase of trial in a manner consistent with the affidavits (and testimony) they furnished the state habeas court, there is no reasonable basis to believe the outcome of the punishment phase of petitioner's capital murder trial would have been any different. Suggestions that petitioner might suffer from Fetal Alcohol Syndrome would have opened the door to the prosecution's presentation of psychological evidence showing that persons suffering from such maladies are incapable of experiencing or displaying remorse for their criminal misconduct, incapable of learning from their mistakes, and unlikely to grow out of their tendency toward violent conduct. In sum, evidence petitioner suffers from Fetal Alcohol Syndrome would have been double-edged in nature, i.e., while potentially diminishing petitioner's moral culpability, it would most definitely have increased the likelihood of a prosecution-friendly answer to the future dangerousness special issue. Given (1) the documented, extensive, violent, nature of petitioner's criminal history, (2) the conflicting evidence showing petitioner ever expressed remorse for his murder of officer Riojas, (3) petitioner's failure to take the stand at his trial and express remorse for any of his criminal

misconduct, (4) the undisputed fact petitioner was trained by members of his own family (themselves almost all convicted criminals) to commit crimes, and (5) petitioner's early onset drug abuse, sexual activity, and gang involvement, reasonable minds could not disagree with this Court's analysis of the prejudice prong of *Strickland* with regard to petitioner's *Wiggins* claim.

There can be no disagreement among reasonable persons with this Court's conclusion that petitioner's last two ineffective assistance claims are foreclosed by state appellate or state habeas court decisions construing applicable state procedural or evidentiary rules as forbidding the very actions petitioner complains his trial counsel failed to accomplish at trial. Petitioner's trial counsel cannot be faulted for failing to do the impossible. *United States v. Cronic,* 466 U.S. at 656 n. 19, 104 S.Ct. at 2045 n. 19.

Petitioner's fifth through ninth claims herein are all challenges to the Texas capital sentencing scheme which have repeatedly been either (1) implicitly rejected by the Supreme Court (through repeated denials of certiorari review following denials of CoA by the Fifth Circuit), (2) expressly rejected by both the Fifth Circuit and this Court in published opinions, or (3) both. None of these claims deserve encouragement to proceed further. For the foregoing reasons, this Court concludes petitioner is not entitled to a Certificate of Appealability with regard to any of his claims herein. *See Blue v. Thaler,* 665 F.3d at 662–70 (rejecting a CoA for many of the same constitutional challenges petitioner presents herein to the Texas capital sentencing scheme).

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's amended federal habeas corpus petition, filed January 26, 2012, docket entry no. 29, is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3. Petitioner's request for an evidentiary hearing is **DENIED.**

4. All other pending motions are **DISMISSED AS MOOT.**

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.